UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DR. JENNIFER LYNN GLASS,
DR. LISA MOORE, and
DR. MIA CARTER,
*Plaintiffs*,

**v.**

KEN PAXTON, in his official capacity as Attorney General of Texas, GREGORY L. FENVES, in his official capacity as President, University of Texas at Austin, and PAUL L. FOSTER, R. STEVEN HICKS, JEFFERY D. HILDEBRAND, ERNEST ALISEDA, DAVID J. BECK, ALEX M. CRANBERG, WALLACE L. HALL, JR., BRENDA PEJOVICH, SARA MARTINEZ TUCKER, AND VARUN P. JOSEPH, in their official capacities as members of the University of Texas Board of Regents,
*Defendants*.

No. 1:16-cv-845

**COMPLAINT**

**Preamble: Nature of action**

1. In a cruel irony, the Texas Legislature has mandated that fifty years to the day after one of the worst gun-related massacres ever on a college campus—when Charles Whitman gunned down forty-three people on or about the campus of the University of Texas in Austin—UT-Austin must begin allowing the concealed carrying of handguns on campus and in classrooms. Worried about much more than cruel irony, the three plaintiff professors seek to at least retain the option of maintaining their academic classrooms as gun-free zones when classes start again on August 24, 2016. They request a federal injunction, based on rights asserted under the United States Constitution's First, Second, and Fourteenth

Amendments, against having the state compel that their classrooms be the locus of implementation of the overly-solicitous, dangerously-experimental gun policies of the Texas Legislature and the insufficiently protective policies of UT-Austin's President.

**Jurisdiction and venue**

2. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. §§ 1983 and 1988. This matter arises under the First, Second, and Fourteenth Amendments to the United States Constitution and is asserted through 42 U.S.C. § 1983.

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 124(d)(1) and 1391(b)(1). All the defendants have their official place of business with respect to the matters in question in Austin, Texas, Travis County.

**Parties**

***Plaintiffs***

4. Plaintiff Jennifer Lynn Glass is a resident of Austin, Texas, in Travis County, and is the Barbara Bush Professor of Liberal Arts, the University of Texas at Austin.

5. Plaintiff Lisa Moore is a resident of Austin, Texas, in Travis County, and will be the Archibald T. Hill Professor of English and Women's and Gender Studies, the University of Texas at Austin.

6. Plaintiff Mia Carter is a resident of Austin, Texas, in Travis County, and is a University Distinguished Teaching Associate Professor, University of Texas at Austin, and a University of Texas System Regents' Outstanding Teacher.

***Defendants***

7. Defendant Ken Paxton is the Attorney General of Texas. He is sued in his official capacity only.

8. Defendant Gregory L. Fenves is the President of the University of Texas at Austin. He is sued in his official capacity only.

9. Defendants Paul L. Foster, Jr., R. Steven Hicks, Jeffery D. Hildebrand, Ernest Aliseda, David J. Beck, Alex M. Cranberg, Wallace L. Hall, Jr., Brenda Pejovich, Sara Martinez Tucker, and Varun P. Joseph are the members of the Board of Regents of the University of Texas. They are sued in their official capacities only.

**Factual allegations**

10. Generally speaking, Texas law authorizes individuals who venture beyond the confines of their home to carry concealed on their persons one or more loaded handguns. The authorization extends not only to residents, but to visiting residents of other states, resident aliens, and some nonimmigrant aliens. For in-state persons, the state issues licenses called Concealed Handgun Licenses, often referred to simply as "concealed carry" permits. Through reciprocity and unilateral gubernatorial fiat, persons from other states are allowed to concealed carry without obtaining permits from the State of Texas.

11. The basic rules for concealed carry permits are in subchapter H of Chapter 411 of the Texas Government Code. Administered by the Texas Department of Public Safety ("DPS"), the program allows those who have received some training by private licensed instructors to pay $140 and receive a concealed carry permit. The initial permit is good for four years and may be renewed every five years for $70, without evidence of proficiency or training.

