UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DR. JENNIFER LYNN GLASS, <br> DR. LISA MOORE, and <br> DR. MIA CARTER, <br>     *Plaintiffs*, <br> <br> **v.** <br> <br> KEN PAXTON, in his official <br> capacity as Attorney General of Texas, <br> GREGORY L. FENVES, in his official <br> capacity as President, University of <br> Texas at Austin, and <br> PAUL L. FOSTER, R. STEVEN HICKS, <br> JEFFERY D. HILDEBRAND, ERNEST <br> ALISEDA, DAVID J. BECK, ALEX M. <br> CRANBERG, WALLACE L. HALL, JR., <br> BRENDA PEJOVICH, SARA MARTINEZ <br> TUCKER, AND VARUN P. JOSEPH, in their <br> official capacities as members of the <br> University of Texas Board of Regents, <br>     *Defendants*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | No. 1:16-cv-845-LY |

DECLARATION OF DR. JENNIFER LYNN GLASS

I, Dr. Jennifer Lynn Glass, do declare,

1.     My name is Jennifer L. Glass. I am a plaintiff in this case.

2.     I received my Ph.D. from the University of Wisconsin in 1983. I was employed as a faculty member at the University of Southern California from 1983-85, the University of Notre Dame from 1985-94, and the University of Iowa from 1994-2012 until I took my present position at the University of Texas at Austin. I am a quantitative demographer, specializing in labor force demography. I ordinarily teach graduate statistics classes, as well as undergraduate classes on gender stratification & inequality, and work-family issues.

3.     I am currently the Barbara Bush Regents Professor of Liberal Arts in the Department of Sociology and Population Research Center at the University of Texas-Austin. I have held this position as a tenured faculty member since January of 2012. I originally received academic tenure at the University of Notre Dame in 1989, and became a full professor at the University of Iowa in 1996.

4.     I am not teaching in the 2016 summer session at UT-Austin.   In  the  fall semester of 2016, I will be teaching a required graduate statistics course for our Ph.D. program in sociology entitled Social Statistics: Basic Concepts and Methods. The class will have 15 to 20 students, all over 21 and many facing their first required math course in years. A failing grade carries drastic consequences, including possible loss of graduate school stipend funding and removal from the Ph.D. program.

5. In the spring semester of 2017, I will be teaching a large undergraduate lecture course to over 100 students entitled  Fertility and Reproduction. Since seniors register for classes before other underclassmen, at least one quarter of the class consists of graduating seniors, most of whom would be over 21 years old.

6.     I have a solo faculty office; my office hours vary each semester but are typically Wednesdays from 12 to 2 p.m. and by appointment.

7.     I am Principal Investigator on two National Science Foundation Grants, employ six  graduate students on my research team, serve as a faculty mentor for other graduate students in the Population Research Center. Weekly team meetings are held on the second floor in the PRC seminar room of the CLA building. Weekly PRC-wide colloquium runs from 12-1 p.m. Fridays on the first floor of the CLA building. I am the Executive Director of the Council on Contemporary Families, a non-profit research dissemination organization in the PRC, as well as a member of several departmental and university committees, including the Provost's Gender Equity Committee.  Meetings for these groups and committees are held all over campus in seminar rooms and classrooms, mostly in the CLA, MAIN, and Gebauer buildings.

8.     My undergraduate course syllabus details class policies concerning disruptive behavior in class, cheating on graded materials, and required attendance/class participation. I also announce these policies verbally on the first day of class.

9.     The Fall semester of 2016 will be the first time in my career that I am compelled to accept concealed handguns in my classroom. I find this horrifying and dismaying. This was not one of the conditions of employment that I agreed to when I joined UT and moved my tenure from the University of Iowa in 2012.  I want to retain the option as a tenured faculty member at an institution of higher education to exclude guns from the classrooms in which I teach, and would in fact exclude them as a matter of policy if allowed to do so.

10.    I do agree with the part in President Fenves's transmittal letter where he concluded that forcing guns onto campus, which extends to all classrooms irrespective of individual faculty's classroom policies, inhibits free speech and the open expression of sincerely held beliefs.

11.     The Provost's instruction in her July 14, 2016 email to faculty is the first official UT-Austin statement that I have seen that prevents individual exercise of the gun-exclusion option. That instruction also includes a warning that syllabi cannot discourage students from bringing concealed handguns into the classroom. This is new and represents a worrisome suppression of professors' free speech on the course syllabus.

12.    Based on the Provost's instructions, I fear that either attempting to discourage concealed handguns in my classroom or openly prohibiting them from my classes would expose me to adverse consequences and actions from the University in connection with my faculty position.

13.    I do not understand why it is acceptable to exclude guns from some campus locations such as labs, athletic stadiums, and rooms where minor children are present but not from classrooms. My undergraduate class requires students to participate in class discussions for 10% of their grade. They must write opinion essays on controversial topics for another 30% of their grade. The contentious and highly charged nature of the topics discussed (abortion, LGBT assisted reproduction,

gestational surrogacy, racial disparities in infant and maternal mortality) have already led to gun violence in other locations, including medical clinics, nightclubs, and other public spaces. My classroom is at least as worthy of gun exclusion, if not more so, as these other spaces on campus that do not routinely generate heated conversations on controversial issues.

