UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Dr. Jennifer Lynn Glass, *et al.*, <br> *Plaintiffs*, | : <br> : <br> : | |
| v. | : <br> : | No. 1:16cv845-LY |
| Ken Paxton, *et al.*, <br> *Defendants*. | : <br> : <br> : <br> : | |

**MEMORANDUM OF LAW IN SUPPORT OF
APPLICATION FOR PRELIMINARY INJUNCTION**

Professors Glass, Moore, and Carter, all on the UT Austin faculty and plaintiffs herein, submit submit the following memorandum of law in support of their application for a preliminary injunction, (Doc. 20). Two sets of defendants are sued in their official capacities:

- "UT officials," composed of Gregory L. Fenves, President of the University of Texas at Austin ("UT Austin") and "UT Regents," the ten members of the Board of Regents of the University of Texas System; and

- The "Texas AG," who is Ken Paxton, Attorney General of Texas.

**I.  The core clash in the case is between the professors' individual constitutional rights and the laws and policies of the government defendants.**

The question of whether three professors—all tenured—at a public university retain the individual option of keeping their academic classrooms gun-free zones in the face of new state policies weaponizing Texas college campuses does not present a clash between two sets of constitutional values. At odds with the over-broad popularization of the term "Second Amendment rights," which undoubtedly played a motivational role in the laws and policies before the Court, is the actual constitutional principle: "The right of a member of the general public to carry a

concealed firearm in public is not, and never has been, protected by the Second Amendment." *Peruta v. County of San Diego*, 2016 WL 3194315, at *6 (9th Cir. June 9, 2016) (*en banc*).

The two fairly recent Supreme Court decisions recognizing the Second Amendment as a personal right applicable to states—*District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010)—went no further than recognition of the right to possession of handguns *in the home*.[1] The decisions themselves were new developments in Second Amendment law, and the Court has not extended the principle since handing them down. The most recent federal appellate ruling on the Second Amendment's reach held that "the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public." *Peruta*, *supra*, at *15.

*Heller*, in fact, made it clear that the Second Amendment should in no way be read to compel allowing guns on campus, much less in classrooms. The majority opinion authored by Justice Scalia took care to explain that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding firearms in sensitive places such as schools and government buildings." 554 U.S. at 627.

So the issue here does not involve a constitutional right to carry guns into a classroom versus the constitutional right of a professor—particularly one who is tenured[2]—to exclude them. Rather, the clash is between the laws and policies of the State of Texas that are forcing guns into public university classrooms versus the professors' individual constitutional right to say "not

---

[1] *Heller* invalidated a District of Columbia prohibition on the possession of usable handguns in the home. *McDonald* invalidated ordinances in Chicago and one of its suburbs that effectively prohibited possession in the home of handguns.

[2] Being tenured is not an essential element of the constitutional claims pressed in the preliminary injunction phase. But tenure does carry with it certain due process rights because of the property interest it entails. It also is emblematic of a heightened attachment to the academic discipline.

2

in here while I'm teaching you." If the professors establish that the state laws and UT Austin policies infringe on that right, then the laws and policies must give way; they cannot be enforced—at least as to the three professors who have come before the Court seeking legal relief.

For purposes of this preliminary injunction phase, the professors assert two specific constitutional rights. One is the First Amendment right of academic freedom; the other is the Fourteenth Amendment right to equal protection of the laws—to be treated no worse than their similarly situated counterparts in the many private colleges across the state who the state has allowed to not have guns forced on them in their classrooms. These two constitutional issues are further addressed in Part III, below.[3]

## II. THE STANDARDS FOR OBTAINING A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, the professors must meet a four-part test. They must show:

- a substantial likelihood that they will prevail on the merits;

- the existence of a substantial threat that they will suffer irreparable injury if the injunction is not granted;

- that the threatened injury to them outweighs the threatened harm an injunction might cause ; and

- that granting the injunction will not disserve the public interest.

