IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DR. JENNIFER LYNN GLASS, *et al.,* | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | NO. 1:16-CV-845 |
| | § | |
| KEN PAXTON, IN HIS OFFICIAL CAPACITY AS | § | |
| ATTORNEY GENERAL OF TEXAS, *et al.,* | § | |
| Defendants. | § | |

---

### UT DEFENDANTS' RESPONSE TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION

---

Defendants Gregory L. Fenves, President of The University of Texas at Austin ("UT Austin"), and the Board of Regents for The University of Texas System, in their official capacities, including Paul L. Foster, R. Steven Hicks, Jeffery D. Hildebrand, Ernest Aliseda, David J. Beck, Alex M. Cranberg, Wallace L. Hall, Jr., Brenda Pejovich, Sara Martinez Tucker, and Varun P. Joseph,[1] ("the Regents"), (collectively "UT Defendants") hereby respond to the Plaintiffs' Application for Preliminary Injunction in the above-captioned cause, and show as follows:

### STANDARD FOR ISSUANCE OF PRELIMINARY INJUNCTION

To obtain preliminary injunctive relief, the applicant must show (1) a substantial likelihood that she will prevail on the merits, (2) a substantial threat that she will suffer irreparable injury if the injunction is not granted, (3) that her threatened injury outweighs the threatened harm to the party whom she seeks to enjoin, and (4) that granting the relief will serve the public interest. *See Planned Parenthood of Houston & Southeast Tex. v. Sanchez,* 403 F.3d 324, 329 (5th Cir. 2005). Relief in the form of "federal injunctive decrees directing state officials" is an extraordinary remedy. *Morrow v. Harwell,* 768 F.2d 619, 627 (5th Cir. 1985). A court should not grant such relief "unless the party seeking it has

---

[1] The UT Defendants note that, as a student regent, Varun P. Joseph has no voting authority.

clearly carried the burden of persuasion on all four requirements." *PCI Transp. Inc. v. Fort Worth & Wstrn. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

<u>**Relevant Facts**[2]</u>

## I.      **The Campus Carry Law**

Under Texas Government Code §411.2031(d-1)—often called the "campus carry" law,"

[a]fter consulting with students, staff, and faculty of the institution regarding the nature of the student population, specific safety considerations, and the uniqueness of the campus environment, the president or other chief executive officer of an institution of higher education in this state shall establish reasonable rules, regulations, or other provisions regarding the carrying of concealed handguns by license holders on the campus of the institution or on premises located on the campus of the institution. *The president or officer may not establish provisions that generally prohibit or have the effect of generally prohibiting license holders from carrying concealed handguns on the campus of the institution.*

TEX. GOV'T. CODE §411.2031(d-1) (emphasis supplied). "Campus" includes "all land and buildings owned or leased by" the higher education institution. *Id.* §411.2031(a)(1). The law further provides that the required "rules, regulations or other provisions" are to be reviewed by the institution's board, which may amend them in whole or part by a two thirds vote before they become final. *Id.* §411.2031(d-2). A copy of Texas Government Code §411.2031 is attached to this filing as **Exhibit A.**

To become a "license holder" and thus be permitted to carry a handgun under §411.2031, Texas residents must satisfy 14 requirements administered by the Department of Public Safety ("DPS"). TEX. GOV'T CODE §411.172. Applicants, *inter alia*, must be at least 21 years of age (with an exception for military members or veterans); cannot have been convicted of a felony; cannot have been convicted of a Class A or B misdemeanor in the past five years; cannot presently be charged with a Class A or B misdemeanor or a felony; cannot be currently subject to a court protective order or restraining order; cannot be chemically dependent; must be capable of exercising sound judgment

---

[2] The relevant facts, many of which the Parties have stipulated to in their Joint Proposal on Preliminary Injunction Matters (Doc. 16, ¶5) ("Joint Proposal"), are largely undisputed.

regarding the proper use and storage of a handgun; and must be fully qualified to purchase a handgun under all applicable federal and State laws. *Id.*

Applicants must also complete four hours of training, pass a proficiency examination, and submit identifying information including two sets of fingerprints, photographs, residence and business addresses for the preceding five years, hair and eye color, height, weight, driver license number, criminal history, and history of psychiatric hospitalization and treatment for drugs or alcohol. *Id.* §§411.188, 411.174. If a licensee fails to inform DPS of any change of name, address or status; commits an act of family violence and is subject to a protective order; or is charged with a Class A or B misdemeanor or equivalent offense, an offense under §42.01 of the Penal Code, or a felony under an information or indictment; her license is suspended. TEX. GOV'T CODE §411.187. If a licensee otherwise becomes ineligible under §411.172, her license is revoked. *Id.* §411.186. Complete eligibility requirements and restrictions are available on the DPS website.[3]

## II.     The UT Defendants

Pursuant to this statutory directive, Defendant President Fenves established the Campus Carry Policy Working Group ("Working Group"), made up of nineteen individuals including faculty, staff, students, an alumnus, a parent, and University administrators, to recommend the campus carry policies required under §411.2031(d-1). Stipulated Joint Ex. 1. A copy of the Working Group's final report is attached to this filing as **Exhibit B.** The report details the Working Group's extensive consultation with the University community in issuing its policy recommendations. Those efforts included an online survey that generated over 3,300 comments; two public forums attended by approximately 400 people with 75 speakers (which were recorded and posted online); various surveys seeking input about

