

# Campus Carry Policy Working Group

Final Report
December 2015

**Exhibit 3**

## TABLE OF CONTENTS

**EXECUTIVE SUMMARY**

**I.  INTRODUCTION**

**II.  THE LAW**
    **A.  Summary of Key Points**
    **B.  This is Not an Open-Carry Law**
    **C.  The Applicable Law**
        1.  The Law Before S.B. 11
        2.  S.B. 11

**III. THE WORKING GROUP'S CONSULTATIVE AND DELIBERATIVE PROCESS**
    **A.  Consultation**
    **B.  Working Group Process**
    **C.  What We Heard and Learned**
        1.  Consultation with Students, Staff, and Faculty
        2.  Relevant Demographic Information
        3.  Information from Other States

**IV. RECOMMENDATIONS**
    **A.  How Handguns Must Be Carried and Stored**
    **B.  Where License Holders Must Not Carry Handguns**
        1.  Statutory Gun-Exclusion Zones
        2.  Gun-Exclusion Zones Established Under Section 411.2031(d-1)
    **C.  Incidental Implementation Measures**
    **D.  Proactive Measures**
        1.  Mental Health
        2.  Safety Training and Communication
        3.  Academic Research and Data Collection
        4.  Additional Safety Measure
    **E.  Why We Do Not Recommend Classrooms Should Be Gun-Exclusion Zones**

**V.  CONCLUSION**

**Appendix A.**  Membership of Campus Carry Policy Working Group and Subcommittees
**Appendix B.**  Text of Relevant Statutes
**Appendix C.**  Recommendations and Comments

## EXECUTIVE SUMMARY

### Background

Senate Bill 11, the "campus carry" law, was passed by the Texas Legislature and signed into law by Governor Abbott last spring. It provides that, beginning August 1, 2016, a person who holds a license to carry may carry a handgun – concealed – both on the grounds and in the buildings of an institution of higher education. S.B. 11 authorizes the president of a public university to enact reasonable rules and regulations regarding the concealed carry of handguns on campus. But these rules and regulations may neither generally prohibit nor have the effect of generally prohibiting license holders from carrying their concealed handguns on campus. A second bill passed by the Legislature – the open-carry law – expressly exempts institutions of higher education. Thus, the open carry of handguns on campus is now and will remain a crime.

University of Texas at Austin President Gregory L. Fenves established the Campus Carry Policy Working Group to recommend to him implementation policies for S.B. 11. The Working Group comprises faculty, staff, students, a distinguished alumnus, a parent and university administrators.

### Consultation and Deliberation

The Working Group consulted extensively with the University community. Our online survey generated more than 3,300 comments, and we received and considered numerous other submissions from scores of departments and schools, student groups, professional associations and organizations, individuals, and the Faculty Council. We conducted two public forums, which were attended by approximately 400 people. Both events were live-streamed, and the recordings were then posted on our website. The second forum alone garnered nearly 32,000 views. We also researched the applicable legal and regulatory regimes of the seven states where campus carry has already been mandated and reached out to representatives of campuses in those states.

A very substantial majority of the comments we received from the University community expressed opposition to or serious misgivings about S.B. 11 and the implementation of campus carry. Many fears were repeatedly expressed: about handgun carriers going on rampages; about the risk of accidental discharges, especially in large crowds or labs; that handgun carriers will make bad decisions when faced

with an active shooter; and that more guns on campus will lead to an increase in campus suicides.

Substantial numbers of faculty strongly conveyed their belief that campus carry will have a significant, adverse effect on classroom discussions and their academic freedom. They expressed a deep-seated fear that the knowledge that one or more students might be carrying a concealed weapon would have a substantial chilling effect on class discussion. These comments were echoed by many students and by numerous national organizations, such as the American Association of University Professors and the Association of American Colleges and Universities.

Many commenters expressed the view that campus carry would impede the University's ability to recruit and retain students, faculty, and staff.

On the other hand, a substantial number of the comments we received favored campus carry. Many of these commenters said they should be able to carry a concealed handgun as they walked – sometimes a substantial distance, at night – to a parked car or their home. Others asserted that they should be able to have a concealed handgun available should an active shooter situation arise. Many contested claims that campus carry would cause an increase in campus violence, citing Texas Department of Public Safety data indicating that license holders are, as a group, extremely law-abiding. And many cited the Second Amendment of the U.S. Constitution.

Based on Texas DPS and University enrollment data, we estimate that less than one percent of our students will have a license to carry a handgun. We did not perform similar calculations for staff and faculty. According to Texas DPS and census data, however, license holders comprise about 4.5% of the Texas population aged 21 and older.

Our examination of states that already have campus carry revealed little evidence of campus violence that can be directly linked to campus carry, and none that involves an intentional shooting. We learned of four accidental discharge incidents. Two involved a license holder who was openly displaying a handgun to another person; the other two involved license holders who were carrying their handguns unholstered in their pants pocket.

We found that the evidence does not support the claim that a causal link exists between campus carry and an increased rate of sexual assault. We found no evidence that campus carry has caused an increase in suicide rates on campuses in other states.

## Recommendations

Our recommendations are the product of substantial study, deliberation, and debate. The 19 members of the Working Group brought a wide range of experiences and expertise to our deliberations. Not surprisingly, our discussions were intense, and we often disagreed.

In the end, however, we were able to reach consensus on 25 recommendations. These are grouped in four categories: how handguns must be carried and stored; where handguns must not be carried; incidental implementation measures; and proactive measures. This summary sets forth – sometimes in somewhat simplified fashion – what we believe to be the most significant recommendations.

### How Handguns Must Be Carried and Stored.

These recommendations are designed to ensure that handguns will be carried and stored on campus in the safest way possible.

- License holders who carry a handgun on campus must carry it on or about their person at all times or secure their handgun in a locked, privately-owned or leased motor vehicle. "About" the person means that a license holder may carry a handgun in a backpack or handbag, but the backpack or handbag must be close enough to the license holder that he or she can grasp it without materially changing position.

- Handguns – including those carried in backpacks and handbags – must be carried in a holster that completely covers the trigger and the entire trigger guard area. The holster must have sufficient tension or grip on the handgun to retain it in the holster even when subjected to unexpected jostling.

- Semiautomatic handguns must be carried without a chambered round of ammunition.

### Where Handguns Must Not Be Carried.

Regardless of S.B. 11, Texas law will continue to prohibit license holders from carrying handguns in certain on-campus locations. These include:

- The physical premises of a pre-K through 12 school or educational institution. This includes, for example, the UT Elementary School.

- The grounds or building on which an activity sponsored by a pre-K through 12 school or educational institution is being conducted. This would include, for example, the Blanton Museum of Art when a public school field trip is being conducted there.

- The premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place. This would include UT athletic events.

The Working Group recommends the concealed carry of handguns also be prohibited in the following:

- Areas for which state or federal law, licensing requirements, or contracts require guns be excluded. This would include, for example, our Nuclear Engineering Teaching Laboratory and on-campus child-care facilities.

- Patient-care areas, including those in which professional mental health services are provided. This would include, for example, the University Health Services and Counseling and Mental Health Center.

- Areas in which formal hearings are being conducted pursuant to institutional disciplinary and grievance rules. This would include, for example, formal hearings conducted by Student Judicial Services.

- Areas where the discharge of a firearm might cause great harm, such as laboratories with extremely dangerous chemicals, biologic agents, or explosive agents, and areas with equipment that is incompatible with metallic objects, such as magnetic resonance imaging machines.

The Working Group recommends that counselors, staff, and volunteers who work in a campus program for minors and parents of attendees should not be permitted to carry a concealed handgun on the grounds or in buildings where the program is conducted.

*On-Campus Residence Halls and University Apartments.* The Working Group recommends:

- The concealed carry of handguns should be generally prohibited in on-campus residence halls.

**Exhibit 3**

- Exception: A resident's parents should be permitted to carry a concealed handgun on or about their person while visiting a child in on-campus residence halls.

- Exception: The concealed carry of handguns should be permitted in common areas of on-campus residence halls such as lounges, dining areas, and study areas.

- The concealed carry of handguns should be allowed in University Apartments (widely known as "married student housing").

- Residents of University Apartments who have handguns must store them in gun safes that meet specified standards and that are physically secured in a manner that conforms to Division of Housing and Food Service policy.

Several considerations justify these recommendations. First, while only about one percent of students who are at least 21 years old live in on-campus residence halls, a substantial number of students under the age of 18 live in them. Second, only two percent of on-campus residence hall rooms are designated single rooms. This significantly diminishes the likelihood that handguns can be safely stored at all times. These specific safety considerations, however, pertain most strongly to the living areas of the residence halls. Therefore, we recommend that common areas such as lounges, dining areas, and study areas be treated as they are elsewhere on campus, and that concealed carry be permitted there. Nor are these safety considerations relevant to a parent's concealed carry of a handgun while visiting a child in a residence hall.

University Apartments should be treated differently because of their physical lay-out – they have private bedrooms – and because their resident population is considerably older – virtually all contract holders are at least 21.

*Offices.* The Working Group recommends:

- The occupant of an office to which he or she has been solely assigned and that is not generally open to the public should be permitted, at the occupant's discretion, to prohibit the concealed carry of a handgun in that office.

- An office occupant who chooses to exercise this discretion must provide oral notice that the concealed carry of a handgun in the occupant's office is prohibited.

- If the occupant's duties ordinarily entail meeting people who may be license holders, the occupant must make reasonable arrangements to meet them in another location at a convenient time.

The law has traditionally vested the occupant of an office with substantial control over his or her office space. The United States Supreme Court has recognized that government employees have a constitutionally-protected right of privacy in their offices. UT faculty, staff, and students who occupy offices to which they are solely assigned and that are not generally open to the public have traditionally been vested with the authority to control who may and may not enter. They have long exercised that discretion (unrelated to the concealed carry law) and should be able to continue to do so. We recommend that an office occupant must give oral rather than written notice to avoid the proliferation of signage that would otherwise be required.

**Proactive Measures.**

The Working Group makes recommendations regarding steps the University could take to improve campus safety, alleviate fears aroused by S.B. 11, and enhance the University's role in the study of gun violence.

*Mental Health.* The University should examine the level of resources devoted to mental health services and better publicize the existence of mental health services already available to the UT community.

*Safety Training and Communication.* The University should both package existing training materials in a unified and easy-to-find webpage and better publicize their existence. The University should develop mandatory training materials for all students, staff, and faculty on how to respond to an active shooter situation. It should also develop additional training materials on a variety of other suggested topics.

*Academic Research and Data Collection.* The University should develop an institutionalized means of systematically gathering and analyzing data on the effects of campus carry. It also should consider ways to encourage and support the study of a panoply of issues related to gun violence.

*Additional Safety Measure.* To the extent possible, office space within gun-exclusion zones should be made

**Exhibit 3**

available to faculty and staff who do not have offices to which they are solely assigned. These may be used for conferences and meetings on a scheduled basis.

**Classrooms**

The Working Group is aware of, and sympathetic to, the overwhelming sentiment on campus that concealed carry should not be permitted in classrooms. Every member of the Working Group – including those who are gun owners and license holders – thinks it would be best if guns were not allowed in classrooms. Nevertheless, the Working Group does not recommend that classrooms should be designated a gun-exclusion zone.

The primary on-campus activity for most of our more than 50,000 students is going to class. Excluding handguns from classrooms would have the effect of generally prohibiting license holders from carrying their handguns and so would violate S.B. 11.

The only possible way to avoid this result would be for the University to provide gun lockers at strategic points around campus. We believe that this would be extremely ill-advised for several reasons. Most significantly, every knowledgeable source we consulted unequivocally

stressed the danger that accompanies the transfer of a handgun to a storage unit. A policy that increases the number of instances in which a handgun must be stored multiplies the danger of an accidental discharge. We believe this danger would be especially acute in gun lockers placed around campus. These are most likely to be used when a license holder is attempting to store a handgun while heading to class. It is all-too easy to imagine that there will be days when a license holder is running a bit late and thus will be less cautious in storing the handgun.

The Working Group concluded, without hesitation, that the risks to human life of placing gun lockers around campus would substantially outweigh any benefits that would accrue from banning concealed handguns in classrooms. Our charge from President Fenves was to make recommendations that would promote safety and security for all members of the campus in a way that is fully compliant with the law. Recommending that the University install and operate gun lockers around campus would be inconsistent with that charge.

This Executive Summary provides only a brief overview of the results of our three months of work. We urge all members of the University community to read the full report.

**Exhibit 3**
© 2015 The University of Texas at Austin   Campus Carry Policy Working Group   *Final Report*

# I.  INTRODUCTION

Earlier this year, the Texas Legislature passed and Governor Abbott signed into law Senate Bill 11. Known as the "campus carry" law, S.B. 11 provides that, as of August 1, 2016, a person who holds a license to carry may carry a handgun – concealed – both on the grounds and in the buildings of an institution of higher education. As fully explained below, S.B. 11 authorizes the president of a public university to enact reasonable rules and regulations regarding the concealed carry of handguns on campus – but not rules or regulations that generally prohibit or have the effect of generally prohibiting license holders from carrying their concealed handguns on campus.[1]

President Fenves established the Campus Carry Policy Working Group to recommend to him implementation policies for S.B. 11. The Working Group comprises faculty, staff, students, a distinguished alumnus, a parent, and university administrators. In addition, President Fenves created two subcommittees to support the Working Group. One focuses on safety and security issues; the other on communication and training. These subcommittees are chaired by members of the Working Group and staffed by employees from the UT Police Department, Campus Safety and Security, the Office of Legal Affairs, and other campus offices. The full membership of the Working Group and these subcommittees is listed in Appendix A.

Campus carry has proved to be a highly controversial issue. It has provoked intense interest and passion among members of the University community. Campus carry has been widely covered in the press, both locally and nationally, especially after the tragic October 2015 campus shooting in Oregon. The Working Group understands well that many members of the UT community strongly believe that S.B. 11 should never have been enacted. We are also keenly aware that no set of recommendations we make will satisfy everyone. Nonetheless, we have made every effort to remain true to the charge President Fenves gave us: to recommend steps he can take that will promote safety and security for all members of the campus in a way that complies with the law.

Part II of this Report reviews the relevant law. In Part III, we detail the Working Group's deliberative process, focusing on how and what we learned from our consultations with students, staff, faculty, and other members of the University community as well as our independent research. Part IV sets forth our recommendations, which are divided into four categories: (1) how license holders must carry and store handguns on campus; (2) places and activities that may constitute gun-exclusion zones; (3) incidental implementation issues; and (4) proactive measures to address concerns raised by campus carry. Part IV concludes with our explanation for why we have not recommended that classrooms be designated gun-exclusion zones.

---

[1] S.B. 11 allows private universities to completely ban license holders from carrying handguns on campus. Tex. Gov't Code § 411.2031(e).

## II. THE LAW

Because of the complexity of the law, we begin with a summary of key points.

### A. Summary of Key Points

- The open carry of handguns on campus is now and will remain a crime.

- The concealed carry of handguns by license holders on the grounds of campus has been allowed since 1995.

- S.B. 11 authorizes license holders to carry concealed handguns in university buildings.

- S.B. 11 authorizes university presidents to establish rules and regulations "concerning the storage of handguns" in on-campus dormitories or other residential facilities.

- S.B. 11 authorizes university presidents to establish reasonable rules and regulations "regarding the carrying of concealed handguns by license holders on the campus ... or on premises located on the campus." There must first be consultation with students, staff, and faculty regarding "the nature of the student population, specific safety considerations, and the uniqueness of the campus environment."

- The rules and regulations may not "generally prohibit or have the effect of generally prohibiting license holders from carrying concealed handguns on the campus."

- Effective notice must be provided with respect to any place where handguns may not be carried.

- Provisions in the Texas Penal Code that criminalize the carrying of handguns in certain areas remain in effect.

### B. This is Not an Open-Carry Law

During our consultations with the University community, it became clear that many people are confused about what S.B. 11 does and does not do. The most common misunderstanding is that S.B. 11 is an "open-carry" law that authorizes license holders to openly display their handguns. This is not true, and we wish to make this crystal clear.

S.B. 11 was one of two major handgun laws enacted by the 2015 Legislature. The other was House Bill 910. While H.B. 910 does generally authorize license holders to visibly carry handguns in a belt or shoulder holster, section 47 of H.B. 910 expressly creates an exception for universities. It is now a crime – and it will remain a crime – for a license holder to openly carry a handgun on university premises as well as on any university driveway, street, sidewalk, walkway, or parking area.

### C. The Applicable Law

The legal framework surrounding campus carry consists of a number of interrelated statutes in the Texas Penal and Government Codes. One cannot apprehend the significance of S.B. 11 without understanding the relevant laws.

