UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DR. JENNIFER LYNN GLASS, *et al.*, *Plaintiffs*, | : : : | |
| v. | : : | No. 1:16cv845-LY |
| KEN PAXTON, *et al.*, *Defendants*. | : : : : | |

# PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION

As directed by the Court at the preliminary injunction hearing on August 4, 2016, Plaintiffs supplement their application for preliminary injunction and memorandum in support of it.

## I. VAGUENESS: LEGAL STANDARDS AND BASIC PROBLEMS WITH THE CAMPUS CARRY RULES AS APPLIED TO GUNS IN THE CLASSROOM

### A. Legal standards

Under the Fourteenth Amendment's Due Process Clause, laws that are so vague that persons of common intelligence have to guess at their meaning and can reasonably differ as to their application are invalid. *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974). A challenged law is unconstitutionally vague if it fails to provide its possible targets a reasonable opportunity to know what conduct is prohibited, *or* is so indefinite that it allows arbitrary and discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). Such a challenged rule has to give an ordinary person a "reasonable opportunity to know what is prohibited." *Groome Res. Ltd. v. Par. of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000). It has to have a "core meaning" that can reasonably be understood. *Rowell v. Pettijohn*, 816 F.3d 73, 84 (5th Cir. 2016).

**B. The essential vagueness problem with UT Austin's guns-in-the-classroom policy**

The details—as much as can be gleaned, at any rate—of UT-Austin's campus carry rules as they apply to guns in the classroom are developed at some length in Part II, below. Suffice it to say that they yield not even a remotely clear picture of what the governing rules are, where they may be found, whether the position Plaintiffs want to take on the issue violates them, or what adverse consequences, if any, might flow from a violation.

There is no Texas statute that instructs Plaintiffs that they are acting illegally if they instruct their students that they may not bring guns into their classrooms. There is no statutorily-authorized written policy statement by either UT-Austin's President nor the UT Regents that directs that UT-Austin faculty are prohibited from exercising the option of banning guns from their classrooms. There is no provision in the disciplinary rules governing UT-Austin faculty providing that Plaintiffs face discipline from UT-Austin's President if they adopt a "no guns in the classroom" policy.

To this point, then, the question isn't whether the policy is unconstitutionally vague; it is whether there is any policy at all that would bar Plaintiffs from doing what they want to do or that would punish them in some way if they did so.

But the threat is there nonetheless, enough to make this case a live case or controversy—but not enough in terms of concreteness to survive the void-for-vagueness challenge made by Plaintiffs. *See* Complaint (Doc. 1) ¶ 52. UT Defendants' counsel in Court has reversed course and said most recently that there would be adverse consequences were Plaintiffs to prohibit students from bringing guns to class. The sourcing of this courtroom threat is quite thin, as detailed below, but it remains a live threat. The "policy" that has been identified is not the one

adopted pursuant to statute by UT-Austin's President and the UT Regents. It is an unsourced restatement, and expansion, of the adopted policies. The punishment that awaits those who violate the non-Presidential "policy" itself is not exactly obvious and not even remotely concrete as applied to what Plaintiffs want to do. It says nothing more than that the President *may*—not must—act against tenured UT-Austin faculty for "good cause." What actions give rise to a "good cause" adverse action are never described; guns-in-the-classroom isn't mentioned anywhere.

The only pointed statements about what is prohibited are in post-policy guidance by non-Presidential officials; they're nowhere to be found in the policies themselves. The punishments for violating the post-policy guidance are nothing more than mere afterthoughts, tacked on as website links of "related information." And, on examination, these punishments are open-ended, based on the broad term "good cause."

All the foregoing is revealed by the careful march through the rules in Part II. No person of common intelligence—and one would think that the tenured Plaintiffs rise at least to that level—can figure out what governs them on this issue under Texas law and UT policies and what, if anything, will happen to them if they trip over the stumbling block somebody at UT may set up. And, to make things worse, the open-endedness of the potential punishment is rife with the possibility of arbitrary and discriminatory enforcement.[1]

---

[1] The concerns on this point are heightened exponentially when the special situation of UT-Austin administrators is considered. Both the UT-Austin President and UT's Chancellor adamantly opposed the 2015 campus carry legislation as a threat to public higher education, including a free speech threat. They lost to the powers-that-be in the Texas Legislature. Now UT-Austin's President is between a rock and a hard place. He is forced to implement a policy that in his view is quite bad for UT-Austin—and if he doesn't do it to the satisfaction of the Texas Legislature or key members of it, then the consequences for the institution he administers could be disastrous in terms of funding and other public policy impositions. In an untenable situation such as this, the pressures are enormous to mount arbitrary and capricious enforcement actions that single out those who stand out from the crowd in resisting vague public policy statements. This is the very set of circumstances that the vagueness doctrine is designed to protect against.