12. DPS reports that, at the end of 2015, there were nearly a million concealed carry permits in Texas. This is an increase of more than 800% in just twenty years. Only 880 permits were revoked in 2015. In 2015 alone, nearly 218,000 people applied for such permits; less than half of a percent of the applications were denied.

13. DPS also reports that there now are about 3,500 licensed private handgun instructors. Only one of these licenses was revoked in 2015.

14. DPS approves all original concealed carry permit applications in less than 60 days. The Texas Legislature regularly fails to provide DPS sufficient resources to regulate gun possession and training in Texas.

15. Making matters worse, Texas has reciprocity agreements with 31 other states, meaning that it accepts concealed carry licenses issued by those states. For another 12 states, Texas accepts their concealed carry licenses through gubernatorial directive, without any reciprocity agreement. These reciprocity agreements can be, and are, used to circumvent Texas training requirements. For example, a person can complete a Texas training program of dubious rigor to obtain a license in a state such as Florida, then use reciprocity to legally concealed carry in Texas. *See* J. Eisenbaum, "Concealed handgun licensing class provides little training, issues out of state applications," *Click2Houston.com* (Feb. 29, 2016) (available http://www.click2houston.com/news/investigates/concealed-handgun-licensing-class-provides-little-training-issues-out-of-state-applications). Or a person may take a short "multistate" course in another state such as Virginia and, even though the training lacks a "live fire" component, receive a concealed carry permit from Utah, then using reciprocity, concealed carry in Texas. *See* E. Osnos, "Making A Killing," *The New Yorker* (June 27, 2016), at 39.

16. Handgun regulation in Texas and nationwide is notoriously weak and inefficient, with gaping loopholes and outright voids. The consequence is that, in Texas, the carrying of handguns is not "well-regulated" within the meaning of the Second Amendment because there has not been the imposition of proper discipline and training.

17. In 2015, more than twenty shootings occurred on college campuses across the country. In recent times, college campuses have seen horrific scenes of gun violence directed at students, staff, and faculty. Fifty years ago, on August 1, 1966, the UT-Austin campus itself was the scene of one of the most notorious of these gun-centered events, when Charles Whitman killed 14 people and wounded more than a score of others. Less than a decade ago, in another campus outbreak of gun violence, a student at Virginia Tech killed 32 and wounded 17 others in Blacksburg, Virginia. Most of the shooting and killing was in a college classroom.

18. Historically, institutions of higher education in Texas were not compelled to allow carrying of concealed handguns on campus. Texas law, in fact, made the carrying of concealed deadly weapons, including pistols, a crime. A century and a half ago, the Supreme Court of Texas upheld a concealed carry ban against state and federal constitutional challenges, describing concealed carry as a "pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung" and finding it "little short of ridiculous that any one should claim the right to carry upon his person any of the mischievous devices" barred by the statute into such places as a "lecture room." *English v. State*, 35 Tex. 473, 474, 476 (Tex. 1871). The Governor of Texas declared in his 1893 message to the legislature that "the practice of carrying concealed deadly weapons marks the unmanly spirit and cowardice of those who indulge in it. . . . Intent to murder, and not the spirit of self-protection, lies in the heart of most men when they deliberately violate this law, and no quarter should be extended them in application of severe penalties."

19. However, in 2015, the Texas Legislature abandoned the state's long history of concern for the damage that can be wrought by deadly weaponry. In its 84th Regular Session, the Texas Legislature enacted Senate Bills 11 and 273. The Governor signed them into law on June 13, 2015, and June 16, 2015, respectively. Senate Bill 11 established new state rules for carrying handguns on Texas college campuses. Senate Bill 273 established new rules limiting the authority of Texas agencies and political subdivisions to regulate carrying handguns at their facilities.