14.   I also do not understand the disparate treatment of public institutions of higher education. No private universities in Texas that I know of allow concealed carry of handguns on their campuses, and the legislature specifically allowed them, but not public universities, to ban firearms on campus. I am unaware of any justification that was offered for this unequal treatment.

15.   In my experience, two subjects, more than any others, have elicited strong emotional reactions from my students: abortion and welfare state tax policies. Many religiously conservative students have extreme views on these subjects, and a few have voiced their opinion in my class that the murder of abortion providers or advocates is a "service" to the unborn and morally justified. In annual evaluations, I sometimes receive anonymous diatribes about the immorality of the class treatment of abortion as a public health issue, and my culpability in allowing anything other than condemnation of abortion in my classroom. I have seen classroom discussions about abortion, racism in health care, and LGBT families become heated, and require my constant supervision to ensure that discourse remains civil and based in logic and reason. I have also learned that tax policies elicit strong views from libertarian students who dislike any support services for parents of minor children. Most of the openly libertarian students in my undergraduate classes are male and overtly hostile to women's rights. I do not have specific knowledge , but I strongly suspect that they are more likely to own guns given their distaste for government and law enforcement.

16. I am also worried about the evaluative stress that students face, especially older graduate students, and the hostile encounters I have experienced with these students over grades and course requirements. Two years ago, a diehard libertarian student got into a shouting match with my teaching assistant over his assigned essay grade. He verbally intimidated her and physically closed in on the much smaller teaching

assistant until I intervened to de-escalate the situation. I shudder to think what might have happened had that student had a concealed handgun.

17.   Most people do not understand either the context of a modern University classroom or the duties of a tenured full professor at my career stage. The classroom environment increasingly consists of large numbers of anonymous students who do not know each other or me. I will not know more than a handful of them by name by the end of the semester, and will not see most of them again after they have completed my class. Yet many will be dependent on the grade I assign, or the letter of recommendation that I do or do not provide, for crucial life-changing outcomes – getting a job, getting or keeping a scholarship or fellowship, getting into a professional degree program, staying in good standing in their major, even graduating with a degree at all. The power imbalance is substantial and often feels life-threatening to students. This then gets combined with student privacy rights that prevent me from knowing who has mental or emotional problems, who has a history of violent or criminal behavior, and who is experiencing academic probation or failure. I have very limited ability to foresee who might pose a danger to me or other students in my classroom.

18. As a senior faculty member, most of my time is spent in high-stakes evaluation of other people's performance. When I am not grading student papers and assignments, I am evaluating candidates for admission to graduate school, evaluating MA and PhD theses, evaluating job applicants for faculty positions, evaluating junior faculty members for tenure and promotion, evaluating grant proposals for funding, evaluating manuscripts for publication, evaluating my colleagues' productivity for merit pay raises, evaluating programs for termination or enhancement. When not evaluating, I am constructing letters of recommendation for students who want entry into graduate or professional programs, or want fellowships, scholarships, or grant funding, or want a job at the end of their academic training. This evaluative activity cannot legitimately take place in a climate of fear or intimidation.

19.   I have spent the majority of my career working in faculty offices less than 100 feet from the site of mass shootings. I spent 17 years at the University of Iowa walking daily past a plaque commemorating the victims of Gang Lu, a graduate

student who killed the members of his dissertation committee (including the Physics Department chair) in Van Allen Hall, then proceeded to walk across campus with his legally obtained gun and shoot the VP for Academic Affairs and her administrative associate *because his dissertation did not win a prestigious prize*. My office in Seashore Hall was less than 50 feet from the offices in Van Allen Hall where Lu started shooting in 1991. In 2004, one of my colleagues in Seashore Hall who taught a large lecture class found a gunshot hole in his office window. When I arrived at UT in 2012, my first office in the PRC was on the 24th floor of the Tower (Main Building), where bathrooms required a special key since their locations in stairwells were always locked to ensure that no one could replicate the Whitman massacre of 1966. The Tower terrace was open only to special escorted tours on Wednesday afternoons.

20. Two issues make the legal presence of concealed handguns an immediate and pressing threat to university instructors –1) privacy rights of students that limit disclosure of mental and emotional illnesses and 2) the anonymity of large classes in which high-stakes evaluations of oral and written work routinely occur. In combination, this means that students under extreme evaluative stress who may have mental or emotional issues now have an incredibly easy way to bring lethal weapons into the classroom and inflict maximum damage on those with whom they disagree.

21. My current syllabus includes the following: "Students will also be evaluated on their class participation and will also complete two short opinion essays. Students are encouraged to express their opinions, ask questions, and bring additional information to class to boost their class participation." I suspect I will have to radically revise these requirements if certain students are legally permitted to bring guns into my classroom. Rigorous and robust academic debate and discussion will not be possible when an unknown number of students in the room possess lethal weaponry.

22. While some have argued that concealed carry is necessary for self-defense, I question who they are defending themselves against. The answer is clearly other people with guns. The notion that we can detect "good guys with guns" from "bad guys with guns" is a lethal fallacy, especially in this age group and in this intensely stressful evaluative environment. Good guys with guns can quickly turn into bad

guys with guns in high stress circumstances. The safest course of action is thus no guns allowed on campus.

   I declare under penalty of perjury under the law of the United States, that the foregoing is true and correct to the best of my knowledge.

   Executed on _22_ day of July, 2016

*Jennifer Glass*
_____

   Jennifer Lynn Glass