---

[3] The professors also assert a violation of their Second Amendment right to not have guns forced into their professional presence in the absence of gun possession and use being "well regulated" within the Second Amendment's meaning.. They are not pressing this claim in the preliminary injunction context because it requires a level of factual development that is not possible in the short timeframe involved here. The professors' other constitutional claim—based on the Fourteenth Amendment's due process void-for-vagueness principle—also is not being pressed at this time. It remains to be seen in later developments in this case whether the UT officials can, or even wish to, identify a basis in statute or the Regents-modified UT Austin policies for the UT Austin Provost's July 14th directive that UT Austin faculty "may not impose a ban on concealed handguns in their classrooms."

*Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008); *see also Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 252-53 (5th Cir. 2009). They meet each of these requirements.

Application of this test to determine whether a preliminary injunction should issue is a matter of trial court discretion and the balancing of harms. *See, e.g., Sells v. Livingston*, 750 F.3d 478, 480 (5th Cir. 2014). In balancing the harms, one of the leading commentaries on federal courts explains that the threat of irreparable injury is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." 11A Wright, Miller, *et al.*, *Federal Practice & Procedure* (3d ed.) § 2948.1.

Unexplained delay in seeking a preliminary injunction may play a role in the Court's balancing of harms. *See, e.g., Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985). Because a question has been raised about whether the professors have delayed their request for preliminary relief, they will address it here. The short answer is that they have not delayed their request for judicial relief in any way that should work against them.

As recounted in ¶¶ 2-5 of the Application for Preliminary Injunction, the professors were never given an explicit directive that they were prohibited from banning guns in their classrooms until a week ago, on July 14, 2016, when the Provost's broadcast e-mail to UT Austin faculty specifically said for the first time during the current saga that they "may not impose a ban on concealed handguns in their classrooms." Stip. Jt. Exh. 2, 7th para. Until then, there had perhaps been rumors, implications, and such but never anything in black and white. The 2015 legislation opening campuses to gun-toting students and teachers did not address the specific question that is before the Court. Even the Texas AG has stated this in writing. *See* Tex. Att'y

4

Gen. Op. KP-51 (2015) at 1. He even acknowledged that "carrying of concealed handguns in certain types of classrooms may pose heightened safety concerns such that the regulation of concealed handguns is authorized" by the 2015 legislation. *Id.*[4] So the 2015 legislation was not a plain directive that the professors were being barred from banning guns in their classroom

Nor did the UT Austin President's February 2016 initial policies for his campus. A review of them reveals not a single specific statement about an individual faculty option to exclude guns from the classroom. *See* Stip. Jt. Exh. 1. Those policies come no closer than repeating the mantra that a given policy "does not have the effect of *generally prohibiting* license holders from carrying concealed handguns on campus." *See, e.g., id.*, Policy Statement No. 1, Finding (emphasis added).

And these initial policies could not even be effective until mid-May of 2016. Tex. Gov't Code § 411.2013(d-2) (1st sent.). As it turns out, the Regents did not even sign off on the policies until a week *after* this lawsuit was filed, on July 13, 2016, when they modified the policies by allowing chambered rounds in the concealed weaponry. *See* Joint Proposal (Doc. 16) ¶ 5 (Stip. d). The next day is when the Provost sent out the notice that first sounded the death knell for these professors being able make their classrooms gun free come August 24th. *Id.* (Stip. f).

As this chronology shows, the professors did not delay in seeking the relief urged in their preliminary injunction application. They have acted promptly in response to events as they have unfolded and have waited, as they should, to seek relief until it was clear in writing for the

---

[4] The 2015 guns legislation is notoriously confusing and unclear, again a point acknowledge in writing by the Texas AG. *See* Tex. Att'y Gen. Op. No. 47 (2015) at 4 (legislature has *not clearly demarcated, or established, a precise boundary* in a building or portion of a building at which handguns are prohibited or permitted) (emphasis added); Tex. Att'y Gen. Op. No. 49 (2015) at 3 (legislature has "*not acted with great clarity* in this matter and enacted section 411.209 with *internal ambiguities*") (emphasis added).

first time[5] that what they want—gun-free classrooms starting August 24th—is being denied them by the UT officials.