---

[3] *See* http://txdps. state.tx.us/RSD/CHL/index.htm.

possible gun-exclusion zones;[4] attendance at other University meetings to speak and take questions; informal communications with University community members; and reviewing additional comments, petitions, and resolutions from various interested parties. *Id.* In addition to consultation with the University community, the Working Group met weekly during the Fall 2015 semester to discuss implementation of the statute's requirements while seeking to maximize campus safety, alleviate fears, and enhance UT Austin's role in the study of gun violence. *Id.* Part of this deliberative process included consulting available data to estimate how many students may have a handgun license, and learning about university responses and experiences in other states with campus carry laws. *Id.* at 10-16.[5]

After this consultative and deliberative process, the Working Group reached a consensus on 25 recommendations, which it made to President Fenves. *Id.* at 16-26. The recommendations detail how handguns must be carried and stored, identify gun exclusion zones, and provide incidental implementation and proactive measures. *Id.* Every member of the Working Group, including those who are gun owners and license holders, expressed a personal preference against guns in classrooms. *Id.* at 26. But the Working Group made no such recommendation. *See id.* This is because the group was charged with implementing the law, and the law requires that UT Austin's policies be reasonable,

---

[4] "Gun exclusion zone" is not a statutory term, rather, it is a phrase many have adopted to refer to places on campus where license holders may not carry. Some gun exclusion zones are created under Texas or federal law. Others were proposed by the Working Group, accepted by the President, and became UT Austin policy after the Board of Regents declined to amend them. *See generally,* Ex. B.

[5] The Working Group considered the seven other states with specific laws allowing some form of campus carry—Utah, Idaho, Colorado, Wisconsin, Kansas, Mississippi, and Oregon. *See* Exhibit B at 13 and authorities cited therein. The Group's "examination of [these] states…revealed little evidence of campus violence that can be directly linked to campus carry, and none that involves an intentional shooting. We learned of four accidental discharge incidents. Two involved a license holder who was openly displaying a handgun to another person; the other two involved license holders who were carrying their handguns unholstered in their pants pocket." Ex. B at 3. The Working Group also found no evidence that campus carry increased the rate of sexual assault or suicide. Ex. B at 15.

and that they not have the "effect of generally prohibiting license holders from carrying their handguns on the campus." *Id.*

The Working Group concluded that "excluding handguns from classrooms would effectively prohibit license holders from carrying their handguns and so would violate S.B. 11." *Id.* at 26. It considered that the only way to make classrooms gun exclusion zones while satisfying the requirement that the policies not effectively prohibit concealed carry on campus would be to provide gun lockers at strategic locations around campus, so licensees could store handguns before entering class. *Id* at 27. However, safety implications made this a non-option, because "[a] policy that increases the number of instances in which a handgun must be stored multiplies the danger of accidental discharge." *Id.* The Working Group ultimately determined that "the risks to human life of placing gun lockers around campus would substantially outweigh any benefit that would accrue from banning concealed handguns in classrooms." *Id.* It recommended six areas—other than places where carrying is already prohibited under applicable law—as gun exclusion zones where concealed carry should be banned.[6] *Id.* at 4-5.

President Fenves accepted the Working Group's recommendations and provided the 25 policy statements, which are reflected in Stipulated Joint Exhibit 1, to the Board of Regents. He emphasized

---

[6] As set forth in Exhibit B at 4-5, those areas are:
- Areas where federal or another state law, licensing requirements, or contracts require gun exclusion (e.g., Nuclear Engineering Teaching Laboratory and child care facilities);
- Patient-care areas, including where professional mental health services are provided (e.g., University Health Services and Counseling and Mental Health Center);
- Areas where formal hearings are conducted pursuant to institutional disciplinary and grievance rules (e.g., formal hearings conducted by Student Judicial Services);
- Areas where firearm discharge might cause great harm (e.g., laboratories with dangerous chemicals, biological agents, or explosive agents);
- On-campus residence halls (with limited exceptions); and
- Sole-occupant offices, if the occupant so desires and provides notice.

the imperative to comply with the law, whether or not he agrees with it.[7] The Working Group's recommendations, as accepted by President Fenves, included the rationale behind each gun exclusion zone,[8] and are summarized as follows:

- **Policy Statement No. 9** prohibits concealed carry in areas where federal or state law, licensing requirements, or contracts require guns be excluded in order to minimize risk based on safety, security, and other special circumstances. Stipulated Joint Ex. 1, Campus Carry Policies and Implementation Strategies at 6.

- **Policy Statement No. 10** prohibits concealed carry in patient care areas including where professional mental health services are provided because these are unique environments present the same safety risk to health care providers, patients, and others present in these areas. Campus Carry Policies and Implementation Strategies at 6-7.

- **Policy Statement No. 11** prohibits concealed carry in areas where formal hearings are conducted pursuant to institutional disciplinary and grievance rules because these environments present the same safety concerns present in a government court or office utilized by a court. Because rights and privileges are being heard and adjudicated, these are unique environments with specific safety considerations. *Id.* at 7.

- **Policy Statement No. 13** prohibits concealed carry in areas where firearm discharge might cause great harm because of the presence of hazardous chemicals, gases, or agents or equipment with powerful magnets. This furthers the special safety concerns present in such environments. *Id.* at 8.