#### 1. The Law Before S.B. 11

Before S.B. 11 was enacted, the laws governing the carrying of handguns by license holders[2] on campus were found primarily in the Texas Penal Code (TPC) §§ 46.02, 46.03, 46.035, and 46.15. Essentially, §§ 46.02 and 46.15 together barred someone who did not have a license from carrying a handgun any place other than his or her own premises and motor vehicle. License holders, however, were permitted to carry their handguns in a concealed manner unless otherwise prohibited by law.

TPC § 46.03(a)(1) made it illegal, even for license holders, to carry a handgun "on the physical premises of a school or educational institution." Before S.B. 11 was passed, this provision covered institutions of higher education, and so license holders were prohibited from carrying a handgun "on the physical premises" of a university. "Premises" is defined in TPC § 46.03(f) as "a building or portion of a building." Therefore, before S.B. 11, license holders were permitted to carry their concealed handguns on the grounds of a university, but not in university buildings. This has been the law in Texas since 1995.

---

[2] Eligibility for a Texas license is restricted to those who, among other things: are at least 21 years of age (except for members of the military or veterans); have not been convicted of felony; have not been convicted in the past five years of a Class A or Class B misdemeanor; are not presently charged with Class A or Class B misdemeanor or a felony; are not currently restricted under a court protective order or subject to a restraining order; are not chemically dependent; are not incapable of exercising sound judgment regarding the proper use and storage of a handgun; and are fully qualified under applicable federal and state law to purchase a handgun. Tex. Gov't Code § 411.172. A license applicant must complete at least four hours of training taught by a certified instructor and pass a proficiency examination. Tex. Gov't Code § 411.188. For a complete list of the eligibility requirements and other information about obtaining a license in Texas, see http://txdps.state.tx.us/RSD/CHL/index.htm.

Exhibit 3

Finally, both TPC §§ 46.03(a) and 46.035(b) listed a number of other places in which even license holders were barred from carrying a concealed handgun. These provisions remain largely unchanged by S.B. 11. Relevant provisions of these laws are detailed in Part IV of this Report, and their text is reproduced in Appendix B.

## 2. S.B. 11

S.B. 11 amends both the Texas Government and Penal Codes in several critical ways.

S.B. 11 adds a new section to the Texas Government Code (TGC) that authorizes campus carry of concealed handguns by license holders. TGC § 411.2031(b) states, "A license holder may carry a concealed handgun on or about the license holder's person while the license holder is on the campus of an institution of higher education … ." Consistent with this, the bill amended TPC § 46.03. Before S.B. 11, TPC § 46.03(a) barred license holders from carrying handguns on the premises of a "school or educational institution." S.B. 11 creates an exception to this provision that allows license holders to carry concealed handguns "on the premises of an institution of higher education." TPC § 46.03(a)(1)(B). Put simply, S.B. 11 extends existing law, which permitted license holders to carry concealed handguns on the grounds of a university campus, by authorizing license holders to carry concealed handguns in university buildings. These changes take effect on August 1, 2016.

S.B. 11, however, gives university presidents some discretion to regulate campus carry. First, under TGC § 411.2031(d), the president of a university may establish rules and regulations "concerning the storage of handguns" in on-campus dormitories or other residential facilities.

Second, TGC § 411.2031(d-1) provides that the president shall establish reasonable rules and regulations "regarding the carrying of concealed handguns by license holders on the campus … or on premises located on the campus." Before establishing these rules and regulations, the president must consult with students, staff, and faculty concerning "the nature of the student population, specific safety considerations, and the uniqueness of the campus environment." Id. Finally, S.B. 11 enjoins the president from enacting rules and regulations that "generally prohibit or have the effect of generally prohibiting license holders from carrying concealed handguns on the campus." Id.

Under S.B. 11, the Board of Regents must review any rules or regulations that a university president adopts under TGC § 411.2031(d-1). The Regents may, by a two-thirds vote, amend those rules or regulations. TGC § 411.2031(d-2). Moreover, S.B. 11 requires each university to submit to the legislature and relevant committees a report that describes the rules and regulations it has adopted and explains the reasons it has adopted them. This report must be submitted by September 1, 2016. TGC § 411.2031(d-4).

S.B. 11 also contains two notice requirements. First, the university must widely distribute its rules and regulations to students, staff, and faculty, and prominently publish them on the University's website. TGC § 411.2031(d-3).

Second, TGC § 411.2031(d-1) requires the university to give "effective notice under Section 30.06, Penal Code, with respect to any portion of a premises on which license holders may not carry." TPC § 30.06 in turn provides that notice may be given by oral or written communication. Written communication may take either of two forms. It may be given individually on a card or document or more generally through posted signage. Either way, TPC § 30.06 prescribes the precise language the written notice must contain:

> "Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun." TPC § 30.06(c)(3)(A).

For posted signs, this language must appear in both English and Spanish, in block letters at least one inch high. The Working Group did a mock-up of this statutorily-mandated signage and determined that these signs will have to be at least two feet by three feet in dimension.

Finally, S.B. 11 amends TPC § 46.035. Most significantly, it adds a provision that criminalizes a license holder's concealed carry of a handgun on campus premises that the university's rules and regulations have declared gun-exclusion zones, so long as the university gives effective notice under TPC § 30.06. TPC § 46.035(a-3). S.B. 11 also adds another section to TPC § 46.035 (as did H.B. 910, the open carry law) that criminalizes the open carry of handguns on campus. TPC § 46.035(a-1). To repeat what we said earlier: The open carry of handguns on campus is and will continue to be a crime.

# III.  THE WORKING GROUP'S CONSULTATIVE AND DELIBERATIVE PROCESS

## A. Consultation

S.B. 11 requires consultation with "students, staff, and faculty ... regarding the nature of the student population, specific safety considerations, and the uniqueness of the campus environment." The Working Group strived to gather as much input as possible, not only from students, staff, and faculty, but also from other members of the University community, including alumni and parents. We also sought to communicate with the University community and to proceed in as transparent a manner as possible. Our efforts included:

- An online survey at our website, campuscarry.utexas. edu. This generated more than 3,300 comments, all of which were read carefully.

- Two public forums. These forums were attended by approximately 400 people, and 75 people spoke. Both events were live-streamed, and the recordings were then posted on our website. The second forum alone garnered nearly 32,000 views.

- A survey of all the deans, directors of off-campus research programs, and various other program directors seeking their input about possible gun-exclusion zones.

- The chair of the Working Group spoke and took questions at meetings of various constituent groups, including the Faculty Council; Staff Council; a student forum hosted by the Student Government, Senate of College Councils, and Graduate Student Assembly; the Texas Parents Association Advisory Board; and the Texas Exes Board.

- Working Group members engaged in frequent informal communication with members of the University community.

- The Working Group received and read numerous other comments, petitions, and resolutions from scores of departments and schools, student groups, professional associations and organizations, individuals, and the Faculty Council.

- The Working Groups heard frequently from groups such as Gun Free UT and Students for Concealed Carry.

Legislatures in seven other states have already mandated various forms of campus carry. These are Colorado, Idaho, Kansas, Mississippi, Utah, Oregon, and Wisconsin. Therefore, the Working Group attempted to learn as much as we could about how campuses in these states have responded to campus-carry mandates. We both researched the applicable legal and regulatory regimes and reached out to representatives of campuses in all of these states.

## B. Working Group Process

The Working Group met on a weekly basis throughout the Fall 2015 semester. Beyond the two subcommittees established by President Fenves, which were composed primarily of University staff and administration members, the Working Group created its own subgroups. To deal with the voluminous number of comments we received (filling more than 800 pages, printed), we formed a Comments Subgroup. Its task was to systemically read and digest these comments, and report its findings to the entire Working Group.

Second, the feedback we received included numerous suggestions as to what the University could do to maximize campus safety, alleviate fears aroused by S.B. 11, and enhance the University's role in the study of gun violence. Therefore, we established a Proactive Measures Subgroup to review these ideas and put forward a coherent set of measures for the President's consideration. In the limited time we had, we were not able to evaluate the cost, feasibility, or sometimes even the desirability of many of these proactive measures. But we believe that many of them are deserving of serious study and consideration.

Third, the Working Group's deliberations occurred in tandem with those of a working group organized by the University of Texas System. The System's working group included a representative from each component institution – the chair of our Working Group represented UT Austin – as well as System administrators. The System working group, which also met on a weekly basis, sought primarily to develop a set of consensus gun-exclusion zones; that is, a list of places that members of all component institutions could agree should and could, under the law, be gun-exclusion zones on each component campus. Of course, the consensus gun-exclusion zones recognized by the System's working group were merely advisory and served only as a starting point for our ultimate recommendations. Throughout the process, UT System made clear that under S.B. 11 each institution was free to establish its own rules and regulations, suited to its own particular circumstances. The System working group

also provided a means by which we could gain valuable insight into how other campuses around the state are addressing the issues raised by campus carry.

## C. What We Heard and Learned

### 1. Consultation with Students, Staff, and Faculty

Our consultations with students, staff, and faculty were immensely productive. The great majority of respondents were thoughtful and highly engaged, and reflected a wide variety of experiences.

Neither our online survey nor our public forums were designed to generate data ripe for statistical analysis. We simply asked people to comment and express their opinions. Many expressed general opposition to or support for campus carry without commenting on how it should be implemented. Many others expressed general opposition to or support for the law and made suggestions regarding implementation. Some expressed neither support for nor opposition to the law, but nonetheless made suggestions regarding implementation. Many expressed views – whether in favor of, opposed to, or neutral about campus carry – that revealed a great deal of confusion about what S.B. 11 does and does not do.

Nevertheless, it is apparent to us that a very substantial majority of the comments we received from the University community expressed opposition to or serious misgivings about S.B. 11 and the implementation of campus carry.

Several themes dominated the "opposition" comments. Safety concerns were widespread. Many expressed fear about handgun carriers going on rampages, often citing the relative youth and immaturity of students as well as the stress that many students experience. Many respondents worry that accidents could easily occur, especially in large crowds or labs. Many voiced anxiety that handgun carriers will make bad decisions when faced with an active shooter, or that law enforcement will be unable to distinguish between good and bad guys. And many expressed fears that relate to gun violence generally – often citing mass shootings that have tragically occurred on this and other campuses – and that are not tied, at least directly, to campus carry or concealed handguns.

Perhaps the most passionate comments we received came from students, staff, and faculty of color and other historically underrepresented groups, including members of the LGBTQ community and international students. Understandably, they fear most viscerally that an increase in the number of guns on campus will place them at greatest risk. For example, a statement by the African and African Diaspora Studies faculty decried the "distinctly vulnerable position of Black people when it comes to firearm violence," adding that "the probability that bullets will find us is higher than for any other campus population." Similar sentiments were expressed by members of other groups that have historically been marginalized, subjected to opprobrium, and victimized by hate crimes.

Another frequently-expressed fear is that campus carry will lead to an increase in campus suicides. We received several lengthy comments that cited recent findings on the extent of emotional distress, severe anxiety, and other psychological problems among college students. A good number of commenters cited their own college experiences in expressing their belief that increasing the accessibility to handguns on campus would make it easier for a depressed student to act on a suicidal thought.

Perhaps the most consistent view expressed by faculty (and many students) was the impact they believe concealed carry will have in the classroom. Substantial numbers of faculty expressed their deeply-held view that campus carry will have a significant, adverse effect on classroom discussions and their academic freedom. These comments highlighted the many highly controversial topics and ideas discussed on a daily basis in UT Austin classrooms. They expressed a deep-seated fear that the knowledge that one or more students might be carrying a concealed weapon would have a substantial chilling effect on class discussion. They asserted that at least some students will demur from engaging in the passionate discussions that are a hallmark of many classes. They believe campus carry will violate their academic freedom. Such comments came not just from our faculty and students, but from numerous national organizations such as the American Association of University Professors, American Federation of Teachers, Association of American Colleges and Universities, Association of Governing Boards of Universities and Colleges, American Political

**Exhibit 3**

Science Association, and Latin American Studies Association.

Citing some or all these concerns, many expressed the view that campus carry would impede the University's ability to recruit and retain students, faculty, and staff.

Several themes likewise dominated the "pro-campus carry" comments. Many of those favoring campus carry stressed their desire to be able to defend themselves. Many asserted that they should be able to have a concealed handgun available for use in an active shooter situation. Others expressed their desire to be able to carry a concealed handgun as they walked – sometimes a substantial distance, at night – to a parked car or their home.

Many opined that the fears voiced by campus carry opponents were unreasonable and that restrictions on campus carry would impede their rights under the Second Amendment. These comments noted that college campuses are conceptually no different from city streets, shops, or office buildings, where concealed carry has long been legal with few obvious ill effects. Many cited data from the Texas Department of Public Safety establishing that license holders, as a group, are extremely law-abiding. They are less likely to be convicted of a crime than other groups, including law enforcement officers. Respondents also cited the experiences of campuses in other states where campus carry is mandated. They noted that concealed carry on those campuses did not produce any increase in campus violence or suicide.

Finally, many respondents contended that creating gun-free zones on campus would, if anything, be counterproductive. They asserted that someone intent on bringing a gun into a classroom and opening fire would not be deterred by a sign that said "no guns allowed." To the contrary, they argued that such a person would find a gun-free zone the most attractive place to wreak havoc.

Those who expressed opposition to or serious misgivings about campus carry tended to urge that handguns be banned from as much of campus as possible (if not from the entire campus). These included, among others, pleas that guns be banned from all classrooms; all offices; all residence halls; places where students, staff, or faculty receive

counseling; places where organizations of minority groups meet; public assemblies; group gatherings; and places with only one exit.

Those who expressed support for campus carry tended to urge that handguns be allowed on as much of campus as possible (if not the entire campus).

We also received many thoughtful ideas about policies regarding how handguns should be carried and stored as well as various steps the University could take to maximize campus safety, alleviate fears aroused by S.B.11, and enhance the University's role in the study of gun violence. These are incorporated in the recommendations we offer in Part IV.

### 2. Relevant Demographic Information

From the outset, many comments to our online survey expressed the view that our campus would be swarming with students carrying concealed handguns – many of whom would be teenagers. Accordingly, we sought to determine just how many license holders we could expect to find on campus. There is no way of coming up with a precise number. The University is forbidden by law from requiring license holders to self-identify, and even law enforcement may not access the Texas DPS database to cross-check a list of all UT students, staff, and faculty against a list of all license holders in Texas.

We estimate that less than one percent of our students will have a license to carry a handgun. (We have no way of determining how many license holders would actually carry their handguns onto campus.) Our estimate is based on Texas DPS data, from which we were able to determine how many licenses were issued to those who are currently aged 21 through 24.[3] Using census data on the number of Texans aged 21 through 24, we were able to estimate that only about 1.6% of Texans in that age cohort are license holders.

---

[3] To be more precise, our estimate is based on the number of license holders who were aged 21 through 24 at the end of 2014, the last year for which there is complete data. In addition, although members of the military and veterans are able to obtain licenses before reaching 21, the number of licenses issued to those under 21 is extremely small. Finally, we recognize that we have many students who are older than 25. But the percentage of 25 through 30 year-olds who obtain licenses does not vary significantly from the percentage of 21 through 24 year-olds.

**Exhibit 3**

We then examined the demographics of our student body. Using the most recent data available, we determined that less than half our students were, as of the beginning of the Fall 2015 semester, eligible to obtain a license to carry a handgun.[4] As a result, we are confident in estimating that less than one percent of our students will have a license to carry a handgun.

We did not perform similar calculations for staff and faculty. We note, however, that our examination of Texas DPS and census data reveals that license holders comprise about 4.5% of the Texas population aged 21 and older. Although we suspect the percentage of license holders among faculty is lower than that in the general population, we are aware of no data that either supports or refutes our intuition.

We also examined the demographics of our on-campus residence halls. At the beginning of the Fall 2015 semester, there were only 313 students in University residence halls aged 21 and above. There were 683 contract holders aged 21 and above in University Apartments (typically known as married student housing). However, only about 132 of these contract holders are eligible to apply for a license to carry a handgun.[5]

### 3. Information from Other States

As mentioned in Part III.A., seven other states already have various forms of mandated campus carry. These are Colorado, Idaho, Kansas, Mississippi, Utah, Oregon, and Wisconsin. We attempted to learn how campuses in these states have responded to and experienced campus-carry mandates. We also researched the applicable legal and regulatory regimes in these states and tried to learn of any incidents related to campus carry.