## II. A DETAILED MARCH THROUGH THE STATUTES, POLICIES, AND IMPLEMENTATION PRONOUNCEMENTS

### A. What is the articulated rule and where does it direct that professors may not exercise the option of excluding guns from the classroom?

#### 1. The statute does not direct that guns must be allowed in individual university classrooms.

The policy against guns in the classroom at UT-Austin is unconstitutionally vague in terms of what the policy is, where it is stated with sufficient particularity that Plaintiffs are able to conform their conduct to it, and what the consequences would be if Plaintiffs violate it.

At the preliminary injunction hearing, the UT Defendants argued that the source of UT-Austin's policy about guns in the classroom is a state statute. This argument could only be referencing the 2015 legislation codified as Section 411.2031(b) of the Texas Government Code.[2] This provision, though, gives no specific guidance about the matter of guns in public university classrooms.

After the 2015 legislation passed, the Texas Attorney General was asked whether Section 411.2031(b) would be violated if a university "designates a meaningful number of classrooms as areas in which the possession of concealed handguns by Licensees is not allowed." Tex. Att'y Gen. Op. No. KP-0051 (Dec. 21, 2015). The Attorney General's non-binding opinion starts his answer to the question by explaining that Section 411.2031(b) "does not expressly address the extent to which the carrying of concealed weapons can be regulated specifically within classrooms." *Id*. at 1. This far, he was right.

---

[2] Another Government Code provision, Section 411.209, is directed at state agencies and political subdivisions and what they may and may not do about the presence of handguns. It gives the Texas Attorney General certain investigative and enforcement powers regarding state and local government regulation of concealed handguns. *See* Tex. Gov't Code § 411.209(d), (f), and (g). But, even if it gives the Attorney General power in this area *vis-á-vis* the UT Defendants, Section 411.209 does not directly regulate Plaintiffs and other individual faculty members, nor does it confer any power on the Texas Attorney General with respect to them.

The statute, then, has no express rule about guns in university classrooms. The closest it comes, and the closest that the Texas Attorney General could come, to discerning a guns-in-the-classroom policy is in the second sentence of Section 411.2031's subsection (d-1): "The president . . . may not establish provisions that generally prohibit or have the effect of generally prohibiting license holders from carrying concealed handguns on the campus of the institution." By its plain terms, this provision addresses only "general prohibitions" and, even as to these general matters, it speaks only of conceal carry "on the campus." It specifies no rule governing an individual faculty member's decision about guns in her particular classroom.[3]

2. **The UT-Austin President's policies ratified (with one deletion) by the UT Board of Regents do not direct that guns must be allowed in individual university classrooms.**

    a. **Policies of UT-Austin's President**

On February 17, 2016, President Fenves transmitted to the Chancellor of the University of Texas his "decision on implementing SB 11 at UT Austin." Joint Stip. Exh. 1 (Doc. 35-1) at 1.[4] The decision was, he stated, "detailed in the attached policy document." *Id*. He explained that there would be subsequent work by a UT-Austin task force to develop guidelines "to comply with the policies contained in the attached document[.]" *Id*. at 2. President Fenves's transmittal concludes: "Unless the Board of Regents amends the *policies transmitted herein* . . ., these

---

[3] The Attorney General opinion then proceeds to read the statute holistically to reach the conclusion that it would "likely" be concluded by a court that Section 411.2031 does not authorize a university president "to *delegate* to individual professors the decision as to whether possession of a concealed handgun is allowed in the individual professor's classroom." Tex. Att'y Gen. Op. No. KP-0051 at 2-3 (emphasis added). Even were this opinion persuasive—and it is works too hard to reach its fore-ordained conclusion to deserve this appellation—it does not address what happens when the university president, instead of delegating the matter of guns in the classroom, simply leaves the matter unaddressed. Just as it would be a strain to say that the President *delegated* to individual faculty members the authority to set classroom policies on laptops and cell phones, it would be no less a strain to say that leaving individual professors with the option of making their classrooms gun-free zones constitutes a presidential delegation.

[4] The page numbers cited for this document are to the pagination at the top of the filed exhibit (*e.g.*, "Page 2 of 13").

5

policies and the resulting guidelines and rules will go into effect . . . on August 1, 2016." *Id*. (emphasis added).