20. The 2015 actions of the Texas Legislature and Governor now allow a person with a Texas concealed carry permit, or a similar permit from one of 43 other states, to carry concealed handguns on higher education campuses in the state, leaving Texas higher education institutions largely powerless to prevent it. *See* Tex. Gov't Code § 411.2031(b), (c); *see also* Tex. Pen. Code § 46.03(a)(1)(B) (concealed carry in a public university classroom no longer a *criminal* offense).

21. The 2015 legislation did include specific exceptions to its new requirements compelling campus carry. Most significantly, private or independent institutions of higher education ("private colleges") are authorized to bar concealed carry on their campuses. *See* Tex. Gov't Code § 411.2031(e). Numerous private colleges in the state, including Baylor University and Trinity University, have invoked the private college exception and barred concealed carry on their campuses.

22. Another exception to the general campus carry mandate in the 2015 legislation is codified in subsection (d-1) of Section 411.2031 of the Government Code. This subsection allows the presidents of private and public colleges in the state to establish "reasonable" rules and regulations regarding concealed carry on the campus, including its premises. The subsection includes

general limitations to the exception. But college presidents invoking the exception by instituting campus-specific policies could not include provisions that "generally prohibit" campus carry.

23. Beyond outlawing a "general prohibition," however, nothing in the 2015 legislation directly addresses specific regulation of concealed handguns in individual classrooms themselves. *See* Tex. Att'y Gen. Op. KP-51 (2015), at 1.

24. Also, nothing in the 2015 amendments addresses how the amendments are to be reconciled with a 1997-enacted provision codified in Chapter 411 which provides that the subchapter in which it appears—the same sub-chapter in which § 411.2031 is codified—"does not prevent or otherwise limit the right of a public . . . employer" to prohibit those with concealed carry permits from carrying a concealed handgun in buildings or portions of buildings on campus. *See* Tex. Gov't Code § 411.203. The 2015 Texas Legislature carried forward this provision, unchanged but for deletion of the word "concealed," in Section 27 of its "open carry" bill, House Bill 910. The Attorney General has opined, in an opinion that does not bind this or other courts, that individual campus presidents may not delegate to individual professors the authority to make concealed carry decisions. Tex. Att'y Gen. Op. KP-51, *supra*, at 2-3. His opinion did not address whether individual professors *retained* such authority.

25. Under Section 8(b) of Senate Bill 11, the President of the University of Texas at Austin had until August 1, 2016, to adopt the policies authorized by subsection (d-1) of § 411.0231. He adopted policies for the UT-Austin campus, forwarding them to the Chancellor of the UT System on February 17, 2016.

26. In his transmittal, the UT-Austin President concedes—and even seems to insist—that the presence of handguns on the UT-Austin campus is contrary to the very foundations of the

university mission: free speech, inquiry, and debate. *See* Letter of G. Fenves to W. McRaven, Feb. 17, 2016, at 1 (1st para.).

27. The UT System Board of Regents had until May 18, 2016 to "review" the UT-Austin President's policies. *See* Tex. Gov't Code § 411.2013(d-2) (1st sent.). The Board of Regents met by then, but took no action concerning the policies. The Board of Regents may modify the UT-Austin President's policies but, under the second sentence of subsection (d-2), only by at least a two-thirds vote within the 90-day period established in subsection (d-2)'s first sentence. Consequently, the Board of Regents has acquiesced, and the UT-Austin President's campus carry policies are operative and will take effect August 1, 2016, when, under Section 8(a) of Senate Bill 11, the state's new campus carry laws take effect. Although the Board of Regents is scheduled to meet again on July 13, 2016—before UT's campus carry policies take effect—it is not possible to say whether the Board will review those policies for possible modification, whether under Tex. Gov't Code § 411.2013(d-2) it still has legal authorization to modify them, or whether the necessary two-thirds vote could be mustered in any event.

28. The UT campus carry policies do not directly address the question of whether individual professors may prohibit the concealed carrying of handguns in their own classrooms. They do provide, repeatedly as to specific policies, that they do "not have the effect of *generally* prohibiting [concealed carry] on campus." (emphasis added).