### III. THE PROFESSORS HAVE A LIKELIHOOD OF SUCCESS ON THEIR FIRST AMENDMENT AND EQUAL PROTECTION CLAIMS.

**A. The state's concealed carry laws and policies for UT Austin classrooms infringe on the professors' First Amendment right of academic freedom.**

1. The curtailment of academic discussion in the professors' classrooms.

Each of the professors is convinced that, from the first day, the coming Fall semester will be witness to a curtailment of academic discussion and debate in her classroom.[6]

  a. Dr. Glass

Dr. Glass is the Barbara Bush Professor of Liberal Arts and will be teaching a graduate statistics course in the Fall. Glass Decl. ¶¶ 3, 4 (Doc. 20-1). She's been a college faculty member for the last thirty-three years and at UT Austin since 2012. *Id*. ¶ 2. Statistics sounds innocuous enough, but it will be an imposing prospect for her Fall students since, for many it will be their first math course in a long time, and the consequences of failure can be substantial, including loss of a stipend and removal from the doctorate program. *Id*. ¶ 4. The undergraduates she will be teaching in the spring in the "Fertility and Reproduction" course, *id*. ¶ 5, have to participate in class and write opinion essays on controversial topics that are highly charged and have been the catalyst for gun violence across the country. *Id*. ¶ 13. She has been there when classroom discussions on topics such as abortion or racism have become heated, requiring her "constant supervision to ensure that discourse remains civil and based in logic and reason." *Id*. ¶ 15. She

---

[5] Glass Decl. ¶ 11.

[6] The textual summaries do not do full justice to the professors' declarations and what they reveal about the depths of their concerns about what the compelled presence of guns will do to harm their academic work in their classrooms. A full reading of them is urged.

has had to intervene to protect her teaching assistant from an angry, shouting student. *Id*. ¶ 16. A key piece of her academic work is "high-stakes evaluation" of students, an activity that "cannot legitimately take place in a climate of fear and intimidation." *Id*. ¶ 18. All this and more about the looming presence of guns in the classroom leads her to anticipate a need to "radically revise" her current requirements for students, which strongly encourage them to express their opinions and ask questions. *Id*. ¶ 21. "Rigorous and robust academic debate and discussion will not be possible when an unknown number of students in the room possess lethal weaponry." *Id*.

### b.   Dr. Moore

Dr. Moore is full Professor in English and Women's and Gender Studies and will be the Archibald Hill Professor of English come September 1st. Moore Decl. ¶ 3 (Doc. 20-2). Among the subjects she teaches are feminist and LGBTQ studies. *Id*. She has been on the UT Austin faculty since 1991. *Id*. In the Fall semester, she will be teaching courses in Literature for Writers and World Literature. *Id*. ¶ 4.[7]

One of the classes Dr. Moore teaches is an upper division class called "LGBT Literature and Culture." *Id*. ¶ 11. It has drawn the enmity of at least one student who announced at the beginning of the class that she was there to "monitor and report on [Dr. Moore's] 'homosexual agenda.'" *Id*. This dampened classroom discussion and participation and, Dr. Moore explains, it "would have been worse if the possibility existed" that the student "monitor" or another student was carrying a loaded gun. *Id*. Against this backdrop, and the 2007 shootings at Virginia

---

[7] Dr. Moore is the only one of the plaintiffs who will have had any classes at all where guns must be allowed as of August 1st. Her summer class ends August 12th, and the final is a take-home essay due on the last class day. Moore Decl. ¶ 4.

7

Tech, she explains that "to properly teach my classes, especially the controversial ones, I must be free from fear from students with guns and so must my students." *Id.*

These concerns of Dr. Moore in particular are heightened because she is openly lesbian, an outspoken opponent of guns on campus, and witness to the harassment and intimidation of a female student and a professor who were vociferous opponents of the new rules for guns on campus, to the point that the student left UT Austin and the city itself for several months. *Id.* ¶ 12.

    c.   **Dr. Carter**

Dr. Carter is University Distinguished Teaching Associate Professor and a University of Texas System Regents' Outstanding Teacher in the Department of English and has been at UT Austin since 1992. Carter Decl. ¶ 3 (Doc. 20-3). She will be teaching two upper-division courses in the Fall semester, Major Authors: Virginia Woolf and Representation of Childhood and Adolescence in Literature and Film. *Id.* ¶ 5. She will be teaching two upper division classes in the Spring 2017 semester. *Id.*

As with her colleagues, her academic work in the classroom involves argumentation, impassioned debate, rigorous analysis, and "sometimes challenging and uncomfortable processes of intellectual development." *Id.* ¶ 14. These are fundamental to effective pedagogy and learning. *Id.* As she explains: "The possibility of the presence of concealed weapons in a classroom setting impedes my and other professors' ability to create a daring, intellectually active, mutually supporting, and engaged community of thinkers." *Id.* Guns in the classroom "restrict and deter open and robust classroom debate." *Id.* She has been witness to the poisonous mix of students in emotional turmoil and guns. *Id.* ¶¶ 19, 20.