- **Policy Statement No. 14** prohibits concealed carry in animal-research facilities and care facilities where rules of ingress and egress create an increased risk of accidental discharge, contamination, or a handgun being separated from a license holder. *Id.*

- **Policy Statement No. 15** prohibits concealed carry for counselors, staff, and volunteers on the grounds or in buildings where campus programs for minors occur because these areas present the same concerns present in pre-K-12 schools, where handguns are prohibited. *Id. See also* TEX. PENAL CODE §46.03(a)(1).

- **Policy Statement No. 16** prohibits concealed carry in certain University residences because of the special risks of loss, theft or misuse by roommates. *Id.* at 9.

---

[7] Stipulated Joint Ex. 1 at 1-2 ("Based on due deliberations of the working group recommendations, I have made my decision on implementing SB 11. . . .The implementation of SB 11 will test our ability to comply with the law without compromising the teaching, learning and research environments that makes UT Austin one of the best public universities in the nation.").

[8] President Fenves's Policy Statements identified eight separate such zones that are within the six areas identified in the Working Group's recommendations, that address areas other than those covered as exclusions under applicable law.

- **Policy Statement No. 18** prohibits concealed carry in single occupant offices that are not generally open to the public when the occupant so chooses. This furthers the substantial control that occupants generally enjoy over their offices and is based on the nature of communications that readily occur in these offices, including one-on-one discussions related to things like student performance or discipline. *Id.* at 10.

The recommendations also include directives regarding how guns must be carried and stored, who may carry, additional locations where concealed carry is prohibited under other laws, and necessary amendments to other policy and training documents to reflect the new policy.[9]

The members of the Board of Regents took no action on these recommendations, with one exception—they rejected Policy Statement No. 3, which required a license holder carrying a semiautomatic handgun on campus to do so without a chambered round of ammunition. Stipulated Joint Ex. 1 at 2. Thus, the policy, as amended, goes into effect on August 1, 2016. Joint Proposal ¶5(e). These policies are now incorporated into UT Austin's Handbook of Operating Procedures, as Policy Number 8-1060, titled Campus Concealed Carry, a copy of which is attached to this filing as **Exhibit C.** The last day of the Summer 2016 session is August 12, and the Fall 2016 session begins August 24, 2016. Moore Decl. ¶4; Joint Proposal ¶5(g).

## III.     The Plaintiffs

The Plaintiffs are professors at UT Austin. They filed their Complaint on July 6, 2016, requesting "a federal injunction, based on rights asserted under the United States Constitution's First, Second and Fourteenth Amendments." Compl. (Doc. 1) at 1. Plaintiffs bring four specific claims, but only base their request for preliminary relief upon two of those claims. First, Plaintiffs bring a First Amendment claim premised on "rights to academic freedom." Compl. ¶46. Second, Plaintiffs assert an Equal Protection claim, claiming that "university policies that prohibit Plaintiffs from exercising

---

[9] Stipulated Joint Ex. 1, Campus Carry Policies and Implementation Strategies at 4-13.

their individual option to forbid handguns in their classrooms violate[] their rights under the Equal

Protection Clause of the Fourteenth Amendment to the United States Constitution." Compl. ¶50.[10]

Plaintiffs each filed an affidavit in support of their motion for preliminary injunction, discussing their

academic qualifications and experience, and averring their fear that guns in the classroom will limit

classroom discussion.[11] They seek a preliminary injunction that "bars the UT defendants and the

Attorney General from implementing and enforcing any rule in Texas statutes, the adopted UT Austin

policy, or informal policy directives to the extent that they bar the three professors from exercising

the option of excluding guns from their UT Austin classrooms starting August 24th." Application for

Preliminary Injunction (Doc. 20) ¶8.

---

[10] According to Plaintiffs, "[f]or purposes of this preliminary injunction," they only advance their First and Fourteenth Amendment claims. Memorandum in Support of Motion for Preliminary Injunction (Doc. 21) ("Pl.'s Mem.") at 3.

Nevertheless, Plaintiffs also assert a claim based on a "Second Amendment right to defend themselves and others in their classrooms from handgun violence by compelling them as public employees to passively acquiesce in the presence of loaded weaponry in their place of public employment without the individual possession and use of such weaponry in public being well-regulated." Compl. ¶48. Plaintiffs further claim that "university policies that prohibit Plaintiffs from exercising their individual option to forbid handguns in their classrooms violate[] their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Compl. ¶52. Because Plaintiffs have decried a right to injunctive relief on the basis of these claims, this filing does not address them. Pl.'s Mem. at n.3.

[11] Declaration of Dr. Jennifer Lynn Glass (Doc. 20-1); Declaration of Dr. Lisa Moore (Doc. 20-2); Declaration of Dr. Mia Carter (Doc. 20-3). To the extent the allegations in these affidavits are conclusory and speculative, they lack adequate foundation and are not proper evidence for the Court to consider in assessing the request for preliminary relief. *See, e.g., Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("Needless to say, unsubstantiated assertions are not competent … evidence."); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.1992); *Webster v. Bass Enters. Prod. Co.*, 192 F.Supp.2d 684, 691 (N.D. Tex. 2002) (striking portions of plaintiff's affidavit as conclusory and containing inadmissible hearsay); *Miller v. Bunce*, 50 F. Supp. 2d 620, 626 (S.D. Tex. 1999) (uncorroborated statements insufficient to support defamation claim), *aff'd*, 220 F.3d 584 (5th Cir. 2000). *See also* Fed. R. Evid. 401 ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action."