No other state has a campus carry law like S.B. 11, and

so the Working Group was unable to find significant guidance in other states' implementation schemes. Some states permit universities very limited discretion. For example, Utah allows each public university to establish one secure area as a hearing room and to create a rule that allows dormitory residents to request only roommates who are not licensed to carry a concealed firearm.[6] Idaho law prohibits public universities from regulating the carrying of handguns on campus by enhanced license holders, but prohibits handgun carry in dormitories and residence halls and in public entertainment facilities that seat at least 1,000 persons.[7] The Colorado concealed carry law does not appear to give public universities the discretion to restrict license holders from carrying concealed handguns on campus.[8] Despite this, the University of Colorado-Boulder has restricted concealed carry in its football stadium and other ticketed public performance venues[9] and in dormitories.[10] At the other end of the spectrum, Wisconsin law allows the concealed carry of handguns on campus grounds, but permits universities, with proper signage, to prohibit the carrying of handguns into buildings.[11] In Kansas, universities may presently ban handguns from campus, but as of 2017 they will be able to do so only where "adequate security measures" are present.[12] The state of the law in Oregon is not particularly clear. Although a state court of appeals decision held that the University of Oregon's complete ban on campus carry violated state law,[13]

---

[4] As of the beginning of the Fall 2015 semester, only about 38% of our undergraduates were 21 years of age or older; nearly all our graduate students were. Combined, about 52% of our entire student body were 21 years of age or older. A substantial number of the students 21 and above, however, are not U.S. citizens, and are therefore ineligible to obtain a license. When we subtract out non-citizens, we find that only about 45% of our students were eligible, as of the beginning of the Fall 2015 semester, to obtain a license. Obviously, this number will increase over the course of the academic year as 20-year-olds turn 21.

[5] Approximately 80% of the contract holders in University apartments are not U.S. citizens and so are not eligible to obtain a license to carry.

[6] Utah Code Ann. § 53B-3-103.

[7] Idaho Code § 18-3309.

[8] Colorado. Rev. Stat. Ann. § 18-12-214. See Regents of the University of Colorado v. Students for Concealed Carry on Campus, LLC, 271 P.3d 496 (Colo. 2012).

[9] See https://police.colorado.edu/services/weapons-campus.

[10] Conversation with Vice President, University Counsel and Secretary of University of Colorado Board of Regents.

[11] Wis. Stat. Ann. § 943.13(1m)(c)5.

[12] Kan. Stat. Ann. § 75-7c20.

[13] Oregon Firearms Educational Foundation v. Board of Higher Educ., 264 P.3d 160 (Or. Ct. App 2011).

another court of appeals decision upheld a more limited restriction on concealed handgun carry imposed by a local school board.[14] At the time of the October 2015 Umpqua Community College campus shooting, its Student Code of Conduct prohibited the possession of firearms "on College premises, at College-sponsored or supervised functions or at functions sponsored or participated in by the College."[15]

We reached out to 17 research universities in the seven campus-carry states.[16] They reported a mix of reactions and experiences. Some schools related that campus carry had been a divisive issue; others did not. Most respondents reported that campus carry had not had much direct impact on student life or academic affairs. However, we cannot discern with confidence whether these reports represent the views of only the particular respondents or reflect wider sentiment on their campuses.

What we can say is that we have found little evidence of campus violence that can be directly linked to campus carry, and none that involves an intentional shooting. Everytown for Gun Safety Support Fund (EGSSF), which represents itself as "an independent, non-partisan 501(c)(3) organization dedicated to understanding and reducing gun violence in America," tracks school shootings that have occurred since the Sandy Hook elementary school shooting in December 2012.[17] As of December 3, 2015, it listed 69 college or university shootings. Five of these occurred in states that had

campus carry laws in place at the time of the shooting.[18] Two were on Wisconsin campuses, both of which prohibit concealed handgun carry in buildings. One is the recent tragedy at Umpqua Community College. As mentioned above, although Oregon is a campus-carry state, Umpqua CC prohibited students from carrying firearms in college buildings, and we are unaware of any mention that the shooter there possessed a license to carry.

The other two shootings listed by EGSSF took place in Utah and Idaho; both involved accidental discharges.[19] We are also aware of two other accidental discharge incidents – one each in Colorado and Utah – that predate Sandy Hook and so are not listed by EGSSF.[20] Of these four accidental discharge incidents, two involved a license holder who was openly displaying a handgun to another person,[21] and the other two involved

---

[14] Doe v. Medford School Dist. 549C, 221 P.3d 787 (Or. Ct. App. 2009).

[15] Umpqua Community College Student Code of Conduct § 721.3(19) https://www.umpqua.edu/resources-and-services/academic/student-code-of-conduct?showall=&start=4.

[16] Ten schools responded to our inquiries: Colorado State University, University of Colorado–Boulder, Boise State University, University of Kansas, Mississippi State University, University of Southern Mississippi, University of Utah, Utah State University, University of Wisconsin–Madison, and University of Wisconsin–Milwaukee.

[17] http://everytownresearch.org/school-shootings/ (last visited 12/3/2015).

---

[18] A couple of shootings took place in Mississippi, where despite a Mississippi statute that seems to authorize campus carry, Miss. Code Ann. § 97-37-7(2), the institutions where the shootings occurred prohibited firearms. In one, a student at the University of Southern Mississippi shot himself in the thigh while sitting in his car on campus. http://www.msnewsnow.com/story/22156392/brandon-usm-student. The University's policy prohibits firearms on campus. https://www.usm.edu/police/firearms-policy. The other involved a Delta State University instructor who murdered his girlfriend at their home and then drove 300 miles and killed a DSU colleague on campus before killing himself. Delta State University prohibits handguns on campus. http://www.deltastate.edu/policies/policy/university-policies/student-affairs/rights-and-responsibilities/weapons-on-campus/.

[19] A training cadet at Utah Valley University was showing his gun to another cadet when the gun discharged and grazed the latter's chest. http://www.campussafetymagazine.com/article/unintentional_discharge_injures_cadet_in_utah#. An Idaho State University professor accidentally shot himself in the foot during class when his unholstered handgun accidentally discharged. http://www.idahostatejournal.com/news/local/isu-prof-with-concealed-weapons-permit-who-accidentally-shot-his/article_18228ab2-3383-11e4-af7e-001a4bcf887a.html.

[20] An employee at the University of Colorado School of Dental Medicine accidentally discharged her handgun while she was dismantling it to show a co-worker how the safety worked. http://www.denverpost.com/ci_22002593/cu-staffer-gone-charges-filed-accidental-shooting. And a student at Weber State University accidentally shot himself in the leg while walking across campus with an unholstered handgun in his pocket. http://ohhshoot.blogspot.com/2012/01/weber-state-university-student.html.

[21] The Idaho State University professor, see note 19, and the Weber State University student, see note 20.

**Exhibit 3**

license holders who were carrying their handguns unholstered in their pants pocket.[22]

Both at the public forum and in online comments, some respondents claimed that the introduction of campus carry in other states has caused an increase in the rate of sexual assault on campus. We have examined this and find that the evidence does not in any way support the claim of a causal link between campus carry and an increased rate of sexual assault.[23] This is not to

say that such a link may not exist. But it has not been demonstrated.

The same is true regarding suicide rates. We found no evidence that campus carry has caused an increase in suicide rates on campuses in other states.[24] Again, this is not to say that such a link may not exist. But it has not been demonstrated.

---

[22] The Utah Valley University training cadet, see note 19, and the University of Colorado School of Dental Medicine employee, see note 20.

[23] The data cited to us came from a fact sheet generated by the Campaign to Keep Guns Off Campus (CKGOC). http://keepgunsoffcampus.org/wp-content/uploads/2015/03/August-9-2015-Fact-Sheet-.pdf. According to a separate posting on the website, CKGOC studied crime statistics from all public colleges and universities in Utah and Colorado that permit concealed carry and compared them to the overall FBI crime statistics for the United States. But this study did not conclude that campus carry increased the incidence of sexual assaults. To the contrary, the website posting reports, "Strikingly, the rate of forcible rape on Utah and Colorado campuses is rising at an alarming rate, much higher than the rate of the national average and steady with the national average on college campuses." http://keepgunsoffcampus.org/blog/2015/03/17/the-campaign-to-keep-guns-off-campus-new-study-shows-that-on-campus-crime-rates-have-increased-in-two-states-where-concealed-carry-on-campus-is-allowed/ (emphasis added). In other words, the cited data indicates that campuses with campus carry have not experienced an increase in the rate of sexual assaults relative to campuses in states that do not have campus carry.

We also looked at Clery Report data for the University of Colorado-Boulder and Colorado State University. They do not support a conclusion that a causal link exists between campus carry and an increased rate of sexual assault. The data do not indicate whether or not a concealed handgun was involved in any of the assaults, and both at CU-Boulder and CSU most of the increased number of sexual assaults occurred either in residence halls, where concealed carry is prohibited, or off campus. Moreover, we spoke with an official at the University of Colorado who had reviewed the sexual assault incident reports during this time frame. He did not recall that a concealed handgun played a role in any of the reported sexual assaults.

Most important, it is widely recognized that growing attention to the problem of sexual assaults on campus has led to an increased willingness by victims to make reports to campus and law enforcement officials. For example, Clery Reports submitted by Colorado College, a private school that prohibits campus carry, reported a far higher increase in sexual assaults over the same

time period than did CU-Boulder or CSU. So did UT Austin.

In the end, we do not believe that the existing data allow us to draw any firm conclusions about possible causal links between campus carry and sexual assaults. Sufficiently robust data simply does not exist. The statistics cited by the CKGOC study, for example, seem quite out of line with oft-cited reports of far higher rates of sexual assault on college campuses. That study reports that since Colorado has allowed campus carry, "the rate of rape has increased 25% in 2012 and 36% in 2013 (15.2 and 20.8 per 100,000 respectively)." Compare that to the vastly higher sexual assault rates cited in the recently-released AAU Campus Survey on Sexual Assault and Sexual Misconduct. It reported that the incidence of sexual assault and sexual misconduct due to physical force, threats of physical force, or incapacitation among female undergraduate student respondents was 23.1%. https://www.aau.edu/uploadedFiles/AAU_Publications/AAU_Reports/Sexual_Assault_Campus_Survey/Report%20on%20the%20AAU%20Campus%20Climate%20Survey%20on%20Sexual%20Assault%20and%20Sexual%20Misconduct.pdf. See also Krebs, et al., The Campus Sexual Assault (CSA) Study (2007) (approximately one out of five women experienced a sexual assault or an attempted sexual assault while in college).

[24] Both Gun Free UT and the Campaign to Keep Guns Off Campus (CKGOC) assert that campus carry will lead to additional campus suicides. CKGOC relies on data comparing the rates of gun suicides vs. non-gun suicides in high gun-ownership vs. low gun-ownership states. http://keepgunsoffcampus.org/moreguns.html. This data, however, compares only gun-related suicides and makes no attempt to compare the total number of suicides. Gun Free UT relies on a series of generalized statements about demographic suicide data, but makes no attempt to compare suicide rates in colleges and universities with campus carry and those without campus carry. http://gunfreeut.org/wp-content/uploads/2015/09/firearms-fact-sheet.pdf. Students for Concealed Carry asserts that there is not a single campus suicide related to campus carry on any of the "more than 150 U.S. college campuses [that] have allowed campus carry for an average of more than five years." http://concealedcampus.org/ (viewed 11/10/2015). We have no reason to contest that statement, but do not know the evidence upon which it is based.

# IV.  RECOMMENDATIONS

The recommendations that follow are the product of substantial study, deliberation, and debate. The Working Group comprises 19 people with a wide range of experiences and expertise, who represent every major university constituency. Not surprisingly, our discussions were intense, and we often disagreed. In the end, however, we were able to reach consensus on 25 recommendations.

The three factors mentioned in S.B. 11 – the nature of the student population, specific safety considerations, and the uniqueness of the campus environment – were lodestars in our deliberative process. We also looked at the already-existing statutory gun-exclusion zones and considered whether various places and activities on campus were sufficiently analogous to receive similar treatment. We also examined whether other governmental entities permit concealed carry in publicly-operated activities analogous to on-campus activities. For example, we discovered that concealed carry is allowed in the Bullock Texas State History Museum and in the City of Austin public libraries. This guided our decisions regarding whether museums and libraries on campus should be designated as gun-exclusion zones.

Our recommendations are grouped in four categories: how handguns must be carried and stored; where handguns must not be carried; incidental implementation measures; and proactive measures. After setting forth our recommendations, we conclude this Part with an explanation of why we do not recommend that classrooms should be designated gun-exclusion zones.

## A. How Handguns Must Be Carried and Stored

### RECOMMENDATION # 1:

License holders who carry a handgun on campus must carry it on or about their person at all times or secure their handgun in a locked, privately-owned or leased motor vehicle. The only exception to this is that license holders who reside in University Apartments or who are staff whose employment responsibilities require them to reside in University housing may store their handguns in a gun safe in accordance with the requirements set forth in Recommendation # 17. In compliance with Texas Penal Code § 46.035(a-1), a license holder may not carry a partially or wholly visible handgun on campus premises or on any university driveway, street, sidewalk or walkway, parking lot, parking garage, or other parking area.

### RECOMMENDATION # 2:

A license holder who carries a handgun on campus must carry it in a holster that completely covers the trigger and the entire trigger guard area. The holster must have sufficient tension or grip on the handgun to retain it in the holster even when subjected to unexpected jostling.

### RECOMMENDATION # 3:

A license holder who carries a semiautomatic handgun on campus must carry it without a chambered round of ammunition.

**Comment:** These recommendations are designed to ensure that handguns will be carried and stored on campus in the safest way possible.

Recommendation # 1 aims at minimizing the possibility of accidental loss or theft of a concealed handgun. License holders must either carry their handguns on or about their person or store them in their locked motor vehicle. "About" the person means that a license holder may carry a handgun – holstered – in a backpack or handbag, but the backpack or handbag must be close enough to the license holder that he or she can grasp it without materially changing position. A license holder who leaves a handgun out of immediate reach or stores it in an unsecure location risks losing it and having it wind up in the hands of someone who does not have and may be completely unqualified to obtain a license.

Recommendations # 2 and # 3 are designed to minimize the possibility of accidental discharge. As discussed in Part III.C.3, two of the four accidental discharge incidents on campuses that have campus carry involved license holders carrying handguns loose in their pants pockets. Compliance with Recommendation # 2 would significantly reduce the likelihood of such accidental discharges. Recommendation # 3 reinforces these safety requirements.

**Exhibit 3**

## B. Where License Holders Must Not Carry Handguns

We include in this subpart our recommendations for places that should be designated gun-exclusion zones in accordance with the authority vested in university presidents by S.B. 11. We begin, however, by listing in subpart IV.B.1 relevant exclusion zones that already exist under Texas Penal Code (TPC) §§ 46.03 and 46.035. In connection with each of these statutory exclusion zones, we make a recommendation regarding appropriate notice.

### 1. Statutory Exclusion Zones

1. The physical premises of a school or educational institution, any grounds or building on which an activity sponsored by a school or educational institution is being conducted, or a passenger transportation vehicle of a school or educational institution.

### RECOMMENDATION # 4:

In its website posting of rules and regulations regarding campus carry, the University should post a list of places that are commonly the site of pre-K-12 school-sponsored activities. When a pre-K-12 school-sponsored activity is being conducted at a particular location, a sign reading "Pre-K-12 school-sponsored activity in progress" should be posted there.

*Comment:* This exclusion is found in TPC § 46.03(a)(1). "School or educational institution" does not include institutions of higher education. But both the statutory text and the legislative history make clear that this exclusion still applies to a pre-K-12 school located on the grounds of a university and to a pre-K-12 school-sponsored activity that is conducted on the grounds of a university. Therefore, license holders are forbidden from carrying their handguns on the physical premises of any pre-K-12 schools on campus, such as the UT Elementary School, as well any grounds on or buildings in which a pre-K-12 school-sponsored activity is being conducted. Although TPC § 46.03(a)(1) does not require signage, we believe it is appropriate to provide fair notice.

2. The premises of a polling place on the day of an election or while early voting is in progress.

### RECOMMENDATION # 5:

A sign should be posted at any polling place located on campus from the commencement of early voting through Election Day that reads either "Polling Place" or "Vote Here."

*Comment:* This exclusion is found in TPC § 46.03(a)(2). Although this subsection does not require signage, we believe it is appropriate to provide fair notice.

3. The premises of any government court or offices utilized by the court, unless pursuant to written regulations or written authorization of the court.

### RECOMMENDATION # 6:

A sign should be posted at the entrance to a courtroom and associated offices whenever they are being used by a federal, state, or local judge for official business.

*Comment:* This exclusion is found in TPC § 46.03(a)(3). The School of Law has a courtroom, judges' chambers, and jury room in the Connally Center for Justice. These are occasionally used by federal, state, and local judges for judicial proceedings. Although this subsection does not require signage, we believe it is appropriate to provide fair notice.

4. The premises of a business that has a permit or license issued under designated chapters of the Alcoholic Beverage Code, if the business derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption.

### RECOMMENDATION # 7:

Any premises on campus that meets the requirements of TPC § 46.035(b)(1) must provide notice in accordance with Texas Gov't Code § 411.204.