The next eleven pages of the exhibit (Joint Exh. 1) are the "Campus Carry Policies and Implementation Strategies" dated February 17, 2016. Each page of the text is headed "CAMPUS CARRY POLICIES." These policies contain twenty-five "Policy Statements." Not a single one of them addresses the matter of guns in UT-Austin classrooms; every one of them includes a finding that the particular policy "does not have the effect of generally prohibiting license holders from carrying concealed handguns on campus." In short, the policies are careful to avoid a general prohibition but utterly silent on the question of an individual professor's decision about guns in her particular classroom.

**b. UT Regents' one-modification ratification of President's policies**

The UT Board of Regents met twice after receiving the UT-Austin campus carry policies, first on May 12th, then on July 13th. The Regents took no action on the policies on May 12th. Joint Proposal (Doc. 16) at 2 (Stip. 5.c). At the July 13th meeting, the Regents eliminated Policy Statement No. 3 (which would have barred chambered rounds on campus). *Id*. (Stip. 5.d).

Thus, through the July 13th Board of Regents meeting, the UT-Austin campus carry policies did not address the question of guns in the classroom. Just like the state statute, they were silent on the particular matter at the core of this case.

**3. UT-Austin's Provost speaks: guns in the classroom cannot be prohibited.**

The first explicit statement from a UT official on the question of guns in the classroom came the day *after* the UT Regents adopted the policies of UT-Austin's President, modified only by eliminating Policy Statement No. 3. This statement came in the form of an e-mail com-

munication from UT-Austin's Provost to UT-Austin faculty. *See* Joint Stip. Exh. 2 (Doc. 35-2). The Provost started by noting that the day before, "the UT System Board of Regents signed off on the rules for implementing the state's new campus carry law at UT Austin." *Id*. at 1. The seventh paragraph states: "Faculty members may not impose a ban on concealed handguns in their classrooms, and they cannot use syllabi to discourage the concealed carry of handguns." This is the first official word of any sort from UT-Austin that individual professors would not be allowed to bar students from bringing guns into their classrooms. *See, e.g.*, Decl. of J. Glass (Doc. 20-1) ¶ 11 (1st sent.); Decl. of M. Carter (Doc. 20-3) ¶ 15 (1st sent.). It provides no citation to any statute, rule, or policy to support what it says.

   **4.   The UT Defendants' attorney speaks: guns may be carried into the classroom.**

At the preliminary injunction hearing, the attorney for the UT Defendants identified a specific document as constituting the UT-Austin policies for campus carry. *See* Joint Stip. Exh. 4 (Doc. 35-4). In contrast to the UT President's policies—each page headed "CAMPUS CARRY POLICIES"—this document is described as "Handbook of Operating Procedures 8-1060 Campus Concealed Carry effective 8/1/16." *See* Amended Exhibits for Joint Proposal on Preliminary Injunction Matters (Doc. 35) at 1.

The document is from the UT-Austin Handbook of Operating Procedures, numbered 8-1060. Its heading indicates that it emanates from UT-Austin's University Policy Office; it is undated. The last sentence of the first paragraph of Part II refers to President Fenves's campus carry policies (as modified) as follows: "This policy memorializes the rules and regulations en-

acted by the president regarding the carrying of concealed handguns by license holders on campus or University owned property."[5]

Operating Procedure No. 8-1060 has no direct statement about guns in the classroom. The second sentence of Part I does state: "Individuals licensed to carry may do so on campus *except in locations and at activities prohibited by law or by this policy*." (emphasis added). The highlighted clause certainly is an indication that professors are not allowed to keep guns out of their classrooms. But it cross-references no statute and no Presidential policy from July 13th.

**B. What counts as the policy?**

Subsection (d-1) of Section 411.2031 allows a university president to "establish reasonable rules, regulations, or other provisions" for campus carry. The "provisions" — referring to the "reasonable rules, regulations, or other provisions" — "take effect as determined by the president" unless later amended by the Board of Regents under "Subsection (d-2)."

Subsection (d-2) is quite specific about the mechanism for putting campus carry policies in place. The regents are to review the president's (d-1) policies within ninety days of their being forwarded by the president. The regents may amend the forwarded policies by a supermajority—which is what UT's Regents did on July 13th.[6] Then, the statute specifies: as amended, "the provisions are considered to be those of the institution as established under Subsection (d-1)." Tex. Gov't Code § 2031(d-2) (last sent.).