29. Nor do the policies invoke the permission in Section 411.203 to prohibit concealed handguns in such things as campus classrooms. Without explanation, UT-Austin's President appears to have foresworn invocation of his authority under this pre-existing, but extant, provision.

30. The UT-Austin policies do specifically bar concealed carry in numerous places and situations on campus. Among the places where concealed handguns are prohibited are: (i) solo

faculty offices; (ii) on-campus residence halls (with some exceptions); (iii) especially sensitive areas where materials present dangers if a gun discharges; (iv) ticketed sporting events, plus any other sporting or interscholastic events; (v) building locations where alcohol is sold; (vi) patient-care areas; (vii) areas where minors are with university counselors, staff, or volunteers; (viii) places where formal hearings for student or faculty discipline are being conducted; (ix) places where court proceedings are being conducted or court personnel are in offices; and (x) animal research facilities.

31. Texas law also allows prohibition of concealed carrying of handguns in numerous other locations, including: (i) private businesses where more than half their revenue is from sales of on-premises alcohol consumption; (ii) high school or professional sporting events and interscholastic events; (iii) correctional facilities; (iv) hospitals or nursing homes; (v) amusement parks; (vi) churches, synagogues, or other places of worship; (vii) meetings of government entities; (viii) physical premises of schools and on school buses; (ix) premises of government courts or court offices; (x) racetracks; and (xi) airport secured areas.

32. Enforcement of the new 2015 legislation broadly opening UT-Austin generally, and Plaintiffs specifically, to daily encounters with those carrying concealed handguns—the law does not limit concealed carry to merely *one* handgun per permit holder—rests in at least two sets of hands. UT-Austin's President is authorized to enforce campus policies and rules including the imposition of various forms of discipline on campus faculty transgressing campus rules and policies. As a result of Senate Bill 273, the Attorney General of Texas also has enforcement responsibilities in this area. Texas citizens and those with concealed carry permits are allowed to file complaints with the Attorney General that a state agency—which presumably includes UT-Austin—is violating state law concerning the posting of signs barring concealed handguns from

government premises. Tex. Gov't Code § 411.209(d). Section 411.209 then gives the Attorney General investigative and enforcement power with respect to issues raised in such complaints; he may even seek imposition of civil monetary penalties on violating agencies.

33. Compelling professors at a public university to allow, without any limitation or restriction, students to carry concealed guns in their classrooms chills their First Amendment rights to academic freedom. "[T]he intellectual give and take of campus debate" is entitled to protection under the First Amendment. *Healy v. James*, 408 U.S. 169, 181-82 (1972). Academic freedom is "a special concern of the First Amendment," and the "robust exchange of ideas" is critical to such academic freedom. *Keyishian v. Bd. of Regents of Univ. of State of New York*, 385 U.S. 589, 603 (1967). Furthermore, the U.S. Supreme Court's seminal cases on academic freedom have recognized that constitutional academic freedom comprises an individual right, in addition to an institutional right. *See Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (holding that restrictions on the contents of a lecturer's lesson "unquestionably was an invasion of petitioner's liberties in the areas of academic freedom and political expression"); *Keyishian*, 385 U.S. at 604 (warning against the "chilling effect upon the exercise of vital first amendment rights [that] must be guarded against by sensitive tools which clearly inform teacher what is being proscribed"); *see also* David M. Rabban, *A Functional Analysis of "Individual" and "Institutional" Academic Freedom Under the First Amendment*, 53 LAW & CONTEMP. PROBS. 227, 280 (1990) (UT-Austin law professor arguing that institutional and individual academic freedom are both potentially recognized by the U.S. Supreme Court).