8

### 2. The challenged policies infringe on the professors' right to academic freedom.

"[U]niversities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Partly for that reason, academic freedom is not just a policy or pedagogical issue. It is a well-established component of the First Amendment.

Against the background understanding that this country is "deeply committed to safeguarding academic freedom," the Supreme Court has held that academic freedom is "a special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of State of New York*, 385 U.S. 589, 603 (1967); *Omosegbon v. Wells*, 335 F.3d 668, 676 (7th Cir. 2003) ("[a]cademic freedom rights are rooted in the First Amendment").[8]

*Keyishian* fleshes out some of what it means to encompass in its First Amendment academic freedom principles. It embraces the principle that there should be a "robust exchange of ideas," with the classroom being peculiarly the "marketplace of ideas." *Id*. at 603. The constitutional concept of academic freedom "does not tolerate laws that cast a *pall of orthodoxy* over the classroom." *Id*. (emphasis added).

The guns in the classroom mandate that has been laid on Plaintiffs clashes with these fundamental precepts underpinning the constitutional concept of academic freedom. Plaintiffs' declarations, summarized above in Part III.A.1, demonstrate that their ability to teach in the classroom, to make it truly a marketplace for the robust exchange of ideas will be impaired when guns are forced into their rooms. Theirs is not a theoretical fear that this might happen. It is

---

[8] This constitutional concept continues to hold sway. In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Court held that the First Amendment does not insulate public employees making statements in connection with their official duties from employer discipline. But the Court was careful to be clear that those in academia may not be reached by this broad ruling. It recognized that "expression related to academic scholarship *or classroom instruction*" very well may implicate additional constitutional interests giving more protection than in the usual public employer-public employee context. *Id*. at 425 (emphasis added). It held the question open. In *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014), the appeals court held that the narrowing First Amendment rule of *Garcetti* "does not apply" to academic scholarship and teaching. 746 F.3d at 406.

9

what they know to be true from their years of college teaching, their knowledge of students and the pressures they face (and the age at which they face them), and their past experiences with difficult or threatening classroom situations when guns were not a compelled presence.[9] It may be theoretical to fear that someone may actually be driven to the point that a gun is pulled and someone shot. That is certainly a deeply troubling concern, but, for First Amendment purposes, it is Plaintiffs' knowledge that classroom discussion is inevitably going to be circumscribed by the near-certain presence of loaded guns that is more pertinent.

The "pall of orthodoxy" invalidated in *Keyishian* was cast when the university punished or rejected those with a specific different political view. The pall of orthodoxy here is spread broader by the guns-in-the-classroom ukase. It is an undifferentiated imposition of orthodoxy. Plaintiffs now are incentivized to err on the side of "trimming their sails," academically speaking, when they push for classroom debate on topics such as abortion, race, and gay rights. To repeat the apropos statement of Dr. Glass: "Rigorous and robust academic debate and discussion will not be possible when an unknown number of students in the room possess lethal weaponry." Glass Decl. ¶ 21.[10]

In this situation, then, Plaintiffs are likely to prevail on their First Amendment claim that the laws, policies, and directives forcing guns into their classrooms at UT Austin infringes on their academic freedom.

---

[9] This is even more concrete than the "intangible 'qualities which are incapable of objective measurement'" that the Court has said, in support of UT Austin itself, make for greatness in a university. *Fisher v. Univ. of Texas at Austin*, (June 23, 2016) (slip op. at 19).

[10] These circumstances parallel in some way the situation of the "heckler's veto." The First Amendment does not allow the public expression of ideas to be prohibited or truncated simply because the ideas might be offensive to some ears. *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970). By the same token, the First Amendment should not allow the expression of ideas in a college classroom to be curtailed because giving full expression to them might set off a violent reaction from someone that is there with a loaded gun.