Defendants therefore object to the Court's consideration of Plaintiffs' affidavits to the extent they contain conclusory, unsubstantiated statements.

<u>ARGUMENT & AUTHORITIES</u>

I.  **Plaintiffs have not established a likelihood of success on the merits under either the Equal Protection Clause or the First Amendment.**

   a.  **Plaintiffs' First Amendment Claim lacks legal support, and Plaintiffs lack standing to assert it.**

      i.  **The UT Defendants' policies do not implicate Plaintiffs' First Amendment right to academic freedom.**

Plaintiffs assert that the requested injunction is necessary to protect their academic freedom as individual professors, because "[e]ach professor is convinced that, from the first day, the coming Fall semester will be witness to a curtailment of academic discussion and debate in her classroom." Pl.'s Mem. at 6 (citing Glass Decl. ¶6.) Plaintiffs rely upon four cases from the United States Supreme Court and two cases from the Courts of Appeals (one from the Ninth Circuit, and one from the Seventh Circuit) in support of this claim. Pl.'s Mem. at 9-10. But none of these authorities supports a professor's academic freedom to challenge policies that do not actually regulate speech. Further, most of Plaintiffs' authorities involve punitive measures—such as termination or adverse employment action—that are not at issue here. Thus, Plaintiffs cannot meet their burden to show a likelihood of success on the merits of the claim that "the challenged policies infringe on the professors' right to academic freedom." *Id.* at 9. We take each case Plaintiffs cite in turn.

*Grutter v. Bollinger* recognized a *university's* institutional academic freedom to set admissions policies—in that case, through affirmative action—to promote its educational mission. 539 U.S. 306, 324 (2003). That is, "[i]n seeking the right to select those students who will contribute the most to the robust exchange of ideas, a *university* seeks to achieve a goal that is of paramount importance in the fulfillment of its mission." *Id.* (emphasis supplied). Thus, *Grutter* does not address Plaintiffs' academic freedom as individual professors, and is further distinct because it does not involve the First Amendment, but instead, equal protection of applicants under a race-conscious admissions policy.

In *Keyishian v. Board of Regents of the University of the State of New York*, several public university professors and a faculty member challenged a statute that required termination of public employment for "treasonable or seditious" utterances or acts. 385 U.S. 589, 597 (1967). The statute did not define "treasonable" or "seditious." *Id.* The Court invalidated the statute as unconstitutionally vague in violation of the First Amendment, because it required that "one must guess what conduct or utterance may lose him his position," and in such cases, "one necessarily will 'steer far wider of the unlawful zone'" of speech. 385 U.S. at 604 (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). *Keyishian* is inapplicable because *no* speech is prohibited under the UT Defendants' policies. Indeed, Plaintiffs do not have to "guess" anything in exercising their First Amendment rights under the UT Defendants' policies—those policies do not say anything about what Plaintiffs may say, either individually *or* as professors. Moreover, the UT Defendants' policies do not provide for termination of public employment, or any other punitive measures against university professors. Thus, *Keyishian* does not provide a basis for the Plaintiffs to succeed on the merits of their First Amendment claim.

The next authority Plaintiffs invoke—*Garcetti v. Ceballos*—undermines Plaintiffs' position, to the limited extent that it is relevant. 547 U.S. 410 (2006). There, the Court held that the First Amendment does not protect a government employee from discipline based on speech made pursuant to his official duties. *Garcetti*, 547 U.S. at 413. Ceballos was a deputy district attorney who prepared a memorandum criticizing the veracity of an affidavit used in a prosecution by his employer. Ceballos claimed he suffered adverse employment action as a result of that criticism. The Court concluded that Ceballos did not have a protected First Amendment interest in the content of the memorandum, because he drafted it in fulfillment of an employment responsibility. *Id.* at 421-22. The Court explained that government "employees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit." *Id.* at 422.

Nevertheless, as Plaintiffs note, *Garcetti* recognized "some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Id.* at 425. In fact, the Ninth Circuit case Plaintiffs cite—*Demers v. Austin*—took this recognition one step further, concluding that a more relaxed test applies to public university professors, since "teaching and writing are at the core of the official duties of teachers and professors." 746 F.3d 402 at 411 (9th Cir. 2014). And subsequent district court decisions have concluded that professor speech about potentially divisive topics such as homosexuality[12] and the merits of vaginal delivery versus Cesarean sections[13] is, indeed, protected under the First Amendment.

But this is relevant, because all of those cases presented two things absent here: (1) speech by a governmental employee and (2) adverse employment consequences by the government entity based on the content of that speech. Indeed, the UT Defendants' policy plainly does not restrict the Plaintiffs' speech or writing. *Cf. Garcetti*, 547 U.S. at 438-39 (Souter, J., dissenting) (noting that speech and writing by university professors in their capacities as public employees implicates academic freedom). Nor does the UT Defendants' policy provide for termination (or any other punitive or adverse action) in connection with any expressive activity. Thus, *Garcetti* is inapposite.