*Comment:* This exclusion is found in TPC § 46.035(b)(1). It applies at least to the Cactus Café in the Student

Union and to Gabriel's Café in the AT&T Executive Education and Conference Center. Section 46.035(k) specifies that notice must be given in accordance with Texas Gov't Code § 411.204.

5. The premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place, unless the license holder is a participant in the event and a handgun is used in the event.

### RECOMMENDATION # 8:

Notice should be given for all collegiate sporting events. If possible, for ticketed sporting events this notice should be given by means of a written communication on the back of, or appended to, the ticket. Vendors and others who are permitted to enter the premises without a ticket should be provided written notice through other means.

*Comment:* This exclusion is found in TPC § 46.035(b)(2). For high school or professional sporting events, § 46.035 does not require notice that handguns are excluded. But for a collegiate sporting event, § 46.035(l) requires notice that meets the requirements of TPC § 30.06.

### 2  Exclusion Zones Established Under Section 411.2031(d-1)

We make the following recommendations regarding where and under what conditions the concealed carry of handguns should be prohibited. Recommendations # 9-15 correspond to the "consensus" exclusion zones identified by the UT System working group. Recommendations # 16 and # 18 are additional exclusion zones the Working Group believes should be established on this campus.

### RECOMMENDATION # 9:

The concealed carry of handguns should be prohibited in areas for which state or federal law, licensing requirements, or contracts require exclusion exclusively at the discretion of the state or federal government, or are required by a campus accrediting authority. Where appropriate, signage must conform to the overriding federal or state law requirements. Otherwise, notice conforming to TPC § 30.06 must be provided.

*Comment:* In some instances, federal law prohibits firearms from being carried in certain places. For example, 10 C.F.R. § 73.81 bars a person from carrying a firearm in a protected facility or installation, such as our Nuclear Engineering Teaching Laboratory (NETL), which is a Nuclear Regulatory Commission-licensed facility. Similarly, state law or licensing requirements may place restrictions on concealed carry. For example, licensing standards for before- and after-school programs for school-aged children and for child-care centers prohibit on-premises firearms. See Texas Dept. of Family and Protective Services, Licensing Division, Minimum Standards for School-Age and Before or After-School Programs §744.2607; Minimum Standards for Child-Care Centers §746.3707. Finally, in rare instances, the federal or state government may unilaterally impose a restriction on the carrying of firearms, as may a campus accrediting authority.

### RECOMMENDATION # 10:

The concealed carry of handguns should be prohibited in patient-care areas, including those in which professional mental health services are provided.

*Comment:* TPC § 46.035(b)(4) prohibits the concealed carry of handguns in hospitals licensed under Chapter 241 of the Texas Health and Safety Code. By analogy, we recommend that all patient-care areas be excluded. This includes hospitals, clinics, and mental health treatment areas. A "patient-care area" should involve patients for whom a formal record of treatment is maintained.

### RECOMMENDATION # 11:

The concealed carry of handguns should be prohibited on premises in which a ticketed sporting event is taking place.

*Comment:* TPC § 46.035(b)(2) prohibits handguns at high school, collegiate, and professional sporting events. The University hosts other types of sporting events, such as club-sponsored swim meets. By analogy, we recommend that the concealed carry of a handgun be excluded at any such sporting events if they are ticketed. The tickets can be used to provide notice conforming to TPC § 30.06.

### RECOMMENDATION # 12:

The concealed carry of handguns should be prohibited in areas in which formal hearings are being conducted pursuant to Chapter 11 (Student Discipline and Conduct) of the Institutional Rules on Student Services and Activities (General Information Catalog, App. C); Regents Rule 31008 (Termination of a Faculty Member); Handbook of Operating Procedure 2-2310 (Faculty Grievance Procedure); or Handbook of Operating Procedure 5-2420 (Policies and Procedures for Discipline and Dismissal and Grievance of Employees).

*Comment:* TPC § 46.03(a)(3) bans the concealed carry of handguns "on the premises of any government court or offices utilized by the court." By analogy, we recommend that the concealed carry of handguns be excluded from any areas in which a formal hearing is being conducted in accordance with the enumerated discipline and grievance procedures for students, faculty, and staff. Notice conforming to Texas Penal Code § 30.06 must be provided.

### RECOMMENDATION # 13:

The concealed carry of handguns should be prohibited in areas where the discharge of a firearm might cause great harm, such as laboratories with extremely dangerous chemicals, biologic agents, or explosive agents, and areas with equipment that is incompatible with metallic objects, such as magnetic resonance imaging machines.

*Comment:* The training required for handgun license holders does not include special training regarding the safe use of weapons in such facilities. The accidental or purposeful discharge of a weapon in such a facility could cause grave and catastrophic harm. In addition, handguns are inappropriate in the vicinity of some types of equipment, such as magnetic resonance imaging equipment, because of the presence of a very strong magnetic field. We believe "specific safety considerations" justify these exclusions. Notice conforming to TPC § 30.06 must be provided.

### RECOMMENDATION # 14:

The concealed carry of handguns should be prohibited in animal-research facilities and other animal-care and animal-use locations in which protocols regulating ingress and egress create a risk that a concealed handgun will accidentally discharge, be contaminated, or be separated from a license holder.

*Comment:* The transmission of infectious agents from research animals to humans can cause human disease, and the transmission of infectious agents from humans (or their clothing and possessions) can cause animal illness or jeopardize research results. As a result, animal research, care, and use areas typically have strict protocols for entering and exiting the facility, including requirements for the wearing of dedicated or disposable clothing and protective waterproof gloves. Compliance with these protocols by someone carrying a concealed handgun may have the effect of increasing the risk of its discharge, contamination, or unanticipated separation from the license holder. In addition, research animals have the ability to bite and kick objects in the possession of persons working with them, and some (e.g., monkeys) may be able to grab and manipulate objects. These potential hazards suggest that concealed weapons should be excluded from animal research, care, and use facilities.

### RECOMMENDATION # 15:

Counselors, staff, and volunteers who work in a campus program for minors must, as a condition of their participation, agree not to carry a concealed handgun on the grounds or in buildings where the program is conducted. Parents of attendees must also agree, as a condition of their child's participation, not to carry a concealed handgun on the grounds or in buildings where the program is conducted. "Campus program for minors" is defined in HOP 3-1710.

*Comment:* The Texas Penal Code prohibits the concealed carry of handguns in pre-K-12 schools and on the grounds or in buildings where a school-sponsored activity is being conducted. By analogy, places where

children under the age of 18 participate in a campus program for minors should be exclusion zones. Because providing signage in each such location would be impracticable, we recommend that the exclusion be accomplished by means of contractual arrangements with the people who are most likely to be in contact with the minor participants. HOP 3-1710 defines "campus program for minors" as "[a]ny program or camp held on University premises that offers recreational, athletic, religious, or educational activities to minors, or one that is University sponsored. This excludes programs for University-enrolled students under the age of 18."

## RECOMMENDATION # 16:

The following rules should apply to the concealed carry of handguns in University housing.

a. With three exceptions, the concealed carry of handguns should be prohibited in all on-campus residence halls. The concealed carry of handguns should, however, be permitted in University Apartments.

b. The first exception for on-campus residence halls is that the concealed carry of handguns should be permitted in common areas such as lounges, dining areas, and study areas. The second exception is that a resident's family members should be permitted to carry a concealed handgun on or about their person while visiting. The third exception is that staff members whose employment responsibilities require them to be in University housing should be permitted to carry a concealed handgun on or about their person while present in University housing for business purposes.

c. License holders who reside in University Apartments or who are staff whose employment responsibilities require them to reside in University housing must store their handguns either in a locked, privately-owned or leased motor vehicle or in a gun safe that meets the requirements set forth in Recommendation # 17 below. License holders are also responsible for ensuring that their guests comply with all such rules and regulations.

*Comment:* Our residence halls are unique in several respects. First, the great majority of our students reside in off-campus facilities. This is particularly true of students who are at least 21 years old. During the Fall 2015 semester, nearly 99% of our students who are 21 or over live off campus. A rule prohibiting residents of on-campus residence halls from having handguns in their rooms will, therefore, affect only the tiniest fraction of students who are eligible to apply for a license to carry a handgun. And, as the data show, there are ample, and widely-used alternative housing arrangements available for those who wish to keep handguns in their rooms.

Second, the great majority of students in on-campus residence halls share bedrooms. Only two percent of on-campus residence hall rooms are designated single rooms. Consequently, we believe that the danger of accidental loss, theft, or misuse by roommates or others (including suicide or other violence) in on-campus residence halls is unacceptably high. Even if we were to require residents to store their handguns in approved gun lockers, our residence halls typically do not provide space that is subject to the sole control of a resident. This means there is no way of assuring that only a handgun-owning resident will have access to his or her locker. Moreover, while we are confident that the great majority of license holders routinely and conscientiously store their handguns, we believe it is naïve to think that there won't be lapses in judgment or vigilance. There will too often be a temptation, upon entering one's room, simply to leave a handgun sitting in a backpack or handbag or (less likely) out in the open, even if only for a relatively brief time.

Two other facts exacerbate our concerns about possible accidental loss, theft, or misuse. First, we have a substantial number of students under the age of 18 who live in on-campus residence halls. At the beginning of the Fall 2015 semester, we had 298 such students, 13 of whom were 16 or younger. We do not think it is wise to place students that young in close proximity to handguns. Second, residence hall residents typically have numerous visitors, and these visitors may come at the invitation of a license holder's roommate. This further increases the chance that someone other than the license holder will come into possession of a handgun.

**Exhibit 3**

University Apartments (widely known as "married student housing"), however, differ from on-campus residence halls in both physical lay-out and resident population. University Apartments are typically occupied by married students, families, or students and their unmarried, live-in guests. These living arrangements afford license holders greater control over entry by non-residents. More importantly, University Apartments have private bedrooms and so enable license holders to store a handgun in a place that is not accessible to visitors. Therefore, we believe that the specific safety considerations that lead us to recommend a general prohibition of concealed handguns in on-campus residence halls are substantially diminished in University Apartments.

We believe as well that the concealed carry of handguns should be permitted in on-campus residence halls in three instances. First, license holders should be permitted to carry concealed handguns in non-residential common areas such as lounges, dining areas, and study areas. In accordance with our earlier recommendation (see Part IV.A, Recommendation # 1), license holders who bring a handgun into a common area must carry it on or about their person. We believe the concealed carry of handguns in non-residential common areas does not raise the specific safety concerns associated with residents routinely having handguns in their rooms.

Second, a resident's family members should be permitted to carry a concealed handgun on or about their person while visiting. For example, a parent who is helping his or her child move into a dorm should be permitted to carry. As long as family members carry their guns on or about their person – as would be required – this does not raise the specific safety concerns associated with residents routinely having handguns in their rooms.

Third, staff members, such as the building services and maintenance staff, should be permitted to carry a concealed handgun on or about their person while they are discharging their employment responsibilities.

Finally, we considered the possibility of creating a residence hall or wing of a residence hall in which residents could have and store their concealed handguns. We concluded that this would not be feasible. We consulted the University of Colorado-

Boulder, which has offered students this option. We learned that they have not received a single application for their gun-permitted dorm and that as a result they have a substantial number of rooms left vacant. Given the experience there, we do not believe that we have any residential facility or segregable part of a facility that can be set aside without risking a substantial number of rooms being left unoccupied.

Obviously, license holders who are permitted to possess guns in their University residence cannot be expected to have their handgun on or about their person at all times. Under this Recommendation, they may store their handgun either in their locked car or in a gun safe. Any gun safe used for storage must meet the safety standards set forth in Recommendation # 17. We believe that any other form of storage poses too great a risk of accidental discharge, loss, theft, or misuse.

**RECOMMENDATION # 17:**

A gun safe that is used by a license holder must:

(a) be large enough to fully contain all firearms placed in it and provide for secure storage;

(b) have exterior walls constructed of a minimum 16-gauge steel;

(c) have a high-strength locking system consisting of a mechanical or electronic combination or biometric lock, and not a key lock; and

(d) be physically secured inside the license holder's residence in a manner that conforms to Division of Housing and Food Service policy.

*Comment:* This Recommendation is designed to ensure that an unattended handgun is securely stored. The importance of this safety measure is widely-recognized. For example, the gun manufacturer Smith & Wesson emphasizes the importance of handgun security in its discussion of Basic Handgun Safety Rules. "Your safety and the safety of others requires that you always secure and store your firearm in a manner that will prevent unauthorized access. Never leave a firearm unattended unless it is unloaded, locked and secured."[25]

---

[25] https://www.smith-wesson.com/webapp/wcs/stores/servlet/Category3_750001_750051_757978_-1_Y.

## RECOMMENDATION # 18:

The occupant of an office to which the occupant has been solely assigned and that is not generally open to the public should be permitted, at the occupant's discretion, to prohibit the concealed carry of a handgun in that office. An occupant who chooses to exercise this discretion must provide oral notice that the concealed carry of a handgun in the occupant's office is prohibited. In addition, if the occupant's duties ordinarily entail meeting people who may be license holders, the occupant must make reasonable arrangements to meet them in another location at a convenient time.

**Comment:** The occupant of an office to which the occupant has been solely assigned and that is not generally open to the public has traditionally been vested with substantial control over his or her office space. In O'Connor v. Ortega, 480 U.S. 709 (1987), for example, a majority of the justices agreed that a government employee has a constitutionally-protected right of privacy in his office. "The Court of Appeals concluded that Dr. Ortega had a reasonable expectation of privacy in his office, and five Members of this Court agree with that determination." Id. at 718. Justice Scalia was one of those five Members, writing in his concurring opinion, that "one's personal office is constitutionally protected against warrantless intrusions by the police, even though employer and co-workers are not excluded." Id. at 730. University faculty, staff, and students who occupy offices to which they are solely assigned and that are not generally open to the public have traditionally been vested with the authority to control who may and may not enter. They have long exercised that discretion (unrelated to the concealed carry law) and should be able to continue to do so. We believe this policy is consistent with Texas House of Representatives Policy and Procedure Manual § 3.14, which provides that House members may control access to their offices and may, at their discretion, exclude visitors.

To avoid the proliferation of signage that conforms to Texas Penal Code § 30.06, we recommend that the rule include that the required notice must be given orally. Finally, this rule would not have the effect of generally prohibiting license holders from carrying a concealed handgun on campus. A license holder who needs to enter a particular office that the occupant designates as a gun-exclusion office is accommodated by the requirement that the occupant must make reasonable arrangements to meet the license holder in another location.

We note, however, that this recommendation, although phrased in terms of the right of an occupant, would favor faculty over staff and students. While there are staff members and even some students who occupy offices on campus to which they are solely assigned, a faculty member is much more likely to have an office of which he or she is the sole occupant. This recommended rule, therefore, would have the overall effect of giving faculty members more control over their work environment than staff or students would enjoy. Our concern is that this policy will perpetuate structural inequalities between faculty and staff members at UT Austin.

## C. Incidental Implementation Measures

## RECOMMENDATION # 19:

The University should amend Sec. 11-404(a) (Student Discipline and Conduct – General Misconduct) of the Institutional Rules on Student Services and Activities (General Information Catalog, App. C); Handbook of Operating Procedure 5-2420(III)(B) (Policies and Procedures for Discipline and Dismissal and Grievance of Employees – Conduct Which is Subject to Disciplinary Action); and Handbook of Operating Procedure 8-1010(I)(B) (Prohibition of Campus Violence) to provide that causing the accidental discharge of a firearm is conduct subject to disciplinary action.

**Comment:** If the preceding recommendations are formally adopted as University rules and regulations, then staff, students, and faculty who violate them may be subject to discipline under University procedures (and to punishment under applicable criminal laws as well). This recommendation is designed to ensure that anyone who causes the accidental discharge of a handgun – even a non-license holder – may be subject to University discipline.

## RECOMMENDATION # 20:

The Division of Housing and Food Service should include in its housing contracts that violation of any University rules regarding the carrying or storage of firearms in University housing is grounds for terminating the housing contract.

*Comment:* This is designed to make certain that a housing contract holder's violation of any rule regarding the carrying or storage of a firearm in University housing may result in termination of the housing contract.

## RECOMMENDATION # 21:

Exclusion zones created by TPC §§ 46.03 and 46.035 as well as by the rules and regulations enacted under S.B. 11 may sometimes comprise only a portion of a building. In some instances it may not be feasible to exclude concealed handguns only from the designated exclusion zones. The following factors and principles should govern the implementation of these rules and regulations in those buildings in which some, but not all parts are designated as exclusion zones.

Governing factors:

- The percentage of assignable space or rooms in a building that are designated as exclusion zones.

- The extent to which the area (or areas) designated as exclusion zones are segregable from other areas of the building.

- The extent to which use of the building, and hence its status as an exclusion zone, varies from day-to-day or week-to-week.