---

[5] The UT Defendants have not provided any information on the provenance of Operating Procedure No. 8-1060. An e-mail sent mid-afternoon August 5th from Plaintiffs' counsel to counsel for the UT Defendants asked: "Will you tell me the date that your Exhibit 4 (Doc. 35-4) was first published and who (which UT official) published it? Thanks." There has not yet been a response to the inquiry.

[6] There may be a state law question about whether the Regents could take this kind of action after the 90-day statutory deadline for review.

In short, under subsection (d-2), the policies that President Fenves forwarded in February, as modified by the Regents on July 13th, *are* the operative policies for UT-Austin campus carry. Subsection (d-1) allows the *President* to amend the policy provisions, but there has been no such presidential amendment since July 13th. The Provost's July 14th e-mail is not an amendment under the statute, nor is the unattributed, undated Operating Procedure No. 8-1060. While the latter two documents may be helpful guidance to the UT-Austin community about how administrators are interpreting and will administrer the President's policies, they are not stated to be, nor do they give, any indication that they are in fact amendments to the July 13th policies.

C. **What adverse consequences do Plaintiffs face if they exclude guns from their classrooms this Fall?**

Plaintiffs want to be able to exclude handguns from their classrooms at the start of the semester on August 24th. Dr. Moore, for example, wants to include in her class syllabus the following statement: "Please to not bring weapons of any kind to my class . . ." Decl. of L. Moore (Doc. 20-2) ¶ 7. Drs. Glass and Carter wish to similarly instruct enrollees in their Fall classes.

The President's July 13th campus carry policies say nothing about what, if any, adverse consequences would follow from their violation—nor do they indicate that a statement such as Dr. Moore's would violate those policies. When they filed this lawsuit, Plaintiffs anticipated that they might face adverse consequences if they implemented the classroom "no guns" policies they want to implement, but they were unable to identify what the consequences might be. And as of Monday, August 1, the UT Defendants not only had not identified any, they had seemed to plainly say that there would *not* be any: "[T]he UT Defendants' policies do not provide for termination of public employment, or any other punitive measures against university

9

professors." UT Defendants' Response (Doc. 28) at 10. They said that "termination or adverse employment action" are "not at issue here." *Id*. at 9.

Things changed for some reason by the time of the August 4th hearing, and UT Defendants insisted that Plaintiffs' counsel had misunderstood and that, yes indeed, there would be adverse employment consequences if Plaintiffs established their classrooms as gun-free zones. The document that they identified as the policy establishing these consequences is Operating Procedure No. 8-1060. Specifically, UT Defendants' counsel pointed to one link—11th on the list identified as "Related Information"—in ¶ X of the operating procedure. It is the Faculty Grievance Procedure, HOP 2-2310. (This grievance procedure is attached here as Exhibit 1; the UT Regents' Rule that it cross references—Rule 31008—is attached as Exhibit B.)

The faculty grievance procedure establishes an elaborate, multi-layered, time-consuming process for UT-Austin faculty who wish to challenge imposition of discipline as to them by UT-Austin's President. Since Plaintiffs are all tenured, the rule governing their discipline is Regent Rule 31008. The discipline can be "only for good cause shown." Rule 31008, Sec. 1. Only the President can initiate this discipline. Rule 31008, Sec. 1. Before proceeding into any disciplinary procedures, the President must "meet with the faculty member," explain the allegations and supporting evidence, and "give the faculty member a reasonable amount of time, as determined by the president, to respond either orally or in writing." Rule 31008, Sec. 3. Only then, and only if discipline is the President's chosen course of action, do the elaborate grievance procedures kick into gear.

It is not clear at this point whether President Fenves would consider a syllabus instruction such as that by Dr. Moore to violate UT-Austin campus carry policies and, if he did, whether

10

he would consider such an instruction to constitute "good cause" for instituting the disciplinary processes of Rule 31008. There is nothing in writing from the President, or for that matter, from any other UT-Austin official, that her would-be syllabus instruction violates a campus policy; there is nothing specifically identifying what that policy is; and there is nothing in writing that the President would consider the syllabus instruction to constitute "good cause" for discipline. Even were all these pieces to fall into place, Dr. Moore (or someone similarly situated) would be able, down the line of the grievance process, to argue that this bears on, and violates, "the academic freedom of an individual faculty member." *See* Faculty Grievance Procedure ¶ II.A.1.

**D. Summary**

Texas statutes do not prevent Plaintiffs from excluding guns from their classrooms. The policies of UT-Austin's President, as modified by the UT Regents, don't either.