34. Plaintiffs are committed to the principle of academic freedom and the free and robust expression of ideas that is part and parcel of it. As part of the learning process, they sometimes have to engage in difficult discussions of controversial, emotionally-laden topics. It is inevitable

that they will have to pull back, consciously or sub-consciously, at important junctures in classroom exposition and discussion. Licensees' anonymity is protected by Texas law, so a professor cannot anticipate whether any particular student has the present wherewithal for violent classroom action with a gun. But robust academic debate in the classroom inevitably will be dampened to some degree by the fear that it could expose other students or themselves to gun violence by the professor's awareness that one or more students has one or more handguns hidden but at the ready if the gun owner is moved to anger and impulsive action.

35. Professor Glass has specific concerns about her safety, and the safety of her students, as a result of the current concealed carry rules and her inability to bar concealed carry in her classroom. Among the courses she teaches is one on fertility and reproduction which includes classroom discussion on such currently volatile topics as abortion and unwanted pregnancies. Her teaching approach tries to generate debate. The possible presence of hidden weapons that can quickly deal death threatens to chill Professor Glass's manner of teaching, a threat that is heightened by the fact that, since seniors have first registration rights for the class, the percentage of the class made up of those eligible for concealed carry permits is increased—and with it, the threat level. She has witnessed in her own classroom a verbally aggressive student, disappointed in a grade handed out during class, displaying a level of animosity and aggressiveness toward Professor Glass's teaching assistant that, had the current concealed carry rule been in place, would have left her hesitant to confront the student in defense of her teaching assistant and urge a reasoned discussion of the matter at hand.

36. Professor Moore has specific concerns about her safety, and the safety of her students, as a result of the current concealed carry rules and her inability to bar concealed carry in her classroom. One of Professor Moore's courses is an upper-division class entitled "LGBT Litera-

ture and Culture." Prejudices against those who are part of the LGBT community has sometimes made the class a target of hate. For example, in the past, a student announced on the first day of class that she was enrolled to monitor and report on Professor Moore's "homosexual agenda." Ensuing classroom discussion and participation was dampened, and Professor Moore's concern is that the dampening would have been even more pronounced if the possibility existed that the student "monitor," or, for that matter, some other student had been carrying a loaded gun. After the 2007 classroom killings at Virginia Tech, the same kind of problem cropped up again, with a student making increasingly troubling statements, and taking personally intrusive steps, toward the professor and his co-students, to the point that seemed personally threatening. Debate again was dampened, with some even dropping the class. The possibility of guns in the classroom would only have exacerbated the deleterious effect on academic discussion and freedom for those in the class.

37. Professor Carter has specific concerns about her safety, and the safety of her students, as a result of the current concealed carry rules and her inability to bar concealed carry in her classroom. Her pedagogic approach emphasizes dialogue and debate and the critical examination of one's own ideas and others' beliefs. Professor Carter teaches courses in modern and contemporary cultures, both of which include controversial topics such as imperialism and power structures related to sexuality and gender. Engendering a community of trust is crucial for the classroom to work as it should. The potential of having a student carrying a weapon in the classroom would jeopardize the community of trust and be destructive to the dynamic educational process. Further exacerbating this situation would be the presence of students with mental health issues, a situation that the professor has encountered in the past. She has been threatened, and so

have other students. All this would be made even worse were guns allowed into the classroom, with the consequence that classroom debate would be chilled to a greater degree.

38. The defendant state officials cannot demonstrate a compelling governmental need to infringe on Plaintiffs' First Amendment rights through the current policies for concealed carry in UT-Austin classrooms.

39. Plaintiffs also are concerned that their own right of self-defense—not based on possession or use of deadly weaponry but, rather, based on its exclusion from places that the Supreme Court has recognized are especially sensitive to such concerns—is being infringed. They are being forced to allow handguns in their classroom even though regulation of handgun possession and use is notoriously lax and inefficient. The Second Amendment is not a one-way street. It starts with the proposition that a "*well-regulated* militia," (emphasis added), is necessary to the security of a free state. The Supreme Court has explained that "well-regulated" means "imposition of proper discipline and training." *District of Columbia v. Heller*, 554 U.S. 570, 597 (2008). Post-*Heller*, the Fifth Circuit recognized that "gun use and gun control have been inextricably intertwined," and that, consequently, "an expectation of sensible gun safety regulation was woven into the tapestry of the [Second Amendment] guarantee." *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 200 (5th Cir. 2012).