B.  **Forcing public university professors to accept guns in their classrooms, while freeing private university professors from the same obligation, violates the Equal Protection Clause.**

Plaintiffs teach at a public university. According to the UT Austin Provost, that means that they are left with no legal option (under Texas law anyway); they must allow guns in their classrooms on August 24th. Professors at private universities in Texas, however, face no such compulsion. The legislature allowed their universities to say "no guns allowed on campus," which, of course, means no guns in the classroom. *See* Tex. Gov't Code § 411.2031(e). Nearly all, if not all, private universities in the state have said "no." App. for Prelim. Inj. at 2 n.*.

Plaintiffs simply cannot fathom the reason for this disparate treatment. *See* Glass Decl. ¶ 14; Moore Decl. ¶ 10; Carter Decl. ¶ 17. They also cannot discern a rationale for the UT policies' allowance of exclusion of guns from other places on campus but not in the classroom. *See* Glass Decl. ¶ 13; Moore Decl. ¶ 10; Carter Decl. ¶¶ 14, 17. The legislation provides no rationale for the different treatment of similarly situated professors in public universities such as UT Austin on the one hand and private universities such as Baylor and Trinity on the other.

The fundamental principle of the Equal Protection Clause is that "all persons similarly situated should be treated alike." *Cleburne Living Ctr. v. City of Cleburne*, 473 U.S. 432, 439 (1985). As the Supreme Court's famous footnote in 1938 established, judicial inquiry is to be heightened, and more intensive scrutiny applied to asserted governmental interests and the relation of a challenge law to them, if either suspect classifications (for example, race, alienage) are drawn or fundamental rights (for example, religion or free speech) are impinged upon. *United States v. Carolene Products*, 304 U.S. 144, 152 n.4 (1938). For purposes of the preliminary injunction request, Plaintiffs are not seeking heightened judicial scrutiny of the state's linedraw-

ing about where guns must be allowed and where they may be excluded on Texas college campuses.[11]

Consequently, the test to be applied is the rational basis test. It requires the Court to determine whether the lines drawn are "rationally related to a legitimate state interest." *See, e.g., Cleburne, supra*, 473 U.S. at 440. The reaction to invocation of this level of scrutiny tends to be that it nearly automatically means that the challenged dissimilar treatment will be upheld as constitutional. But that common reaction is inapplicable here.

The Supreme Court has used the rational basis test to invalidate state and local laws and ordinances. *Cleburne* is a prime example. The Court refused to invoke heightened scrutiny of the challenged local zoning rule but still invalidated it as a violation of the Equal Protection Clause using the rational basis test. A key reason was the Court's rule that a government "may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic." 473 U.S. at 448. This, of course, is precisely what has occurred with the guns on campus debate. A constitutionally misguided outcry about guns and the need for them wherever and whenever someone wishes has driven the Texas legislature to the point that it is forcing guns where historically Texas has said they should not be and where even the *Heller* decision says it makes perfect sense to exclude them.

In *St. Joseph Abbey v. Castile*, 712 F.3d 215 (5th Cir.), *cert. denied*, 134 S.Ct. 423 (2013), the court used the rational basis test to invalidate on equal protection grounds a Louisiana statute that granted funeral homes the exclusive right to sell caskets and barred monks at a Benedictine

---

[11] The linedrawing does implicate two fundamental rights. One is the First Amendment academic freedom right. But that is already separately addressed in Part III.A. The other is the "well regulated" Second Amendment claim asserted by Plaintiffs. That claim, though, is not being pressed in this phase for the reasons already explained in footnote 3, above. No suspect classification appears to be drawn.

12

abbey from doing so. It upheld the right of plaintiffs, even in a rational basis test situation, to negate with evidence whatever rational basis is offered up by the proponents of the state law. *Id*. at 223. Defendants have yet to offer up a rational basis for the guns-on-campus and guns-in-the-classroom linedrawing they've performed thus far. They are allowed to do so *post hoc* under this test. *See FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993). But they do have to take that step—and it has not yet been taken.

As already stated, Plaintiffs are at a complete loss about what possible rationale could justify the linedrawing, especially the one dividing private and public colleges and faculty. Until that justification is offered, and is found to even be rational, what can be said is that, because there is no discernible rational basis for the differential treatment, it must be struck down as violative of Plaintiffs' right to equal protection.