Plaintiffs cite *Bachellar v. Maryland* for the proposition that "the First Amendment does not allow the public expression of ideas to be prohibited or truncated simply because the ideas might be offensive to some ears." Pl.'s Mem at 10, n.10 (citing 397 U.S. 564, 567 (1970)). But again, the First Amendment assumes that some *restriction* on speech is in issue, and this is not so here. Plaintiffs argue that "the First Amendment should not allow the expression of ideas in a college classroom to be curtailed because giving full expression to them might set off a violent reaction from someone that is

---

[12] *Kerr v. Hurd*, 694 F. Supp. 2d 817, 842 (S.D. Ohio 2010).

[13] *Sheldon v. Dhillon*, No. C-08-03438 RMW, 2009 WL 4282086, at *3 (N.D. Cal. Nov. 25, 2009).

there with a loaded gun." *Id.* This speculative assertion, however, cannot support a right to recovery under the First Amendment, because it assumes without factual or legal authority that (1) hypothetical students will refrain from expressing (2) hypothetical viewpoints because of the (3) hypothetical presence of a legal handgun which might cause a (4) hypothetical violent reaction using that handgun. Such attenuated assumptions are insufficient to show a likelihood of success on the merits. *See supra* n.11 and authorities cited therein.

Plaintiffs' final authority in support of their First Amendment claim is *Omosegbon v. Wells*, 335 F.3d 668 (7th Cir. 2003). There, the Seventh Circuit concluded that a professor's First Amendment "academic freedom claim fails because he did not allege that he was ever restricted from or sanctioned for speaking publicly about an issue." 335 F.3d at 677. Plaintiffs also have not argued that their speech is sanctioned or restricted.[14] Thus, their First Amendment claim similarly fails.

Finally, it is worth noting—as the Working Group did—that courts in other states with campus carry statutes have considered legal challenges to those statutes. While those cases are distinct from the facts here, none recognized academic freedom as a basis to override a legislative provision for campus carry. Ex. B at 28, n.28 (citing *University of Utah v. Shurtless*, 144 P.3d 1109, 1122-28 (Utah 2006); *Regents of Univ. of Colo. v. Students for Concealed Carry on Campus, LLC*, 271 P.3d 496 (Colo. 2012); *Ore. Firearms Educ. Found. v. Bd. of Higher Educ.*, 264 P.3d 160 (Ore. Ct. App. 2011)).

### ii. Plaintiffs' speculation that speech will be chilled is insufficient to confer First Amendment standing.

As set forth above, it is plain that the UT Defendants' policy does not prohibit the Plaintiffs from teaching (or otherwise speaking) about any given topic, or voicing any opinions on such topics. Instead, Plaintiffs claim that "their ability to teach in the classroom, to make it truly a marketplace for the robust exchange of ideas will be impaired" by the fact that Texas handgun license holders might

---

[14] To the extent Plaintiffs argue that their speech is chilled, they lack standing. *See infra.* Part(ii).

carry guns in the classroom. Pl.'s Mem. at 9. Similarly, they claim they "now are incentivized to err on the side of 'trimming their sails,' academically speaking, when they push for classroom debate on topics such as abortion, race, and gay rights." *Id.* at 10. But they offer no evidence that these speculative assertions are reasonable, other than their own opinions, claiming this is "what they know to be true." *Id.* This is insufficient to establish standing to bring a First Amendment challenge.

Of course, "governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 12–13 (1972). But this has "in no way eroded the 'established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action.'" *Id.* (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937)) (alteration omitted).[15] When a plaintiff asserts that a given law or policy will chill future speech, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.'" *Id.* at 13-14 (quoting *United Pub. Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)).

Plaintiffs do not allege more than subjective chill. They offer their opinions that the possibility that license holders could bring concealed firearms into a classroom will make students (and possibly the Plaintiffs) reticent to discuss certain topics or espouse certain views. *See generally*, Glass Aff.; Moore Aff.; Carter Aff. This assumes—without evidence—that (1) license holders, as a class, share the same views,[16] (2) license holders will be inclined to use a legal handguns in response to an individual voicing

---

[15] As a student regent, defendant Varun P. Joseph's lack of voting authority provides an additional and independent basis to defeat Plaintiffs' standing to sue him.

[16] *See, e.g.,* Glass Aff. ¶15 ("Most of the openly libertarian students in my undergraduate classes are male and overtly hostile to women's rights…I strongly suspect that they are more likely to own guns given their distaste for government and law enforcement."); Moore Aff. ¶11 ("On one occasion,

a different view, and (3) other students will refrain from robust intellectual debate as a result. These opinions, however, are not based upon any evidence, studies, or other empirical data to support them. *Id.* That is, Plaintiffs offer these opinions on the basis of their teaching experience. Glass Aff. ¶15; Moore Aff. ¶11; Carter Aff ¶19. But Plaintiffs do not claim to have any expertise on firearms, concealed firearms, Texas's process to obtain a handgun license, violence in the classroom generally, violence in the classroom in response to particular topics, campus carry, campus security, or any of the other fields of study which would give their opinions evidentiary significance.