Governing principles:

- If a small number of rooms or a small fraction of assignable space in a building is subject to exclusion, only the rooms or areas that qualify for exclusion should be excluded. Appropriate signage needs to be posted for rooms or areas that are excluded.

- If a significant fraction of the total building in terms of number of rooms or assignable space is subject to exclusion, or if the excludable space is not segregable from other space, then as a matter of practicality, the whole building should be excluded. Appropriate signage needs to be posted for any such building.

*Comment:* Resolving how to deal with mixed-use buildings has proved to be one of the most perplexing problems both we and the UT System working group faced. The number of buildings on campus – each one unique in its own way – meant the problem defied formulaic or categorical resolution. Ultimately, we concluded that the only sensible solution was to decide how each mixed-use building should be treated on a case-by-case basis, in accordance with the factors and principles enunciated in this recommendation.

## D. Proactive Measures

The more than 3,300 comments, emails, petitions, statements, and memos we received included many thoughtful ideas regarding steps the University could take to improve campus safety, alleviate fears aroused by S.B. 11, and enhance the University's role in the study of gun violence. We observe that much of the apprehension expressed pertained not just to license holders carrying concealed handguns on campus but to more general fears about gun-related violence. The frequency with which school shootings have occurred – about 160 in the last three years[26] – has, quite understandably, engendered substantial anxiety among students, staff, faculty, and their families. Therefore, the recommendations and suggestions that follow address a broader range of concerns, not just those directly linked to S.B. 11.

### 1. Mental Health

Many of the comments and suggestions we received related to the provision of and communication about mental health services on campus. Numerous

---

[26] http://everytownresearch.org/school-shootings/.

commenters noted that high levels of academic and social stress on college campuses contribute to emotional distress, severe anxiety, and other psychological problems. Several buttressed their observations by citing from an impressive body of literature on the subject. Other commenters conveyed their thoughts in more personal terms, describing times of distress or despondency in their own college experience. Almost all these commenters expressed concerns – again, often backed by data – about the high risk of suicide or the link between mental health issues and school shootings. The comments we received also made clear that, for many, the advent of campus carry will heighten their fear and anxiety.

Consequently, we believe that the University should consider ways to address these concerns. The Counseling and Mental Health Center (CMHC) website contains a number of excellent online resources, including Be That One (suicide prevention); Voices Against Violence (sexual assault prevention); guides to a wide range of student concerns such as anxiety, depression, stress, loneliness, and substance abuse; and the Together > Alone campaign. The CMHC also offers a series of presentations and training sessions for students, staff, and faculty on topics such as suicide prevention and how to recognize and help a student in distress. CMHC has also partnered with the UT Police Department, Office of the Dean of Students, and Employee Assistance Program to create the Behavior Concerns Advice Line (BCAL), which faculty, students, and staff may call to discuss their concerns about another individual's behavior and seek guidance about how to address these concerns. Although most of these resources can readily be found on the CMHC's website, the comments we received indicated that many people are unaware of their existence. We suggest that the University explore how better to publicize their existence to all members of the UT community, including the parents of our students. This might include harnessing the talents of our students by urging faculty in, for example, marketing, communication, and art design to incorporate projects along these lines into their curricula. We also suggest that the University work with the Texas Exes and Texas Parents Association to help publicize available resources to their members.

We believe the University should examine the level of resources devoted to mental health services. We are aware that the CMHC provides individual counseling services during normal business hours and staffs a 24/7 hotline. But we also heard complaints about substantial waiting times to see a counselor. A thorough review of campus mental health resources fell outside our charge and capabilities, but we forward these complaints to President Fenves for his consideration.

## 2. Safety Training and Communication

We also received many comments calling for additional training and communication about campus carry and safety measures that should be taken should an active shooter situation occur on campus. Again, we found that some excellent resources are already available. For example, the Emergency Preparedness page of the Campus Safety and Security website includes links to a video on how to respond to an active shooter situation and safety protocols regarding armed subjects and disruptive individuals. A video, "When Shots Are Fired on Campus," can be found on the UT Police Department website. The comments we received indicated that many people are unaware of the existence of these resources, and we note that they are not as easy to find as they should be. We suggest that steps be taken to repackage these resources, locate them in a unified and easy-to-find webpage, and publicize their existence to the entire UT community, again with the possible assistance of the Texas Exes and Texas Parents Association.

We also suggest that the University develop additional training materials. These materials may take different forms, including online modules, live orientation sessions, and scheduled and on-demand presentations. Topics might include – this is not an exclusive list – an enhanced version of the existing safety protocol on what students, faculty, and staff should do if they see an armed person; how to deescalate a tense situation; how to handle a disgruntled student or employee; how to facilitate debate on controversial topics; developing competency among members of the University community for understanding differences based on race, ethnicity, religion, and sexual orientation; additional gun-safety training that could be made

**Exhibit 3**

available on a voluntary basis to license holders; and specialized training for particular audiences such as academic counselors and human resources staff. These resources should be communicated effectively to the entire University community. For example, the University might devise a campaign, "If you see a gun, call 9-1-1." Again, we suggest that consideration be given to involving our students and harnessing their talents in the creation and communication of these materials.

Beyond these suggestions, we make two formal recommendations:

### RECOMMENDATION # 22:

The University should develop training materials particular to UT on how to respond to an active shooter situation. These should be incorporated in the CW 122: A Safe Workplace training module, and all faculty and staff should be required to complete this module. All students should also be required to complete training on how to respond to an active shooter situation.

*Comment:* Regardless of campus carry, the startling number of on-campus shootings nationwide impels us to recommend that the University should require and not just make available training on how to respond to an active shooter situation.

### RECOMMENDATION # 23:

The University should develop and post in a prominent place a detailed Campus Carry FAQ.

*Comment:* We believe a detailed FAQ is critical to communicating to the UT community an understanding of the relevant law and campus policies.

### RECOMMENDATION # 24:

The University should develop materials to educate and inform parents of UT students and prospective students about campus carry and how it is being implemented.

*Comment:* Parents of our students and prospective students need to be fully informed about campus carry and how the University is implementing it. Informational materials created specifically for parents would provide a vehicle for letting parents know that students will not be permitted to have handguns in on-campus residence hall rooms and about other steps the University is taking to make the campus as safe as possible. These materials could also help to rectify many of the common misunderstandings about S.B. 11. The Texas Parents Association and Texas Exes could be of great assistance in implementing this recommendation.

### 3. Academic Research and Data Collection

Some of the comments we received focused on the need to monitor the impact that campus carry has on the University. Others focused on the desirability of the University embarking on a concerted, more-broadly gauged study of gun-related policies and gun violence.

We believe these are important issues, but this working group is not well-positioned to recommend particular ways the University should respond to them. We believe the University should develop an institutionalized means of systematically gathering and analyzing data on the effects of campus carry. This might involve augmenting data collection that already occurs, such as numbers of suicides, sexual assaults, and other acts of violence, to include whether a concealed handgun was involved; attitudinal surveys to assess student and faculty perceptions of the effect of campus carry on free speech in the classroom; faculty and management perceptions of their ability to give fair and accurate performance assessments; and perceptions about campus climate issues such as safety and race relations. The University might also attempt to assess the effects of campus carry on faculty, staff, and student recruitment and retention.

We believe the University should consider ways to encourage and support the study of a panoply of issues related to gun violence. We are aware that the Center for Gun Policy at the Johns Hopkins Bloomberg School of Public Health and Research and the Harvard Injury Control Research Center at the T.H. Chan School of Public Health are both engaged in this endeavor.

We are also aware that 18 higher education research centers and institutes (including UT's Center for Community College Student Engagement) issued a joint call in October for further research into on-campus shootings. We believe that UT can certainly play a role in these efforts. But determining what exactly that role should be requires far more information about the resources available on this campus, including the research interests of our faculty, for the Working Group to make any specific recommendations.

#### 4. Additional Safety Measure

In addition to the recommendations we have already made, we recommend one more safety measure.

### RECOMMENDATION # 25:

To the extent possible, office space within gun-exclusion zones should be made available on a scheduled basis to faculty and staff who do not have offices to which they are solely assigned. These spaces can be used for conferences that faculty or staff would prefer to conduct in a gun-exclusion zone.

*Comment:* Numerous faculty and staff expressed a desire to be able to conduct difficult and sensitive meetings in a gun-exclusion zone. Under Recommendation # 18, those who have offices to which they are solely assigned will be able to do so. We believe that efforts should be made to identify available office space in designated gun-exclusion zones and make it accessible to faculty and staff who do not have offices to which are they solely assigned. Given the likely scarcity of such spaces, this should be done on a scheduled basis. This recommendation does not involve the creation of any additional gun-exclusion zones.

### E. Why We Do Not Recommend Classrooms Should Be Gun-Exclusion Zones

Throughout the consultative process, many people have urged the Working Group to recommend that classrooms be designated as gun-exclusion zones. The Working Group is keenly aware that this sentiment is widespread on campus. We received submissions from dozens of

departments, centers, schools, and professional and student organizations stating their opposition to S.B. 11 and the prospect of allowing handguns on campus. Most emphatically expressed the view that handguns do not belong in classrooms. Similar views were expressed by many speakers during the public forums, by numerous respondents to our online survey, and by members of the University community in conversations with individual members of the Working Group.

We seriously considered the issue. The Working Group is sympathetic to the notion that guns do not belong in the classroom. Every member of the Working Group – including those who are gun owners and license holders – thinks it would be best if guns were not allowed in classrooms. Nevertheless, for the reasons that follow, we cannot recommend that classrooms should be designated a gun-exclusion zone.

Under S.B. 11, any rule or regulation enacted by the President must meet two tests: it must be reasonable and it must not have the effect of generally prohibiting license holders from carrying their handguns on campus. Consequently, we considered possible justifications for excluding handguns from classrooms and whether such an exclusion would effectively prohibit concealed carry on campus. We do not here attempt to catalog all the reasons proffered for the exclusion of handguns from campus. Rather we focus on the most-commonly articulated reasons and, we believe, the most salient ones.

Numerous faculty and students asserted that allowing license holders to carry concealed handguns in the classroom would adversely affect the educational mission of the University. Without doubt, the free and open discussion of controversial, and, at times, uncomfortable ideas is an essential component of the educational process – one that occurs throughout our campus on a daily basis. Many faculty and students believe, however, that the potential presence of concealed handguns in classrooms will tend to stifle this type of intellectual exploration. Echoing comments Chancellor McRaven made while the Legislature was considering S.B. 11, respondents told us repeatedly that the idea that a student might be carrying a gun would chill the open, animated, and sometimes heated discussions that typify their classes. Some faculty indicated that they may even feel compelled to desist from addressing certain topics in class.

We heard many expressions of concern that allowing concealed carry in classrooms would impede our ability to recruit and retain faculty, students, and staff. This was a common thread of the comments we heard from faculty, but similar comments came from all parts of the University community. Parents told us they would not send their children to UT; many current students, particularly minority and international students, said they would not have chosen UT had they known that guns would be allowed in classes. A substantial number of graduate students who serve as teaching assistants indicated that they would not have come to UT and will not be inclined to remain. The substantial publicity that campus carry at UT has received nationwide has exacerbated concerns about recruitment and retention.

Of course, these views are not universally shared. Many people – albeit a distinct minority of those from whom we heard – took contrary positions. One frequently-voiced view, for example, was that license holders pose no threat to classroom discussion. Many commenters cited data from the Texas Department of Public Safety that show that license holders are, on the whole, very law-abiding. It was also noted that concealed carry has been allowed on campus grounds since 1995, including the West Mall and other outdoor areas where protests and heated debates have occurred without a single incident related to concealed carry.

The Working Group recognizes that allowing concealed handguns in classrooms may chill some class discussion and hinder the recruitment and retention of faculty and students. But it is also clear to us that excluding handguns from classrooms would effectively prohibit license holders from carrying their handguns and so would violate S.B. 11. The only possible way to avoid this result would be for the University to provide gun lockers at strategic points around campus. We believe that this would be an extremely ill-advised measure, and we cannot recommend it.

The primary on-campus activity for most of our more than 50,000 students is going to class. If handguns were banned from classrooms, license holders would have to leave their handguns at home or in their cars every day they go to class. Short of an outright prohibition of handguns in all buildings – that is, a reversion to the state of the law as it was before S.B. 11 was passed – we can think of no measure that would more effectively prohibit campus carry than designating classrooms as gun-exclusion zones.

We considered the possibility that the University could place gun lockers at strategic points around campus so that license holders could store their handguns whenever they are in class. With readily-available gun lockers, license holders would not have to leave their guns at home or in their cars on days they attend class. The Working Group concluded, however, that, for many reasons, placing gun lockers around campus is a bad idea.

First, since the open display of a handgun on campus will remain a criminal offense, gun lockers would have to put in places that allowed license holders to remove their handguns without displaying them in plain view of others. Second, the University would have to ensure that measures are taken to safeguard the lockers, limit accessibility only to the license holders who have stored their handguns there, and deal with handguns that are stored but not reclaimed. Third, license holders could be "outed" by anyone who chose to linger near the entrance to the gun lockers. The Working Group considered these to be serious, but not necessarily insurmountable issues.

We believe one last reason is, however, insurmountable. Every knowledgeable source we consulted unequivocally stressed the danger that accompanies the transfer of a handgun to a storage unit. A policy that increases the number of instances in which a handgun must be stored multiplies the danger of an accidental discharge. We believe this danger would be especially acute in gun lockers placed around campus. These are most likely to be used when a license holder is attempting to store a handgun while heading to class. It is all-too easy to imagine that there will be days when a license holder is running a bit late and thus will be less cautious in storing the handgun. This substantially raises the risk of accidental discharges on campus.

In the end, the Working Group concluded, without hesitation, that the risks to human life of placing gun lockers around campus would substantially outweigh any benefits that would accrue from banning concealed handguns in classrooms. Our charge from President Fenves was to make recommendations that would promote safety and security for all members of the campus in a way that is fully compliant with the law. Recommending that the University install and operate gun lockers around campus would be inconsistent with that charge. [27]

---

[27] In reaching this conclusion, we considered the arguments presented in a memorandum prepared by counsel for the Campaign to Keep Guns

**Exhibit 3**

Lastly, some have argued that the constitutionally-based doctrine of academic freedom or educational autonomy authorizes the University (or individual professors) to ban concealed handguns from classrooms, regardless of what

S.B. 11 may command. Our charge, however, was to make recommendations regarding how to implement S.B. 11, not to judge its constitutionality.[28]

---

Off Campus (CKGOC). Counsel for CKGOC state that, "with proper arrangements," banning handguns from classrooms would amount to only a partial ban of handguns on campus. The only two "proper arrangements" counsel suggest are the provision of "accessible storage spaces" or "more limited bans on firearms only during times when classes are in session." Banning handguns from classes "only when classes are in session" – that is, during most of the day throughout the school year – would not save this from being an effective general prohibition on campus carry. As discussed above, we agree that the adequate provision of gun safes would allow license holders to carry their handguns on campus, but conclude, for safety reasons, that this is not an acceptable option.

Counsel's argument that "the actual primary goal of SB 11 [was] to restrict the power of universities to prohibit firearms outdoors" is unpersuasive. To our knowledge – and we checked with University and UT System governmental affairs representatives who closely monitored the progress of S.B. 11 during the last legislative session – none of the sponsors or supporters of S.B. 11 ever argued that this was the purpose of the bill.

Finally, the cases upon which CKGOC's counsel rely to support their arguments that a ban on handguns in classrooms would not constitute a general prohibition on campus carry are inapposite. Both DiGiacinto v. Rectors and Visitors of George Mason University, 704 S.E.2d 365 (Va. 2011), and Bonidy v. United States Postal Serv., 790 F.3d 1121 (10th Cir. 2015), involved Second Amendment challenges to firearm restrictions in places – university buildings (DiGiacinto) and post office property (Bonidy) – where the Supreme Court recognizes that restrictions may constitutionally be imposed. District of Columbia v. Heller, 554 U.S. 570 (2008). The Working Group must address a completely different question: whether a ban on guns in classrooms would violate a statutory directive that a university may not enact rules or regulations that effectively negate a license holder's express statutory right to carry a concealed handgun on campus. Neither DiGiacinto nor Bonidy speaks to the statutory issues that S.B. 11 presents.

[28] The extent to which courts will defer to a university's judgment that a particular policy is essential to its educational mission is far from clear. In upholding the University of Michigan Law School's affirmative action program, the Supreme Court, "in keeping with [its] tradition of giving a degree of deference to a university's academic decisions," took into account "complex educational judgments in an area that lies primarily within the expertise of the university." Grutter v. Bollinger, 539 U.S. 306, 328 (2003). But the Supreme Court rejected Virginia Military Institute's educational judgment about the value of its "adversative method of training" in ruling that the school violated the constitution by excluding women. United States v. Virginia, 518 U.S. 515 (1996).