Non-statutory, non-Presidential policy statements by the UT Provost and in the operating procedures handbook do. But the Provost's implementation e-mail says nothing about the consequence of sticking with what the statute and policies say instead of the Provost's follow-up statements. And the operating procedures handbook does nothing more than mention that one might also consult the faculty grievance procedures—which, if one gets that far, send the inquirer to Regent Rule 31008. In turn, Rule 31008 announces a Presidential "good cause" rule for discipline, a statement that is so buried and so vague that no reasonable person can be expected to know how it will be handled. All this epitomizes a set of rules that are unconstitutionally vague.

In addition, it is clear that no one at UT-Austin is going to know for a long time how this all will shake out in the specific context of an individual professor announcing that she is asking students not to bring guns into her classroom. First would have to come the faculty member's direction or request to would-be students. Then would have to come the President's evaluation of whether this direction or request violated his policies or some subsequent instructions from a subordinate. Then he would have to evaluate whether this would constitute "good cause" in his view to take punitive action against the professor. Then he would have to give the professor notice. Then he would have to meet with the professor. Then he would have to actually institute proceedings. Then the grievance process would kick into gear, a process that would include some of the very academic freedom issues raised in this case.

There is no telling how long all this would take—or even whether it would ever reach the point of being a concrete dispute. But this much is certain: it wouldn't end until well after the time that this case could be finally tried on the merits.

### III. The professor's free speech rights to tell the students that they shouldn't bring guns to class.

Regardless of whether it is in a written syllabus for a course or the opening of the lecture on the first day of class, what Plaintiffs want to do is a First Amendment activity. It is speech. Restricting it inevitably triggers the need for a First Amendment inquiry: Is the restriction narrowly tailored to serve a compelling government interest. The debate in which the Attorney General (but not the UT Defendants) seeks to engage—about whether academic freedom is an individual or institutional right—is (pardon the phrase) merely academic. Freedom of speech and possible restrictions on it is at the center of this legal dispute.

12

The Supreme Court only recently has warned that it remains open to giving public university professors greater First Amendment protection from employer discipline for speech made in connection with their official duties, including classroom instruction, than is given public employees more generally. *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006). Subsequently, at least one court has afforded such additional First Amendment protection to public university professors. *Demers v. Austin*, 746 F.3d 402, 406 (9th Cir. 2014). When combined with the personal relief afforded college professors in *Keyishian* and *Sweezy*, these more recent cases reinforce the strength of Plaintiffs' First Amendment claims and suppor their argument that they are likely to succeed on the merits of that claim.[7]

### Conclusion

For these reasons, as well as those previously presented to the Court, Plaintiffs urge that their application for preliminary injunction be granted and that, pending final trial on the merits, Defendants be enjoined from taking any adverse action against Plaintiffs for any directions they give their students or would-be students that they cannot bring concealed handguns into their classrooms.

---

[7] Harkening back to an aspect of argument at the preliminary injunction hearing, Plaintiffs would note for the Court that not all prohibited First Amendment restrictions are content-based. Some are, to use the metaphor from argument, more "horizontal" in nature, cutting back on the spectrum of speech rather than on specific elements of it (the "vertical" constraint). *See, e.g., Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630 (5th Cir.), *cert. denied*, 132 S.Ct. 2777 (2012) (striking down on First Amendment grounds state law non-content-based restriction on franchise fee payments).

Respectfully submitted,

GEORGE, BROTHERS, KINCAID & HORTON LLP

*/s/R. James George, Jr.*
    R. James George, Jr.
    State Bar No. 07810000
114 West 7th Street, Suite 1100
Austin, Texas 78701
(512) 495-1400
(512) 499-0094 *facsimile*
rjgeorge@gbkh.com


GREENSTEIN & KOLKER

By: \_\_/s/ *Malcolm Greenstein*\_\_\_
    Malcolm Greenstein
    State Bar No.08403300
1006 E. Cesar Chavez Street
Austin, Texas 78702
malcolm@greensteinandkolker.com
Telephone: (512) 472-6270
Facsimile: (512) 472-8263

\_\_\_*/s/ Renea Hicks*_____
Renea Hicks
Texas Bar No. 09580400
LAW OFFICE OF MAX RENEA HICKS
101 West 6th Street, Suite 504
Austin, Texas 78701
(512) 480-8231
fax (512) 480-9105
rhicks@renea-hicks.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of August, 2016, I served a true and correct copy of the foregoing pleading on all counsel of record through the Court's CM/ECF system.

    \_\_*/s/ Renea Hicks*_____
    Max Renea Hicks