40. To the extent that the state officials have imposed on Plaintiffs an obligation to allow concealed handguns as a matter of course in their classrooms, they have done so in a way that introduces a disabling imbalance in the allocation of rights under the Second Amendment. There are a million permittees in Texas right now. There are about 3,500 instruction programs for the training of those licensees, and there is essentially no way of telling if even the modest number of those permitted to train are sufficiently monitored by the DPS to ensure that training in hand-

gun use and safety is adequate or inadequate for constitutional purposes. Making matters even worse is the fact that reciprocity and unilateral gubernatorial proclamations open the door to people from 43 other states to come into Texas, and possibly Plaintiffs' classrooms, with no meaningful regulation concerning their possession and use of handguns.

41. Plaintiffs have a constitutional right to protection under the "well-regulated" component of the Second Amendment. If the state is to force them to admit guns into their classrooms, then the officials responsible for the compulsory policy must establish that there is a substantial reason for the policy and that their regulation of the concealed carrying of handguns on college campuses is "well-regulated." Current facts indicate that they cannot do so.

42. Plaintiffs have a right under the Fourteenth Amendment to equal protection of the laws. The current system in Texas for campus carry fails to afford them this right insofar as it forces them to permit concealed carry in their classrooms. Outlined above in ¶¶ 30-31 are the numerous places and situations in which current Texas law authorizes both public and private entities to bar concealed carrying of handguns on their premises and campuses. Private colleges may, and in droves have, opted out of allowing concealed carry on their campuses. Beer joints may, and have, barred concealed carry on their premises. Amusement parks, college and high school football stadiums, hospitals, churches—all these may, and have, opted to bar concealed handguns at their facilities. Even on the UT-Austin campus, faculty offices, residence halls, and animal research facilities are explicitly made off-limits to concealed carry of handguns. Yet, for no apparent reason, Plaintiffs' classrooms are treated in exactly the opposite way: they may *not* exclude concealed carrying of handguns.

43. The state officials have a constitutional obligation to show that there is a rational basis for the dividing lines it has established for where concealed carry *must* be permitted and where it

may be prohibited. And then it must show that there is a logical connection between whatever that rational basis may be and the lines actually drawn. This the state officials cannot do and, therefore, their rules violate the equal protection rights of Plaintiffs.

44. There is a constitutional right under the Fourteenth Amendment's Due Process Clause not to be subjected to civil punishment based on laws and policies that are too vague to admit of consistent and coherent application. State officials, particularly the Attorney General, have concluded that those in Plaintiffs' situation are subject to punishment and penalties if they act individually to prohibit concealed carry in their classrooms, yet those officials have failed to produce or identify a single specific statutory provision or rule that bars such an individual action. The Attorney General himself admits in a formal opinion that there is no such provision or rule. This situation effectively freezes Plaintiffs in taking the action they wish to take by threatening to impose official sanctions while failing to identify or specify the rule that prohibits such action. This violates the due process rights of Plaintiffs.

**Legal claims**

***Count 1 (First Amendment)***

45. Paragraphs 1-44 are incorporated.

46. The Texas statutes and university policies that prohibit Plaintiffs from exercising their individual option to forbid handguns in their classrooms violate the First Amendment to the United States Constitution, as applied in Texas through the Due Process Clause of the Fourteenth Amendment. These policies and procedures chill the professors' exercise of their rights to academic freedom, and have been adopted in the absence of a compelling justification and without establishing any necessary link between their objectives and the means chosen to achieve them.