IV. **PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF THE INJUNCTION DOES NOT ISSUE IN TIME TO BAR GUNS STARTING THE FIRST DAY OF CLASS ON AUGUST 24TH.**

Plaintiffs have recounted in their declarations their convictions that the second guns are forced into their classrooms, they will pull back from the full and vigorous kinds of pedagogy they view as a fundamental to their academic freedom. The day they walk into the first class in the Fall semester will be the day that debate becomes paler. The reason is the guns.

That kind of damage to academic freedom is not remediable. There are only so many class days in a semester and teaching doesn't wait until the middle or end of classes to become important to furthering Plaintiffs' academic objectives.[12]

---

[12] It is not clear whether the Fifth Circuit or Supreme Court would adopt and apply the "state-created danger" theory in the event threats of gun violence or worse actually intruded into a UT Austin classroom. *See generally McClendon v. City of Columbia*, 305 F.3d 314, 324-25 (5th Cir. 2002), *cert. denied*, 537 U.S. 1232 (2003). But there would be no solace, and no repairing of the injuries, even if that did happen sometime in the future, after guns begin appearing regularly in the classrooms.

Plaintiffs, therefore, are faced with irreparable injury to their constitutional rights in the absence of their requested preliminary injunction.

V. **THE INJURIES THREATENED TO PLAINTIFFS FAR OUTWEIGH ANY CONCEIVABLE HARMS TO DEFENDANTS IF THE INJUNCTION ISSUES FOR THESE PROFESSORS, AND THE PUBLIC INTEREST WOULD BE SERVED BY SUCH AN INJUNCTION.**

Not allowing guns into Plaintiffs' Fall semester classrooms while awaiting final trial on the merits of this case would work no possible harm to Defendants; in fact, it would be doing most of them a favor. For the UT defendants, the UT System Chancellor has already questioned whether guns on campus is consistent with the educational goals of the institution.[13] UT Austin's President been even more outspoken:

> The presence of handguns at an institution of higher learning is contrary to our mission of education and research, which is based on inquiry, free speech, and debate.

Stip. Jt. Exh. 1, 1st page.

These same observations from respected leaders in the public academy make it abundantly obvious where the public interest lies. After more than a century, there is nothing in the public interest that counsels in favor of forcing concealed handguns into public university classrooms, particularly Plaintiffs' classrooms.

### CONCLUSION

Plaintiffs urge the Court to grant the requested preliminary injunction and set this case down for final trial on the merits.

---

[13] "[O]ur parents, students, faculty, administrators, and law enforcement all continue to express their concerns that the presence of concealed handguns on campus would contribute to a less-safe environment, not a safer one." W. McRaven, Chancellor, to Governor, Lieutenant Governor, and Speaker of the House, Jan. 29, 2015), at 1. "There is great concern that the presence of handguns, even if limited to licensed individuals age 21 or older, will lead to an increase in both accidental shootings and self-inflicted wounds." *Id.* at 2.

14

Respectfully submitted,

GEORGE, BROTHERS, KINCAID & HORTON LLP

/s/R. James George, Jr.
R. James George, Jr.
State Bar No. 07810000
114 West 7th Street, Suite 1100
Austin, Texas 78701
(512) 495-1400
(512) 499-0094 *facsimile*
rjgeorge@gbkh.com


GREENSTEIN & KOLKER

By: ___/s/ *Malcolm Greenstein*___
Malcolm Greenstein
State Bar No.08403300
1006 E. Cesar Chavez Street
Austin, Texas 78702
malcolm@greensteinandkolker.com
Telephone:  (512) 472-6270
Facsimile:   (512) 472-8263


____/s/ *Renea Hicks*_____
Renea Hicks
Texas Bar No. 09580400
LAW OFFICE OF MAX RENEA HICKS
101 West 6th Street, Suite 504
Austin, Texas 78701
(512) 480-8231
fax (512) 480-9105
rhicks@renea-hicks.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of July, 2016, I served a true and correct copy of the foregoing pleading on all counsel of record through the Court's CM/ECF system.

___/s/ *Renea Hicks*_____
Max Renea Hicks

15