Moreover, the anecdotes Plaintiffs offer do not involve lawful handgun license holders. Individuals currently exercise their freedom of speech in public parks, office buildings, shopping malls, DPS offices, and numerous other locations where concealed carry is allowed. In fact, "concealed carry has been allowed on campus grounds since 1995, including the West Mall and other outdoor areas where protests and heated debates have occurred without a single incident related to concealed carry." Ex. B. at 27. Plaintiffs offer no evidence that speech is chilled in these locations just because an individual may be carrying a concealed firearm. Instead, "[t]h[e] alleged 'chilling' effect may perhaps be seen as arising from [Plaintiffs'] very perception of the system as inappropriate," and this is insufficient to confer standing. *Laird v. Tatum*, 408 U.S. at 13.

### b. The UT Defendants' policy does not deny Plaintiffs equal protection of the law.

The Equal Protection Clause of the Fourteenth Amendment provides that a State cannot "deny to any person within its jurisdiction equal protection of the laws." U.S. CONST. amend. XIV, §1. However, that is not to say that it is impermissible for laws to differentiate, in some way, between classes of persons. *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). And the legislature enjoys a "latitude of discretion" that is "notably wide" in making these differentiations. *See id.* Plainly

---

on the first day of class, a student announced that she was enrolled to monitor and report on my 'homosexual agenda.' It resulted in a dampening of classroom discussion and participation, which would have been worse if the possibility that she, or some other student was carrying a loaded gun.").

put, the Equal Protection Clause permits classifications with the caveat that governmental decision-makers should not treat differently those who are "in all relevant respects alike." *Nodlinger v. Hahn*, 505 U.S. 1, 10 (1992); see *F.S. Royster Guano Co.*, 253 U.S. at 415 (1920).

When no fundamental right is jeopardized, equal protection merely requires that a classification rationally further a legitimate state interest. [17] *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439–441 (1985). It "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *McGowan v. Maryland*, 366 U.S. 420, 425–426 (1961) (Generally, "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.").

This standard is met so long as there is a plausible policy reason for a classification,[18] the legislative facts on which the classification is apparently based rationally may have been considered to be true by the decision maker,[19] and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.[20] It is immaterial whether the legislature actually relied on the plausible reason, even if there are other irrational factors it did consider. *Beach Commc'ns, Inc.*, 508 U.S. at 313-14; *Reid v. Rolling Fork Pub. Util. Dist.*, 854 F.2d 751, 754 (5th Cir.1988). "[A] state action viewed under the rational basis test is presumed to be valid." *Kite v. Marshall*, 661 F.2d 1027, 1030 (5th Cir. 1981). In such situations, "the burden is not upon the state to establish the rationality

---

[17] When a fundamental right is implicated, strict scrutiny applies and a law is upheld only when it is precisely tailored to further a compelling governmental interest. *Sonnier v. Quarterman*, 476 F.3d 349, 368 (5th Cir. 2007). Plaintiffs concede that "the test to be applied [in the context of this preliminary injunction] is the rational basis test." Pl.'s Mem. at 12 (citing *Cleburne*, 473 U.S. at 449).

[18] *See United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 174, 179 (1980).

[19] *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981).

[20] *See Cleburne*, 473 U.S. at 446.

of its restriction, but is upon the challenger to show that the restriction is wholly arbitrary." *Karr v. Schmidt*, 460 F.2d 609, 617 (5th Cir. 1972) (*en banc*). Only where a litigant shows that a regulatory classification is "wholly arbitrary" or unrelated to a permissible interest is equal protection violated. *Walsh v. Louisiana High School Athletic Ass'n*, 616 F.2d 152, 160 (5th Cir. 1980).

As explained above, Plaintiffs cannot carry their burden to show that the UT Defendants' policies implicate any First Amendment right that they enjoy.[21] *See supra* Part I(a)(i). Thus, in assessing the Plaintiffs' equal protection claim against UT Defendants, the Court must answer just one question[22]: whether UT Austin's implementing policy's differing treatment of general purpose classrooms from other campus locations[23] rationally furthers a legitimate state interest. [24] [25] The Court should unequivocally answer this question yes.

---

[21] *See also supra* n.7 and accompanying text.

[22] Defendant Paxton's Response addresses the other aspect of Plaintiffs' equal protection claim. Specifically, whether the statute's distinction between public and private universities rationally furthers a legitimate state interest. Accordingly, UT Defendants will not address this aspect of Plaintiffs' claim.

[23] Plaintiffs focus on the policy's differing treatment of different areas as a proxy for the differing affect that has on professors teaching in these areas—namely, the type of area where one teaches determines whether concealed carry is prohibited or not. Defendants' discussion on this point uses the treatment of different areas as a proxy for the same.

[24] Pl.'s Mem. at 11-13; Glass Decl. ¶¶13-14; Moore Decl. ¶10; Carter Decl. ¶17.

[25] In agreeing that rational basis review applies to their claim, Plaintiffs argue that *St. Joseph Abbey v. Castille* counsels in favor of finding UT Austin's policy fails equal protection requirements. That case is not instructive here. 712 F.3d 215 (5th Cir. 2013). There, the Abbey challenged a state regulatory board's regulations which granted funeral homes an exclusive intrastate right to sell caskets. *Id.* at 220. The regulation failed constitutional muster because the court found that economic protectionism is not a legitimate state interest and it was the only interest put forward by the board that was rationally related to the regulation at issue. *Id.* at 222-23. The decision turned on the fact that the blatant protectionism was unrelated to any valid public interest or the general welfare, and instead just a "naked transfer of wealth." *Id.* The court there also reiterated that rational basis review places "no affirmative evidentiary burden on the government," despite Plaintiffs' positing otherwise. *Id.* at 223; Pls.' Memorandum in Support at p. 13. It went on to note that a plaintiff could negate plausible rational basis by adducing evidence of irrationality. *St. Joseph's Abbey*, 712 F.3d at 223. Here, Plaintiffs

UT Austin's policy does not violate equal protection guarantees. The policy, as state regulation, is presumed valid. *See Kite*, 661 F.2d at 1030. Plaintiffs must show that it is wholly arbitrary or that UT Austin's interests in making its determinations are not permissible governmental interests. They fail.