Of particular significance to us are the cases in other states in which the legislature had passed a law that seemingly authorized campus carry and in which universities nevertheless sought to ban campus carry. Courts in Utah, Colorado, and Oregon all overturned the university bans. In Utah, one dissenting judge cited the University's academic autonomy as grounds for upholding the University's ban on firearms. She located the source of this autonomy, however, not in federal constitutional law, but in a provision of the Utah Constitution that ratified an 1892 territorial enactment establishing the University. University of Utah v. Shurtleff, 144 P.3d 1109, 1122-28 (Utah 2006) (Durham, C.J., dissenting). In Colorado, the Regents' ban on firearms was expressly predicated on the judgment that the presence of firearms undermined the educational mission of the University, and counsel for the Regents invoked academic freedom at oral argument, contending that this was the type of educational judgment to which courts must defer. A unanimous Colorado Supreme Court overturned the firearms ban and did not even address the issue of constitutionally-based academic freedom or educational autonomy. Regents of University of Colorado v. Students for Concealed Carry on Campus, LLC, 271 P.3d 496 (Colo. 2012). Finally, the Oregon court of appeals made no mention of constitutionally-based academic freedom or educational autonomy in rejecting the University's ban on campus carry. Oregon Firearms Educational Foundation v. Board of Higher Education, 264 P.3d 160 (Ore. Ct. App. 2011).

---

## V.  CONCLUSION

For the past three months, we have wrestled with the challenge of developing a set of recommended rules and regulations for campus carry. Throughout the process, we have tried to adhere to the charge President Fenves gave us: to recommend steps he can take that will promote safety and security for all members of the campus in a way that complies with the law. We expect that some people will think we did not go far enough in restricting the presence of handguns on campus and that others will think we went too far. We hope, however, that most will at least view this Report for what it is: the product of an honest and good-faith effort to deal with an extraordinarily difficult and divisive issue.

© 2015 The University of Texas at Austin **Exhibit 3**

## APPENDIX A

---

## MEMBERSHIP OF CAMPUS CARRY POLICY WORKING GROUP

**Chair**
Steven Goode, School of Law

**Dean's Representative**
Lynn Crismon, Dean, College of Pharmacy

**Faculty Representatives**
Steven Biegalski, Cockrell School of Engineering
Mechele Dickerson, School of Law
Coleman Hutchison, College of Liberal Arts
Victor Saenz, College of Education
William (Bill) Spelman, LBJ School of Public Affairs

**Staff Representatives**
Leticia Acosta, McCombs School of Business
Glen Baum, Cockrell School of Engineering
Stacey Bennett, Division of Housing and Food Service

**Student Representatives**
Rachel Osterloh, President, Senate College of Councils
Vance Roper, Vice President, Graduate Student Assembly
Xavier Rotnofsky, President, Student Government

**Parent Representative**
Sandra Blount, Sugar Land, Texas

**Alumni Representative**
The Honorable Wallace Jefferson, Distinguished Alumnus of UT Austin, Austin, Texas

**Special Collections Representative**
Stephen Enniss, Director, Harry Ransom Center

**Subcommittee Chairs**
Janet Dukerich, Senior Vice Provost
Gerald R. (Bob) Harkins, Associate Vice President, Campus Safety and Security

**Ex-officio Representative**
Carlos Martinez, Associate Vice President, Office of the President

---

## MEMBERSHIP OF SAFETY AND SECURITY SUBCOMMITTEE

**Chair**
Bob Harkins, Associate Vice President, Campus Safety and Security

**Members**
Chris Brownson, Associate Vice President for Student Affairs, Director, Counseling and Mental Health Center
David Carter, Chief, University Police Department
David O. Cronk, Director, Emergency Preparedness
Janet Dukerich, Senior Vice Provost, Office of the Executive Vice President and Provost
Douglas Garrard, Office of the Dean of Students
Edward L. Goble, Executive Senior Associate Athletic Director, Intercollegiate Athletics
Jeffery L. Graves, Associate Vice President for Legal Affairs
Hemlata G. Jhaveri, Division of Housing and Food Service
James H. Johnson, Fire Marshal, Fire Prevention Services
Paul Liebman, Chief Compliance Officer, University Compliance Services
Carlos Martinez, Associate Vice President, Office of the President
Cynthia G. Posey, Associate Director of Communications, University Operations
John Salsman, Director, Environmental Health and Safety
Peter D. Schaack, Associate Director, Division of Recreational Sports
Gary J. Susswein, Executive Director of Media Relations & Issues Management, University Communications
Del Watson, Director of Faculty Affairs, Office of the Executive Vice President and Provost
Rhonda R. Weldon, Director of Communications, University Operations
Leekeshia Williams, Youth Protection Program Manager, University Compliance Services

## MEMBERSHIP OF COMMUNICATION AND TRAINING SUBCOMMITTEE

**Chair**
Janet Dukerich, Senior Vice Provost, Office of the Executive Vice President and Provost

**Members**
Maria Arrellaga, Chief Communications Officer, Office of the President
Jeffery L. Graves, Associate Vice President for Legal Affairs
Bob Harkins, Associate Vice President, Campus Safety and Security
Susan Harnden, Employee Assistance Program Manager, Human Resources
Debra Kress, Associate Vice President, Human Resources
Carlos Martinez, Associate Vice President, Office of the President
Carmen Shockley, Director of Academic Personnel Services, Office of the Executive Vice President and Provost
Mary Steinhardt, University Faculty Ombuds
Don Verett, Captain, University of Texas Police Department
Brooke Bulow, Director of Communications Office of the Vice President for Student Affairs

## APPENDIX B

---

## TEXT OF RELEVANT STATUTES

**SENATE BILL 11**

AN ACT
relating to the carrying of handguns on the campuses of and certain other locations associated with institutions of higher education; providing a criminal penalty.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subchapter H, Chapter 411, Government Code, is amended by adding Section 411.2031 to read as follows:

Sec. 411.2031.  CARRYING OF HANDGUNS BY LICENSE HOLDERS ON CERTAIN CAMPUSES. (a)  For purposes of this section:

(1)  "Campus" means all land and buildings owned or leased by an institution of higher education or private or independent institution of higher education.

(2)  "Institution of higher education" and "private or independent institution of higher education" have the meanings assigned by Section 61.003, Education Code.

(3)  "Premises" has the meaning assigned by Section 46.035, Penal Code.

(b)  A license holder may carry a concealed handgun on or about the license holder's person while the license holder is on the campus of an institution of higher education or private or independent institution of higher education in this state.

(c)  Except as provided by Subsection (d), (d-1), or (e), an institution of higher education or private or independent institution of higher education in this state may not adopt any rule, regulation, or other provision prohibiting license holders from carrying handguns on the campus of the institution.

(d)  An institution of higher education or private or independent institution of higher education in this state may establish rules, regulations, or other provisions concerning the storage of handguns in dormitories or other residential facilities that are owned or leased and operated by the institution and located on the campus of the institution.

(d-1)  After consulting with students, staff, and faculty of the institution regarding the nature of the student population, specific safety considerations, and the uniqueness of the campus environment, the president or other chief executive officer of an institution of higher education in this state shall establish reasonable rules, regulations, or other provisions regarding the carrying of concealed handguns by license holders on the campus of the institution or on premises located on the campus of the institution. The president or officer may not establish provisions that generally prohibit or have the effect of generally prohibiting license holders from carrying concealed handguns on the campus of the institution. The president or officer may amend the provisions as necessary for campus safety. The provisions take effect as determined by the president or officer unless subsequently amended by the board of regents or other governing board under Subsection (d-2). The institution must give effective notice under Section 30.06, Penal Code, with respect to any portion of a premises on which license holders may not carry.

(d-2)  Not later than the 90th day after the date that the rules, regulations, or other provisions are established as described by Subsection (d-1), the board of regents or other governing board of the institution of higher education shall review the provisions. The board of regents or other governing board may, by a vote of not less than two-thirds of the board, amend wholly or partly the provisions established under Subsection (d-1). If amended under this subsection, the provisions are considered to be those of the institution as established under Subsection (d-1).

(d-3)  An institution of higher education shall widely distribute the rules, regulations, or other provisions described by Subsection (d-1) to the institution's students, staff, and faculty, including by prominently publishing the provisions on the institution's Internet website.

(d-4)  Not later than September 1 of each even-numbered year, each institution of higher education in this state shall submit a report to the legislature and to the standing committees of the legislature with

---

© 2015 The University of Texas at Austin Campus Carry Policy Working Group   *Final Report*

**Exhibit 3**

jurisdiction over the implementation and continuation of this section that:

(1)  describes its rules, regulations, or other provisions regarding the carrying of concealed handguns on the campus of the institution; and

(2)  explains the reasons the institution has established those provisions.

(e)  A private or independent institution of higher education in this state, after consulting with students, staff, and faculty of the institution, may establish rules, regulations, or other provisions prohibiting license holders from carrying handguns on the campus of the institution, any grounds or building on which an activity sponsored by the institution is being conducted, or a passenger transportation vehicle owned by the institution.

SECTION 2.  Section 411.208, Government Code, is amended by amending Subsections (a), (b), and (d) and adding Subsection (f) to read as follows:

(a)  A court may not hold the state, an agency or subdivision of the state, an officer or employee of the state, an institution of higher education, an officer or employee of an institution of higher education, a private or independent institution of higher education that has not adopted rules under Section 411.2031(e), an officer or employee of a private or independent institution of higher education that has not adopted rules under Section 411.2031(e), a peace officer, or a qualified handgun instructor liable for damages caused by:

(1)  an action authorized under this subchapter or a failure to perform a duty imposed by this subchapter; or

(2)  the actions of an applicant or license holder that occur after the applicant has received a license or been denied a license under this subchapter.

(b)  A cause of action in damages may not be brought against the state, an agency or subdivision of the state, an officer or employee of the state, an institution of higher education, an officer or employee of an institution of higher education, a private or independent institution of higher education that has not adopted rules under Section 411.2031(e), an officer or employee

of a private or independent institution of higher education that has not adopted rules under Section 411.2031(e), a peace officer, or a qualified handgun instructor for any damage caused by the actions of an applicant or license holder under this subchapter.

(d)  The immunities granted under Subsections (a), (b), and (c) do not apply to:

(1)  an act or a failure to act by the state, an agency or subdivision of the state, an officer of the state, an institution of higher education, an officer or employee of an institution of higher education, a private or independent institution of higher education that has not adopted rules under Section 411.2031(e), an officer or employee of a private or independent institution of higher education that has not adopted rules under Section 411.2031(e), or a peace officer if the act or failure to act was capricious or arbitrary; or

(2)  any officer or employee of an institution of higher education or private or independent institution of higher education described by Subdivision (1) who possesses a handgun on the campus of that institution and whose conduct with regard to the handgun is made the basis of a claim for personal injury or property damage.

(f)  For purposes of this section:

(1)  "Campus" has the meaning assigned by Section 411.2031.

(2)  "Institution of higher education" and "private or independent institution of higher education" have the meanings assigned by Section 61.003, Education Code.

SECTION 3.  Sections 46.03(a) and (c), Penal Code, are amended to read as follows:

(a)  A person commits an offense if the person intentionally, knowingly, or recklessly possesses or goes with a firearm, illegal knife, club, or prohibited weapon listed in Section 46.05(a):

(1)  on the physical premises of a school or educational institution, any grounds or building on which an activity sponsored by a school or educational institution is being conducted, or a

**Exhibit 3**

passenger transportation vehicle of a school or educational institution, whether the school or educational institution is public or private, unless:

(A)  pursuant to written regulations or written authorization of the institution; or

(B)  the person possesses or goes with a concealed handgun that the person is licensed to carry under Subchapter H, Chapter 411, Government Code, and no other weapon to which this section applies, on the premises of an institution of higher education or private or independent institution of higher education, on any grounds or building on which an activity sponsored by the institution is being conducted, or in a passenger transportation vehicle of the institution;

(2)  on the premises of a polling place on the day of an election or while early voting is in progress;

(3)  on the premises of any government court or offices utilized by the court, unless pursuant to written regulations or written authorization of the court;

(4)  on the premises of a racetrack;

(5)  in or into a secured area of an airport; or

(6)  within 1,000 feet of premises the location of which is designated by the Texas Department of Criminal Justice as a place of execution under Article 43.19, Code of Criminal Procedure, on a day that a sentence of death is set to be imposed on the designated premises and the person received notice that:

(A)  going within 1,000 feet of the premises with a weapon listed under this subsection was prohibited; or

(B)  possessing a weapon listed under this subsection within 1,000 feet of the premises was prohibited.

(c)  In this section:

(1)  "Institution of higher education" and "private or independent institution of higher education" have the meanings assigned by Section 61.003, Education Code.

(2)  "Premises" has the meaning assigned by Section 46.035.

(3) [(2)]  "Secured area" means an area of an airport terminal building to which access is controlled by the inspection of persons and property under federal law.

SECTION 4.  Section 46.035, Penal Code, is amended by adding Subsections (a-1), (a-2), (a-3), and (l) and amending Subsections (g), (h), and (j) to read as follows:

(a-1)  Notwithstanding Subsection (a), a license holder commits an offense if the license holder carries a partially or wholly visible handgun, regardless of whether the handgun is holstered, on or about the license holder's person under the authority of Subchapter H, Chapter 411, Government Code, and intentionally or knowingly displays the handgun in plain view of another person:

(1)  on the premises of an institution of higher education or private or independent institution of higher education; or

(2)  on any public or private driveway, street, sidewalk or walkway, parking lot, parking garage, or other parking area of an institution of higher education or private or independent institution of higher education.

(a-2)  Notwithstanding Subsection (a) or Section 46.03(a), a license holder commits an offense if the license holder carries a handgun on the campus of a private or independent institution of higher education in this state that has established rules, regulations, or other provisions prohibiting license holders from carrying handguns pursuant to Section 411.2031(e), Government Code, or on the grounds or building on which an activity sponsored by such an institution is being conducted, or in a passenger transportation vehicle of such an institution, regardless of whether the handgun is concealed, provided the institution gives effective notice under Section 30.06.

(a-3)  Notwithstanding Subsection (a) or Section 46.03(a), a license holder commits an offense if the license holder intentionally carries a concealed handgun on a portion of a premises located on the campus of an institution of higher education in this

state on which the carrying of a concealed handgun is prohibited by rules, regulations, or other provisions established under Section 411.2031(d-1), Government Code, provided the institution gives effective notice under Section 30.06 with respect to that portion.

(g)  An offense under Subsection (a), (a-1), (a-2), (a-3), (b), (c), (d), or (e) is a Class A misdemeanor, unless the offense is committed under Subsection (b)(1) or (b)(3), in which event the offense is a felony of the third degree.

(h)  It is a defense to prosecution under Subsection (a), (a-1), (a-2), or (a-3) that the actor, at the time of the commission of the offense, displayed the handgun under circumstances in which the actor would have been justified in the use of force or deadly force under Chapter 9.

(j)  Subsections (a), (a-1), (a-2), (a-3), and (b)(1) do not apply to a historical reenactment performed in compliance with the rules of the Texas Alcoholic Beverage Commission.

(l)  Subsection (b)(2) does not apply on the premises where a collegiate sporting event is taking place if the actor was not given effective notice under Section 30.06.

SECTION 5.  Section 46.035(f), Penal Code, is amended by adding Subdivision (1-a) to read as follows:

(1-a)  "Institution of higher education" and "private or independent institution of higher education" have the meanings assigned by Section 61.003, Education Code.

SECTION 6.  Section 411.208, Government Code, as amended by this Act, applies only to a cause of action that accrues on or after the effective date of this Act. A cause of action that accrues before the effective date of this Act is governed by the law in effect immediately before that date, and that law is continued in effect for that purpose.

SECTION 7.  The change in law made by this Act applies only to an offense committed on or after the effective date of this Act. An offense committed before the effective date of this Act is governed by the law in effect on the date the offense was committed, and the former law is continued

in effect for that purpose. For purposes of this section, an offense was committed before the effective date of this Act if any element of the offense occurred before that date.

SECTION 8.  (a) Except as otherwise provided by this section, this Act takes effect August 1, 2016.

(b)  Before August 1, 2016, the president or other chief executive officer of an institution of higher education, as defined by Section 61.003, Education Code, other than a public junior college as defined by that section, shall take any action necessary to adopt rules, regulations, or other provisions as required by Section 411.2031, Government Code, as added by this Act. Notwithstanding any other law, the president or other chief executive officer shall establish rules, regulations, or other provisions under Section 411.2031(d-1), Government Code, as added by this Act, that take effect August 1, 2016.

(c)  Before August 1, 2016, a private or independent institution of higher education, as defined by Section 61.003, Education Code, may take any action necessary to adopt rules, regulations, or other provisions as authorized under Section 411.2031, Government Code, as added by this Act.