***Count 2 (Second Amendment)***

47. Paragraphs 1-44 are incorporated.

48. The Texas statutes and university policies that prohibit Plaintiffs from exercising their individual option to forbid handguns in their classrooms violate the Second Amendment to the United States Constitution, as applied in Texas through the Due Process Clause of the Fourteenth Amendment. These policies and procedures deprive Plaintiffs of their Second Amendment right to defend themselves and others in their classrooms from handgun violence by compelling them as public employees to passively acquiesce in the presence of loaded weaponry in their place of public employment without the individual possession and use of such weaponry in public being well-regulated. This infringement lacks any important justification and is imposed without any substantial link between the objectives of the policies and the means chosen to achieve them.

***Count 3 (Equal Protection)***

49. Paragraphs 1-44 are incorporated.

50. The Texas statutes and university policies that prohibit Plaintiffs from exercising their individual option to forbid handguns in their classrooms violates their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. There is no rational basis for the division in the state's policies between where concealed carry of handguns is permitted and where it may be prohibited.

***Count 4 (Due Process–Void for Vagueness)***

51. Paragraphs 1-44 are incorporated.

52. The Texas statutes and university policies that prohibit Plaintiffs from exercising their individual option to forbid handguns in their classrooms violates their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Plaintiffs are

threatened with possible adverse employment sanctions for violating state and university policies that draw impermissibly vague and uncertain lines about an individual professor's exercise of control over the classroom by exercising the option of banning guns in that professor's own classroom.

**Prayer for Relief**

53. Based upon the foregoing matters, Plaintiffs respectfully request that this Court grant them the following relief:

a. assume jurisdiction over this action;

b. issue a preliminary injunction before the start of Fall Semester classes on August 24, 2016, prohibiting any state statute, rule, regulation, or policy from taking effect which would compel Plaintiffs to allow the concealed carrying of handguns in their classrooms or which would authorize imposition of sanctions of any sort as to Plaintiffs if they bar the carrying of concealed handguns in their classrooms;

c. issue a declaratory judgment that any state statute, rule, regulation, or policy which would compel Plaintiffs to allow the concealed carrying of handguns in their classrooms or which would authorize imposition of sanctions of any sort as to Plaintiffs if they bar the carrying of concealed handguns in their classrooms would violate the First Amendment, the Second Amendment, the Due Process Clause of the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

d. issue a mandatory injunction permanently prohibiting any state statute, rule, regulation, or policy compelling Plaintiffs to allow the concealed carrying of handguns in their classrooms or authorizing imposition of sanctions of any sort as to Plaintiffs if they bar the carrying of concealed handguns in their classrooms;

e. under 28 U.S.C. § 1920, 42 U.S.C. § 1988(b), and Fed. R. Civ. Proc. 54(d), award Plaintiffs their reasonable attorney fees, litigation expenses, and costs incurred in bringing and prosecuting this action; and

f. grant Plaintiffs such other and further relief as may be necessary, appropriate, and equitable.

Respectfully submitted,

GEORGE, BROTHERS, KINCAID & HORTON LLP

By: *__/s/ R. James George, Jr.__*
R. James George, Jr.
State Bar No. 07810000
114 West 7th Street, Suite 1100
Austin, Texas 78701
(512) 495-1400
(512) 499-0094 *facsimile*
rjgeorge@gbkh.com

GREENSTEIN & KOLKER

By: __/s/ *Malcolm Greenstein*__
Malcolm Greenstein
State Bar No.08403300
1006 E. Cesar Chavez Street
Austin, Texas 78702
Telephone: (512) 472-6270
Facsimile: (512) 472-8263
malcolm@greensteinandkolker.com

LAW OFFICE OF MAX RENEA HICKS

By: *__/s/ Renea Hicks__*
Renea Hicks
Texas Bar No. 09580400
101 West 6th Street, Suite 504
Austin, Texas 78701
(512) 480-8231
fax (512) 480-9105
rhicks@renea-hicks.com

ATTORNEYS FOR PLAINTIFFS