Apart from areas where other law prohibits campus carry, the policy identifies eight additional gun exclusion zones. Stipulated Joint Ex. 1 at 3-13. None of these is a typical classroom setting. *See id.* In fact, unless a classroom falls under one of these eight categories, or one set out in other law, campus carry is permitted and the professor lacks discretion to determine otherwise. *See id.* In this way, the policy uniformly treats those professors and areas that are "in all relevant respects alike." *Nodlinger*, 505 U.S. at 10 (1992). Plaintiffs have not and cannot show that the policy generally permitting campus carry in classrooms will impact them differently from other similarly situated professors at UT Austin. *See* Glass Aff. ¶13 (complaining that locations other than classrooms may prohibit concealed carry when she cannot do so in classrooms); Moore Aff. ¶10 (same); Carter Aff. ¶17 (same).

Instead, they complain that classrooms are not an additional area on campus where concealed carry may be prohibited and claim not to understand why these areas are treated differently under the policy. *See id.* This is not enough to show that UT Austin's policy is wholly arbitrary. What's more, the Working Group report, along with President Fenves's letter and policy recommendations, dispel any such notion. These documents detail the thoughtful, deliberative, and consultative process that the University undertook. *See* Ex. B; Stipulated Joint Ex. 1. They also detail how these categories were identified as gun exclusion zones. Equal protection allows for such thoughtful classifications. *Parish v. Nat'l Collegiate Athletic Ass'n*, 506 F.2d 1028 (5th Cir. 1975); *see, e.g., Kite*, 661 F.2d at 1030 (where no fundamental right implicated, regulation treating student athletes who attend summer athletic camps differently from those students who do not—by disqualifying them from eligibility in varsity sports—

have made no such attempt. And the relevant public documents carefully set out the legitimate state interests that drove the policy determinations.

furthers legitimate interest in making competition among member schools as fair as possible and avoiding competitive imbalance between those who can afford camp and those who cannot).

UT Austin, as a State agency, has legitimate interests in promoting safety on campus and following the requirements of state law. *See, e.g., FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 175 (5th Cir. 1996) (identifying public safety as a legitimate public interest); *Campaign for S. Equal. v. Bryant*, 773 F.3d 55, 58 (5th Cir. 2014) ("The inevitable disruption that would arise from a lack of continuity and stability in [an] important area of law presents a potential harm not just to [the State] but to the [p]laintiffs themselves and to the public interest at large."); *Maryland v. King*, 133 S. Ct. 1, 3 (2012) ("'any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'") (citing *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). And Plaintiffs do not dispute that either is a legitimate governmental interest. For each area identified as a gun exclusion zone, both the Working Group recommendations and the resulting policy expressly set out the specific factors warranting this treatment. *See* Ex. B; Stipulated Joint Ex. 1. The rational relationship between maximizing campus safety (while comporting with state law) and each gun exclusion zone is explicit. Regardless of whether Plaintiffs believe the policy determinations are wise, it is not a court's province to weigh in on "the wisdom, fairness, or logic" of such determinations. *Beach Commc'ns, Inc.*, 508 U.S. at 313.

Plaintiffs make no showing that the bases set forth in the Working Group recommendations and the policy statements regarding gun exclusion zones could not reasonably be thought to be true. *See FM Properties Operating Co.*, 93 F.3d 167, 175 (5th Cir. 1996) (discussing required burden to challenge a presumed-valid legislative judgment). Therefore, they have failed to make the required showing to overcome the presumption of the policy's validity. *See id.* For all of these reasons, Plaintiffs fail to show a likelihood of success on the merits of their equal protection claim based on UT Austin's policy.

## II.   Without establishing a viable constitutional claim, Plaintiffs cannot show a substantial likelihood of irreparable harm.

Plaintiffs do not cite any authority for their contention that they will suffer irreparable harm absent the extraordinary relief requested. Instead, they offer "their convictions" that "the second guns are forced into their classrooms, they will pull back from the full and vigorous kinds of pedagogy they view as fundamental to their academic freedom." Pl.'s Mem. at 13. This does not demonstrate irreparable harm. It is undisputed that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). But this, of course, assumes that Plaintiffs have shown they will lose such freedoms and are therefore likely to succeed on the merits of a First Amendment claim. Plaintiffs cannot establish as much. *Supra*, Part I(a)(i). Similarly, without demonstrating an interest protected under the Equal Protection Clause, there is no likelihood—let alone substantial likelihood—of irreparable harm in violation of that Clause. For the reasons set forth above, Plaintiffs have not satisfied this standard. *Supra*, Part I(b). Thus, they cannot show irreparable injury under either the First Amendment or Equal Protection Clause.