(d)  This Act does not apply to a public junior college, as defined by Section 61.003, Education Code, before August 1, 2017. Not later than August 1, 2017, the president or other chief executive officer of a public junior college shall take any action necessary to adopt rules, regulations, or other provisions as required by Section 411.2031, Government Code, as added by this Act. Notwithstanding any other law, the president or other chief executive officer shall establish rules, regulations, or other provisions under Section 411.2031(d-1), Government Code, as added by this Act, that take effect August 1, 2017.

**TEXAS PENAL CODE § 46.03**
(as of August 1, 2016)

**Sec. 46.03. Places weapons prohibited.**

(a)    A person commits an offense if the person intentionally, knowingly, or recklessly possesses or goes with a firearm, illegal knife, club, or prohibited weapon listed in Section 46.05(a):

(1) on the physical premises of a school or educational institution, any grounds or building on which an activity sponsored by a school or educational institution is being conducted, or a passenger transportation vehicle of a school or educational institution, whether the school or educational institution is public or private, unless:

(A)    pursuant to written regulations or written authorization of the institution; or

(B)    the person possesses or goes with a concealed handgun that the person is licensed to carry under Subchapter H, Chapter 411, Government Code, and no other weapon to which this section applies, on the premises of an institution of higher education or private or independent institution of higher education, on any grounds or building on which an activity sponsored by the institution is being conducted, or in a passenger transportation vehicle of the institution;

(2) on the premises of a polling place on the day of an election or while early voting is in progress;

(3) on the premises of any government court or offices utilized by the court, unless pursuant to written regulations or written authorization of the court;

(4) on the premises of a racetrack;

(5) in or into a secured area of an airport; or

(6) within 1,000 feet of premises the location of which is designated by the Texas Department of Criminal Justice as a place of execution under Article 43.19, Code of Criminal Procedure, on a day that a sentence

of death is set to be imposed on the designated premises and the person received notice that:

(A)    going within 1,000 feet of the premises with a weapon listed under this subsection was prohibited; or

(B)    possessing a weapon listed under this subsection within 1,000 feet of the premises was prohibited.

(b)    It is a defense to prosecution under Subsections (a)(1)-(4) that the actor possessed a firearm while in the actual discharge of his official duties as a member of the armed forces or national guard or a guard employed by a penal institution, or an officer of the court.

(c)    In this section:

(1) "Institution of higher education" and "private or independent institution of higher education" have the meanings assigned by Section 61.003, Education Code.

(2) "Premises" has the meaning assigned by Section 46.035.

(3) "Secured area" means an area of an airport terminal building to which access is controlled by the inspection of persons and property under federal law

(d)    It is a defense to prosecution under Subsection (a)(5) that the actor possessed a firearm or club while traveling to or from the actor's place of assignment or in the actual discharge of duties as:

(1) a member of the armed forces or national guard;

(2) a guard employed by a penal institution; or

(3) a security officer commissioned by the Texas Private Security Board if:

(A)    the actor is wearing a distinctive uniform; and

(B)    the firearm or club is in plain view; or

(4) a security officer who holds a personal protection authorization under Chapter 1702, Occupations Code, provided that the officer is either:

(A)    wearing the uniform of a security officer, including any uniform or apparel described by Section 1702.323(d), Occupations Code, and carrying the officer's firearm in plain view; or

**Exhibit 3**

(B)   not wearing the uniform of a security officer and carrying the officer's firearm in a concealed manner.

(e)   It is a defense to prosecution under Subsection (a)(5) that the actor checked all firearms as baggage in accordance with federal or state law or regulations before entering a secured area.

(f)   It is not a defense to prosecution under this section that the actor possessed a handgun and was licensed to carry a handgun under Subchapter H, Chapter 411, Government Code.

(g)   An offense under this section is a third degree felony.

(h)   It is a defense to prosecution under Subsection (a)(4) that the actor possessed a firearm or club while traveling to or from the actor's place of assignment or in the actual discharge of duties as a security officer commissioned by the Texas Board of Private Investigators and Private Security Agencies, if:

(1) the actor is wearing a distinctive uniform; and

(2) the firearm or club is in plain view.

(i)   It is an exception to the application of Subsection (a)(6) that the actor possessed a firearm or club:

(1) while in a vehicle being driven on a public road; or

(2) at the actor's residence or place of employment.

**Exhibit 3**

© 2015 The University of Texas at Austin      Campus Carry Policy Working Group   *Final Report*      37

**TEXAS PENAL CODE § 46.035**
(as of August 1, 2016)

### Sec. 46.035. Unlawful Carrying of Handgun by License Holder

(a)    A license holder commits an offense if the license holder carries a handgun on or about the license holder's person under the authority of Subchapter H, Chapter 411, Government Code, and intentionally displays the handgun in plain view of another person in a public place. It is an exception to the application of this subsection that the handgun was partially or wholly visible but was carried in a shoulder or belt holster by the license holder.

(a-1)   Notwithstanding Subsection (a), a license holder commits an offense if the license holder carries a partially or wholly visible handgun, regardless of whether the handgun is holstered, on or about the license holder's person under the authority of Subchapter H, Chapter 411, Government Code, and intentionally or knowingly displays the handgun in plain view of another person:

(1) on the premises of an institution of higher education or private or independent institution of higher education; or

(2)    on any public or private driveway, street, sidewalk or walkway, parking lot, parking garage, or other parking area of an institution of higher education or private or independent institution of higher education.

(a-2) Notwithstanding Subsection (a) or Section 46.03(a), a license holder commits an offense if the license holder carries a handgun on the campus of a private or independent institution of higher education in this state that has established rules, regulations, or other provisions prohibiting license holders from carrying handguns pursuant to Section 411.2031(e), Government Code, or on the grounds or building on which an activity sponsored by such an institution is being conducted, or in a passenger transportation vehicle of such an institution, regardless of whether the handgun is concealed, provided the institution gives effective notice under Section 30.06.

(a-3)  Notwithstanding Subsection (a) or Section 46.03(a), a license holder commits an offense if the license holder intentionally carries a concealed handgun on a portion of a premises located on the campus of an institution of higher education in this state on which the carrying of a concealed handgun is prohibited by rules, regulations, or other provisions established under Section 411.2031(d-1), Government Code, provided the institution gives effective notice under Section 30.06 with respect to that portion.

(b)    A license holder commits an offense if the license holder intentionally, knowingly, or recklessly carries a handgun under the authority of Subchapter H, Chapter 411, Government Code, regardless of whether the handgun is concealed or carried in a shoulder or belt holster, on or about the license holder's person:

(1)    on the premises of a business that has a permit or license issued under Chapter 25, 28, 32, 69, or 74, Alcoholic Beverage Code, if the business derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption, as determined by the Texas Alcoholic Beverage Commission under Section 104.06, Alcoholic Beverage Code;

(2)    on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place, unless the license holder is a participant in the event and a handgun is used in the event;

(3)    on the premises of a correctional facility;

(4)    on the premises of a hospital licensed under Chapter 241, Health and Safety Code, or on the premises of a nursing facility licensed under Chapter 242, Health and Safety Code, unless the license holder has written authorization of the hospital or nursing facility administration, as appropriate;

(5)    in an amusement park; or

(6)    on the premises of a church, synagogue, or other established place of religious worship.

(c)    A license holder commits an offense if the license holder intentionally, knowingly, or recklessly carries a handgun under the authority of Subchapter H, Chapter 411, Government Code, regardless of whether the

**Exhibit 3**

handgun is concealed or carried in a shoulder or belt holster, in the room or rooms where a meeting of a governmental entity is held and if the meeting is an open meeting subject to Chapter 551, Government Code, and the entity provided notice as required by that chapter.

(d)    A license holder commits an offense if, while intoxicated, the license holder carries a handgun under the authority of Subchapter H, Chapter 411, Government Code, regardless of whether the handgun is concealed or carried in a shoulder or belt holster.

(e)    A license holder who is licensed as a security officer under Chapter 1702, Occupations Code, and employed as a security officer commits an offense if, while in the course and scope of the security officer's employment, the security officer violates a provision of Subchapter H, Chapter 411, Government Code.

(f)    In this section:

(1)    "Amusement park" means a permanent indoor or outdoor facility or park where amusement rides are available for use by the public that is located in a county with a population of more than one million, encompasses at least 75 acres in surface area, is enclosed with access only through controlled entries, is open for operation more than 120 days in each calendar year, and has security guards on the premises at all times. The term does not include any public or private driveway, street, sidewalk or walkway, parking lot, parking garage, or other parking area.

(1-a)  "Institution of higher education" and "private or independent institution of higher education" have the meanings assigned by Section 61.003, Education Code.

(2)    "License holder" means a person licensed to carry a handgun under Subchapter H, Chapter 411, Government Code.

(3)    "Premises" means a building or a portion of a building. The term does not include any public or private driveway, street, sidewalk or walkway, parking lot, parking garage, or other parking area.

(g)    An offense under this section 2 is a Class A misdemeanor, unless the offense is committed under Subsection (b)(1) or (b)(3), in which event the offense is

a felony of the third degree.

(h)    It is a defense to prosecution under Subsection (a), (a-1), (a-2), or (a-3) that the actor, at the time of the commission of the offense, displayed the handgun under circumstances in which the actor would have been justified in the use of force or deadly force under Chapter 9.

<Text of subsec. (h-1) as added by Acts 2007, 80th Leg., ch. 1214, § 2>

(h-1)  It is a defense to prosecution under Subsections (b) and (c) that the actor, at the time of the commission of the offense, was:

(1)    an active judicial officer, as defined by Section 411.201, Government Code; or

(2)    a bailiff designated by the active judicial officer and engaged in escorting the officer.

<Text of subsec. (h-1) as added by Acts 2007, 80th Leg., ch. 1222, § 5>

(h-1)  It is a defense to prosecution under Subsections (b)(1), (2), and (4)-(6), and (c) that at the time of the commission of the offense, the actor was:

(1)    a judge or justice of a federal court;

(2)    an active judicial officer, as defined by Section 411.201, Government Code; or

(3)    a district attorney, assistant district attorney, criminal district attorney, assistant criminal district attorney, county attorney, or assistant county attorney.

(i)    Subsections (b)(4), (b)(5), (b)(6), and (c) do not apply if the actor was not given effective notice under Section 30.06 or 30.07.

(j)    Subsections (a), (a-1), (a-2), (a-3), and (b)(1) do not apply to a historical reenactment performed in compliance with the rules of the Texas Alcoholic Beverage Commission.

(k)    It is a defense to prosecution under Subsection (b)(1) that the actor was not given effective notice under Section 411.204, Government Code.

(l)    Subsection (b)(2) does not apply on the premises where a collegiate sporting event is taking place if the actor was not given effective notice under Section 30.06.

**Exhibit 3**

## APPENDIX C

---

### RECOMMENDATIONS AND COMMENTS

**Recommendation # 1:** License holders who carry a handgun on campus must carry it on or about their person at all times or secure their handgun in a locked, privately-owned or leased motor vehicle. The only exception to this is that license holders who reside in University Apartments or who are staff whose employment responsibilities require them to reside in University housing may store their handguns in a gun safe in accordance with the requirements set forth in Recommendation # 17. In compliance with Texas Penal Code § 46.035(a-1), a license holder may not carry a partially or wholly visible handgun on campus premises or on any university driveway, street, sidewalk or walkway, parking lot, parking garage, or other parking area.

**Recommendation # 2:** A license holder who carries a handgun on campus must carry it in a holster that completely covers the trigger and the entire trigger guard area. The holster must have sufficient tension or grip on the handgun to retain it in the holster even when subjected to unexpected jostling.

**Recommendation # 3:** A license holder who carries a semiautomatic handgun on campus must carry it without a chambered round of ammunition.

***Comment:*** These recommendations are designed to ensure that handguns will be carried and stored on campus in the safest way possible.

Recommendation # 1 aims at minimizing the possibility of accidental loss or theft of a concealed handgun. License holders must either carry their handguns on or about their person or store them in their locked motor vehicle. "About" the person means that a license holder may carry a handgun – holstered – in a backpack or handbag, but the backpack or handbag must be close enough to the license holder that he or she can grasp it without materially changing position. A license holder who leaves a handgun out of immediate reach or stores it in an unsecure location risks losing it and having it wind up in the hands of someone who does not have and may be completely unqualified to obtain a license.

Recommendations # 2 and # 3 are designed to minimize the possibility of accidental discharge. As discussed in Part III.C.3, two of the four accidental discharge incidents on campuses that have campus carry involved license holders carrying handguns loose in their pants pockets. Compliance with Recommendation # 2 would significantly reduce the likelihood of such accidental discharges. Recommendation # 3 reinforces these safety requirements.

*[Recommendations # 4 through 8 to already-existing statutory gun-exclusion zones.]*

**Recommendation # 4:** In its website posting of rules and regulations regarding campus carry, the University should post a list of places that are commonly the site of pre-K-12 school-sponsored activities. When a pre-K-12 school-sponsored activity is being conducted at a particular location, a sign reading "Pre-K-12 school-sponsored activity in progress" should be posted there.

***Comment:*** This exclusion is found in TPC § 46.03(a)(1). "School or educational institution" does not include institutions of higher education. But both the statutory text and the legislative history make clear that this exclusion still applies to a pre-K-12 school located on the grounds of a university and to a pre-K-12 school-sponsored activity that is conducted on the grounds of a university. Therefore, license holders are forbidden from carrying their handguns on the physical premises of any pre-K-12 schools on campus, such as the UT Elementary School, as well any grounds on or buildings in which a pre-K-12 school-sponsored activity is being conducted. Although TPC § 46.03(a)(1) does not require signage, we believe it is appropriate to provide fair notice.

**Recommendation # 5:** A sign should be posted at any polling place located on campus from the commencement of early voting through Election Day that reads either "Polling Place" or "Vote Here."

***Comment:*** This exclusion is found in TPC § 46.03(a)(2). Although this subsection does not require signage, we believe it is appropriate to provide fair notice.

**Exhibit 3**

**Recommendation # 6:** A sign should be posted at the entrance to a courtroom and associated offices whenever they are being used by a federal, state, or local judge for official business.

***Comment:*** This exclusion is found in TPC § 46.03(a)(3). The School of Law has a courtroom, judges' chambers, and jury room in the Connally Center for Justice. These are occasionally used by federal, state, and local judges for judicial proceedings. Although this subsection does not require signage, we believe it is appropriate to provide fair notice.

**Recommendation # 7:** Any premises on campus that meets the requirements of TPC § 46.035(b)(1) must provide notice in accordance with Texas Gov't Code § 411.204.

***Comment:*** This exclusion is found in TPC § 46.035(b)(1). It applies at least to the Cactus Café in the Student Union and to Gabriel's Café in the AT&T Executive Education and Conference Center. Section 46.035(k) specifies that notice must be given in accordance with Texas Gov't Code § 411.204.

**Recommendation # 8:** Notice should be given for all collegiate sporting events. If possible, for ticketed sporting events this notice should be given by means of a written communication on the back of, or appended to, the ticket. Vendors and others who are permitted to enter the premises without a ticket should be provided written notice through other means.

***Comment:*** This exclusion is found in TPC § 46.035(b)(2). For high school or professional sporting events, § 46.035 does not require notice that handguns are excluded. But for a collegiate sporting event, § 46.035(l) requires notice that meets the requirements of TPC § 30.06.

**Recommendation # 9:** The concealed carry of handguns should be prohibited in areas for which state or federal law, licensing requirements, or contracts require exclusion exclusively at the discretion of the state or federal government, or are required by a campus accrediting authority. Where appropriate, signage must conform to the overriding federal or state law requirements. Otherwise, notice conforming to TPC § 30.06 must be provided.

***Comment:*** In some instances, federal law prohibits firearms from being carried in certain places. For example, 10 C.F.R. § 73.81 bars a person from carrying a firearm in a protected facility or installation, such as our Nuclear Engineering Teaching Laboratory (NETL), which is a Nuclear Regulatory Commission-licensed facility. Similarly, state law or licensing requirements may place restrictions on concealed carry. For example, licensing standards for before- and after-school programs for school-aged children and for child-care centers prohibit on-premises firearms. See Texas Dept. of Family and Protective Services, Licensing Division, Minimum Standards for School-Age and Before or After-School Programs §744.2607; Minimum Standards for Child-Care Centers §746.3707. Finally, in rare instances, the federal or state government may unilaterally impose a restriction on the carrying of firearms, as may a campus accrediting authority.

**Recommendation # 10:** The concealed carry of handguns should be prohibited in patient-care areas, including those in which professional mental health services are provided.

***Comment:*** TPC § 46.035(b)(4) prohibits the concealed carry of handguns in hospitals licensed under Chapter 241 of the Texas Health and Safety Code. By analogy, we recommend that all patient-care areas be excluded. This includes hospitals, clinics, and mental health treatment areas. A "patient-care area" should involve patients for whom a formal record of treatment is maintained.