## III.   The balancing of harms counsels against entering the requested injunction.

Plaintiffs argue that "[n]ot allowing guns into Plaintiffs' Fall semester classrooms while awaiting final trial on the merits of this case will work no possible harm to the Defendants," suggesting that it would instead "be doing most of them a favor." Pl.'s Mem. at 14. This, however, ignores the UT Defendants' interests in following the law. Indeed, Plaintiffs frame this case improperly, asserting that "the clash…is between the laws and policies of the State of Texas that are forcing guns into public university classrooms versus the professors' individual constitutional right to say 'not in here while I'm teaching you.'" Pl.'s Mem. at 2-3. But there is no law "forcing" guns into public university classrooms—surely, compulsory campus carry is not contemplated by State law or UT Austin policy. *Contra* TEX. GOV'T CODE §411.2031(d-1). Instead, the law and policy at issue preserve the option for students, faculty, and staff with licenses to carry on campus, as mandated by Texas law. Acting as

agents of a well-known state university, the UT Defendants do not have the prerogative to further any particular policy preference through rulemaking that violates the law. Thus, the "clash" Plaintiffs mention is between the Plaintiffs' policy preference and the UT Defendants' obligation to comply with the law.

Plaintiffs also mischaracterize the holdings of key Second Amendment cases—in particular, *District of Columbia v. Heller* and *McDonald v. City of Chicago*—suggesting that the UT Defendants' policy violates their holdings. 554 U.S. 570 (2008); 561 U.S. 742 (2010). *See generally,* Pl's Mem. at 2, 12. In *Heller* the Supreme Court invalidated the District of Columbia's total ban on useable handguns in the home under the Second Amendment. 554 U.S. 570. *McDonald*, for its part, simply clarified that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*" to the States. 561 U.S. at 791.

Plaintiffs characterize *Heller* and *McDonald* as establishing a *ceiling* on the Second Amendment, asserting that these cases go "no further than recognition of the right to possession of handguns *in the home.*" *Id.* (citing *Heller*, 554 U.S. 570; *McDonald*, 561 U.S. 742) (emphasis Plaintiffs'). Instead, these cases established a *floor*—in regulating areas that implicate Second Amendment rights, States must at least allow individuals to possess useable handguns for self-defense in the home. States that choose to go further are not prohibited from doing so by either *Heller* or *McDonald*.

Moreover, as of August 1, the status quo will be that license holders can carry concealed handguns in most classrooms at UT Austin. Plaintiffs wish to disrupt this, calling for an exception to this necessary result of Texas law—just for them—effective August 24. But case law favors preservation of the status quo at the preliminary injunction stage. Indeed, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). This also counsels in favor of denying Plaintiffs' request which, if granted, would disrupt the status quo.

**IV.**   **The public's interest in uniform and evenhanded application of state law also counsels against entering the requested injunction.**

For the same reasons the UT Defendants have an interest in compliance with Texas law, so does the public. Indeed, recognizing a constitutional right for Plaintiffs to ban guns from the particular classrooms where they teach would conflict with State law. Moreover, the Fifth Circuit has recognized that preliminary injunctions have the effect of "of denying the public interest in the enforcement of its laws[.]" *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) (affirming denial of preliminary injunction). Here, Plaintiffs have not articulated a constitutionally cognizable claim. As such, the Court should preserve the status quo.

## Conclusion & Prayer

For the reasons set forth herein, the Plaintiffs' motion for preliminary injunction should be denied.

**Dated this 1st day of August, 2016.**

**Respectfully submitted,**

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

/s/Anne Marie Mackin
AMANDA J. COCHRAN-MCCALL
Deputy Chief, General Litigation Division
Texas Bar No. 24069526
amanda.cochran-mccall@texasattorneygeneral.gov
ANNE MARIE MACKIN
Assistant Attorney General
Texas Bar No. 24078898

OFFICE OF THE ATTORNEY GENERAL
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2120
(512) 320-0667 *Facsimile*
anna.mackin@texasattorneygeneral.gov

**ATTORNEYS FOR UT DEFENDANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 1st day of August, 2016, a true and correct copy of the foregoing was filed electronically with the Court and delivered via the CM/ECF system to:

James George, Jr.
GEORGE, BROTHERS, KINCAID & HORTON LLP
114 W 7th Street, Ste. 1100
Austin, Texas 78701
512-495-1400
512-499-0094 Fax
State Bar No. 07810000
rigeorge@gbkh.com

Malcolm Greenstein
GREENSTEIN & KOLKER
1006 E. Cesar Chavez Street
Austin, Texas 78702
512-472-6270
512-472-8263 Fax
State Bar No. 08403300
malcolm@greensteinandkolker.com

Renea Hicks
LAW OFFICE OF MAX RENEA HICKS
101 West 6th Street, # 504
Austin, Texas 78701
512-480-8231
512-480-9105
State Bar No. 09580400
rhicks@renea-hicks.com

**ATTORNEYS FOR PLAINTIFFS**

Prerak Shah
Senior Counsel to the Attorney General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
Texas Bar No. 24075053
prerak.shah@texasattorneygeneral.gov

**ATTORNEY FOR DEFENDANT KEN PAXTON**

/s/ Anne Marie Mackin
**ATTORNEY FOR UT DEFENDANTS**

22