**Recommendation # 11:** The concealed carry of handguns should be prohibited on premises in which a ticketed sporting event is taking place.

***Comment:*** TPC § 46.035(b)(2) prohibits handguns at high school, collegiate, and professional sporting events. The University hosts other types of sporting events, such as club-sponsored swim meets. By analogy, we recommend that the concealed carry of a handgun be excluded at any such sporting events if they are ticketed. The tickets can be used to provide notice conforming to TPC § 30.06.

**Recommendation # 12:** The concealed carry of handguns should be prohibited in areas in which formal hearings are being conducted pursuant to Chapter 11 (Student Discipline and Conduct) of the Institutional Rules on

**Exhibit 3**

Student Services and Activities (General Information Catalog, App. C); Regents Rule 31008 (Termination of a Faculty Member); Handbook of Operating Procedure 2-2310 (Faculty Grievance Procedure); or Handbook of Operating Procedure 5-2420 (Policies and Procedures for Discipline and Dismissal and Grievance of Employees).

*Comment:* TPC § 46.03(a)(3) bans the concealed carry of handguns "on the premises of any government court or offices utilized by the court." By analogy, we recommend that the concealed carry of handguns be excluded from any areas in which a formal hearing is being conducted in accordance with the enumerated discipline and grievance procedures for students, faculty, and staff. Notice conforming to Texas Penal Code § 30.06 must be provided.

**Recommendation # 13:** The concealed carry of handguns should be prohibited in areas where the discharge of a firearm might cause great harm, such as laboratories with extremely dangerous chemicals, biologic agents, or explosive agents, and areas with equipment that is incompatible with metallic objects, such as magnetic resonance imaging machines.

*Comment:* The training required for handgun license holders does not include special training regarding the safe use of weapons in such facilities. The accidental or purposeful discharge of a weapon in such a facility could cause grave and catastrophic harm. In addition, handguns are inappropriate in the vicinity of some types of equipment, such as magnetic resonance imaging equipment, because of the presence of a very strong magnetic field. We believe "specific safety considerations" justify these exclusions. Notice conforming to TPC § 30.06 must be provided.

**Recommendation # 14:** The concealed carry of handguns should be prohibited in animal-research facilities and other animal-care and animal-use locations in which protocols regulating ingress and egress create a risk that a concealed handgun will accidentally discharge, be contaminated, or be separated from a license holder.

*Comment:* The transmission of infectious agents from research animals to humans can cause human disease, and the transmission of infectious agents from humans (or their clothing and possessions) can cause animal illness or

jeopardize research results. As a result, animal research, care, and use areas typically have strict protocols for entering and exiting the facility, including requirements for the wearing of dedicated or disposable clothing and protective waterproof gloves. Compliance with these protocols by someone carrying a concealed handgun may have the effect of increasing the risk of its discharge, contamination, or unanticipated separation from the license holder. In addition, research animals have the ability to bite and kick objects in the possession of persons working with them, and some (e.g., monkeys) may be able to grab and manipulate objects. These potential hazards suggest that concealed weapons should be excluded from animal research, care, and use facilities.

**Recommendation # 15:** Counselors, staff, and volunteers who work in a campus program for minors must, as a condition of their participation, agree not to carry a concealed handgun on the grounds or in buildings where the program is conducted. Parents of attendees must also agree, as a condition of their child's participation, not to carry a concealed handgun on the grounds or in buildings where the program is conducted. "Campus program for minors" is defined in HOP 3-1710.

*Comment:* The Texas Penal Code prohibits the concealed carry of handguns in pre-K-12 schools and on the grounds or in buildings where a school-sponsored activity is being conducted. By analogy, places where children under the age of 18 participate in a campus program for minors should be exclusion zones. Because providing signage in each such location would be impracticable, we recommend that the exclusion be accomplished by means of contractual arrangements with the people who are most likely to be in contact with the minor participants. HOP 3-1710 defines "campus program for minors" as "[a]ny program or camp held on University premises that offers recreational, athletic, religious, or educational activities to minors, or one that is University sponsored. This excludes programs for University-enrolled students under the age of 18."

**Recommendation # 16:** The following rules should apply to the concealed carry of handguns in University housing.

    a. With three exceptions, the concealed carry of handguns should be prohibited in all on-campus

**Exhibit 3**

residence halls. The concealed carry of handguns should, however, be permitted in University Apartments.

b. The first exception for on-campus residence halls is that the concealed carry of handguns should be permitted in common areas such as lounges, dining areas, and study areas. The second exception is that a resident's family members should be permitted to carry a concealed handgun on or about their person while visiting. The third exception is that staff members whose employment responsibilities require them to be in University housing should be permitted to carry a concealed handgun on or about their person while present in University housing for business purposes.

c. License holders who reside in University Apartments or who are staff whose employment responsibilities require them to reside in University housing must store their handguns either in a locked, privately-owned or leased motor vehicle or in a gun safe that meets the requirements set forth in Recommendation # 17 below. License holders are also responsible for ensuring that their guests comply with all such rules and regulations.

**Comment:** Our residence halls are unique in several respects. First, the great majority of our students reside in off-campus facilities. This is particularly true of students who are at least 21 years old. During the Fall 2015 semester, nearly 99% of our students who are 21 or over live off campus. A rule prohibiting residents of on-campus residence halls from having handguns in their rooms will, therefore, affect only the tiniest fraction of students who are eligible to apply for a license to carry a handgun. And, as the data show, there are ample, and widely-used alternative housing arrangements available for those who wish to keep handguns in their rooms.

Second, the great majority of students in on-campus residence halls share bedrooms. Only two percent of on-campus residence hall rooms are designated single rooms. Consequently, we believe that the danger of accidental loss, theft, or misuse by roommates or others (including suicide or other violence) in on-campus residence halls is unacceptably high. Even if we were to require residents to store their handguns in approved gun lockers, our residence halls typically do not provide space that is subject to the sole control of a resident. This means there is no way of assuring that only a handgun-owning resident

will have access to his or her locker. Moreover, while we are confident that the great majority of license holders routinely and conscientiously store their handguns, we believe it is naïve to think that there won't be lapses in judgment or vigilance. There will too often be a temptation, upon entering one's room, simply to leave a handgun sitting in a backpack or handbag or (less likely) out in the open, even if only for a relatively brief time.

Two other facts exacerbate our concerns about possible accidental loss, theft, or misuse. First, we have a substantial number of students under the age of 18 who live in on-campus residence halls. At the beginning of the Fall 2015 semester, we had 298 such residents, 13 of whom were 16 or younger. We do not think it is wise to place students that young in close proximity to handguns. Second, residence hall residents typically have numerous visitors, and these visitors may come at the invitation of a license holder's roommate. This further increases the chance that someone other than the license holder will come into possession of a handgun.

University Apartments (widely known as "married student housing"), however, differ from on-campus residence halls in both physical lay-out and resident population. University Apartments are typically occupied by married students, families, or students and their unmarried, live-in guests. These living arrangements afford license holders greater control over entry by non-residents. More importantly, University Apartments have private bedrooms and so enable license holders to store a handgun in a place that is not accessible to visitors. Therefore, we believe that the specific safety considerations that lead us to recommend a general prohibition of concealed handguns in on-campus residence halls are substantially diminished in University Apartments.

We believe as well that the concealed carry of handguns should be permitted in on-campus residence halls in three instances. First, license holders should be permitted to carry concealed handguns in non-residential common areas such as lounges, dining areas, and study areas. In accordance with our earlier recommendation (see Part IV.A, Recommendation # 1), license holders who bring a handgun into a common area must carry it on or about their person. We believe the concealed carry of handguns in non-residential common areas does not raise the specific safety concerns associated with residents

**Exhibit 3**

routinely having handguns in their rooms.

Second, a resident's family members should be permitted to carry a concealed handgun on or about their person while visiting. For example, a parent who is helping his or her child move into a dorm should be permitted to carry. As long as family members carry their guns on or about their person – as would be required – this does not raise the specific safety concerns associated with residents routinely having handguns in their rooms.

Third, staff members, such as the building services and maintenance staff, should be permitted to carry a concealed handgun on or about their person while they are discharging their employment responsibilities.

Finally, we considered the possibility of creating a residence hall or wing of a residence hall in which residents could have and store their concealed handguns. We concluded that this would not be feasible. We consulted the University of Colorado-Boulder, which has offered students this option. We learned that they have not received a single application for their gun-permitted dorm and that as a result they have a substantial number of rooms left vacant. Given the experience there, we do not believe that we have any residential facility or segregable part of a facility that can be set aside without risking a substantial number of rooms being left unoccupied.

Obviously, license holders who are permitted to possess guns in their University residence cannot be expected to have their handgun on or about their person at all times. Under this Recommendation, they may store their handgun either in their locked car or in a gun safe. Any gun safe used for storage must meet the safety standards set forth in Recommendation # 17. We believe that any other form of storage poses too great a risk of accidental discharge, loss, theft, or misuse.

**Recommendation # 17:** A gun safe that is used by a license holder must:

(a)   be large enough to fully contain all firearms placed in it and provide for secure storage;

(b)   have exterior walls constructed of a minimum 16-gauge steel;

(c)   have a high-strength locking system consisting of a mechanical or electronic combination or biometric

lock, and not a key lock; and

(d)   be physically secured inside the license holder's residence in a manner that conforms to Division of Housing and Food Service policy.

**Comment:** This Recommendation is designed to ensure that an unattended handgun is securely stored. The importance of this safety measure is widely-recognized. For example, the gun manufacturer Smith & Wesson emphasizes the importance of handgun security in its discussion of Basic Handgun Safety Rules. "Your safety and the safety of others requires that you always secure and store your firearm in a manner that will prevent unauthorized access. Never leave a firearm unattended unless it is unloaded, locked and secured."[29]

**Recommendation # 18:** The occupant of an office to which the occupant has been solely assigned and that is not generally open to the public should be permitted, at the occupant's discretion, to prohibit the concealed carry of a handgun in that office. An occupant who chooses to exercise this discretion must provide oral notice that the concealed carry of a handgun in the occupant's office is prohibited. In addition, if the occupant's duties ordinarily entail meeting people who may be license holders, the occupant must make reasonable arrangements to meet them in another location at a convenient time.

**Comment:** The occupant of an office to which the occupant has been solely assigned and that is not generally open to the public has traditionally been vested with substantial control over his or her office space. In O'Connor v. Ortega, 480 U.S. 709 (1987), for example, a majority of the justices agreed that a government employee has a constitutionally-protected right of privacy in his office. "The Court of Appeals concluded that Dr. Ortega had a reasonable expectation of privacy in his office, and five Members of this Court agree with that determination." Id. at 718. Justice Scalia was one of those five Members, writing in his concurring opinion, that "one's personal office is constitutionally protected against warrantless intrusions by the police, even though employer and co-workers are not excluded." Id. at 730. University faculty, staff, and

---

[29] https://www.smith-wesson.com/webapp/wcs/stores/servlet/Category3_750001_750051_757978_-1_Y.

**Exhibit 3**

students who occupy offices to which they are solely assigned and that are not generally open to the public have traditionally been vested with the authority to control who may and may not enter. They have long exercised that discretion (unrelated to the concealed carry law) and should be able to continue to do so. We believe this policy is consistent with Texas House of Representatives Policy and Procedure Manual § 3.14, which provides that House members may control access to their offices and may, at their discretion, exclude visitors.

To avoid the proliferation of signage that conforms to Texas Penal Code § 30.06, we recommend that the rule include that the required notice must be given orally. Finally, this rule would not have the effect of generally prohibiting license holders from carrying a concealed handgun on campus. A license holder who needs to enter a particular office that the occupant designates as a gun-exclusion office is accommodated by the requirement that the occupant must make reasonable arrangements to meet the license holder in another location.

We note, however, that this recommendation, although phrased in terms of the right of an occupant, would favor faculty over staff and students. While there are staff members and even some students who occupy offices on campus to which they are solely assigned, a faculty member is much more likely to have an office of which he or she is the sole occupant. This recommended rule, therefore, would have the overall effect of giving faculty members more control over their work environment than staff or students would enjoy. Our concern is that this policy will perpetuate structural inequalities between faculty and staff members at UT Austin.

**Recommendation # 19:** The University should amend Sec. 11-404(a) (Student Discipline and Conduct – General Misconduct) of the Institutional Rules on Student Services and Activities (General Information Catalog, App. C); Handbook of Operating Procedure 5-2420(III)(B) (Policies and Procedures for Discipline and Dismissal and Grievance of Employees – Conduct Which is Subject to Disciplinary Action); and Handbook of Operating Procedure 8-1010(I) (B) (Prohibition of Campus Violence) to provide that causing the accidental discharge of a firearm is conduct subject to disciplinary action.

**Comment:** If the preceding recommendations are formally adopted as University rules and regulations, then staff, students, and faculty who violate them may be subject to discipline under University procedures (and to punishment under applicable criminal laws as well). This recommendation is designed to ensure that anyone who causes the accidental discharge of a handgun – even a non-license holder – may be subject to University discipline.

**Recommendation # 20:** The Division of Housing and Food Service should include in its housing contracts that violation of any University rules regarding the carrying or storage of firearms in University housing is grounds for terminating the housing contract.

**Comment:** This is designed to make certain that a housing contract holder's violation of any rule regarding the carrying or storage of a firearm in University housing may result in termination of the housing contract.

**Recommendation # 21:** Exclusion zones created by TPC §§ 46.03 and 46.035 as well as by the rules and regulations enacted under S.B. 11 may sometimes comprise only a portion of a building. In some instances it may not be feasible to exclude concealed handguns only from the designated exclusion zones. The following factors and principles should govern the implementation of these rules and regulations in those buildings in which some, but not all parts are designated as exclusion zones.

Governing factors:

- The percentage of assignable space or rooms in a building that are designated as exclusion zones.

- The extent to which the area (or areas) designated as exclusion zones are segregable from other areas of the building.

- The extent to which use of the building, and hence its status as an exclusion zone, varies from day-to-day or week-to-week.

Governing principles:

- If a small number of rooms or a small fraction of assignable space in a building is subject to exclusion, only the rooms or areas that qualify for exclusion should be excluded. Appropriate signage needs to be posted for rooms or areas that are excluded.

**Exhibit 3**

- If a significant fraction of the total building in terms of number of rooms or assignable space is subject to exclusion, or if the excludable space is not segregable from other space, then as a matter of practicality, the whole building should be excluded. Appropriate signage needs to be posted for any such building.

- Comment: Resolving how to deal with mixed-use buildings has proved to be one of the most perplexing problems both we and the UT System working group faced. The number of buildings on campus – each one unique in its own way – meant the problem defied formulaic or categorical resolution. Ultimately, we concluded that the only sensible solution was to decide how each mixed-use building should be treated on a case-by-case basis, in accordance with the factors and principles enunciated in this recommendation.

**Recommendation # 22:** The University should develop training materials particular to UT on how to respond to an active shooter situation. These should be incorporated in the CW 122: A Safe Workplace training module, and all faculty and staff should be required to complete this module. All students should also be required to complete training on how to respond to an active shooter situation.

*Comment:* Regardless of campus carry, the startling number of on-campus shootings nationwide impels us to recommend that the University should require and not just make available training on how to respond to an active shooter situation.

**Recommendation # 23:** The University should develop and post in a prominent place a detailed Campus Carry FAQ.

*Comment:* We believe a detailed FAQ is critical to communicating to the UT community an understanding of the relevant law and campus policies.

**Recommendation # 24:** The University should develop materials to educate and inform parents of UT students and prospective students about campus carry and how it is being implemented.

*Comment:* Parents of our students and prospective students need to be fully informed about campus carry

and how the University is implementing it. Informational materials created specifically for parents would provide a vehicle for letting parents know that students will not be permitted to have handguns in on-campus residence hall rooms and about other steps the University is taking to make the campus as safe as possible. These materials could also help to rectify many of the common misunderstandings about S.B. 11. The Texas Parents Association and Texas Exes could be of great assistance in implementing this recommendation.

**Recommendation # 25:** To the extent possible, office space within gun-exclusion zones should be made available on a scheduled basis to faculty and staff who do not have offices to which they are solely assigned. These spaces can be used for conferences that faculty or staff would prefer to conduct in a gun-exclusion zone.

*Comment:* Numerous faculty and staff expressed a desire to be able to conduct difficult and sensitive meetings in a gun-exclusion zone. Under Recommendation # 18, those who have offices to which they are solely assigned will be able to do so. We believe that efforts should be made to identify available office space in designated gun-exclusion zones and make it accessible to faculty and staff who do not have offices to which are they solely assigned. Given the likely scarcity of such spaces, this should be done on a scheduled basis. This recommendation does not involve the creation of any additional gun-exclusion zones.