IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DR. JENNIFER LYNN GLASS, *et al.,* | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | NO. 1:16-CV-845 |
| | § | |
| KEN PAXTON, IN HIS OFFICIAL CAPACITY AS | § | |
| ATTORNEY GENERAL OF TEXAS, *et al.,* | § | |
| *Defendants.* | § | |

## UT DEFENDANTS' MOTION TO DISMISS
### PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)

Defendants Gregory L. Fenves, President of The University of Texas at Austin ("UT Austin"), and the Board of Regents for The University of Texas System, in their official capacities, including Paul L. Foster, R. Steven Hicks, Jeffery D. Hildebrand, Ernest Aliseda, David J. Beck, Alex M. Cranberg, Wallace L. Hall, Jr., Brenda Pejovich, Sara Martinez Tucker, and Varun P. Joseph, (collectively "UT Defendants") move for dismissal of this case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim on which relief may be granted.

## LEGAL AND FACTUAL BACKGROUND

### I.     The Campus Carry Law

Under Texas Government Code §411.2031(d-1)—often called the "campus carry" law,"

> [a]fter consulting with students, staff, and faculty of the institution regarding the nature of the student population, specific safety considerations, and the uniqueness of the campus environment, the president or other chief executive officer of an institution of higher education in this state shall establish reasonable rules, regulations, or other provisions regarding the carrying of concealed handguns by license holders on the campus of the institution or on premises located on the campus of the institution. *The president or officer may not establish provisions that generally prohibit or have the effect of generally prohibiting license holders from carrying concealed handguns on the campus of the institution.*

1

TEX. GOV'T. CODE §411.2031(d-1) (emphasis supplied). "Campus" includes "all land and buildings owned or leased by" the higher education institution. *Id.* §411.2031(a)(1). The law further provides that the required "rules, regulations or other provisions" are to be reviewed by the institution's board, which may wholly or partially amend them by a two thirds vote. *Id.* §411.2031(d-2).

To become a "license holder" and thus be permitted to carry a concealed handgun under §411.2031, Texas residents must satisfy 14 requirements administered by the Department of Public Safety ("DPS"). TEX. GOV'T CODE §411.172. Applicants, *inter alia*, must be at least 21 (with an exception for military members or veterans); cannot have been convicted of a felony; cannot have been convicted of a Class A or B misdemeanor in the past five years; cannot be charged with a Class A or B misdemeanor or a felony; cannot be subject to a protective order or restraining order; cannot be chemically dependent; must be capable of exercising sound judgment regarding proper use and storage of a handgun; and must be qualified to purchase a handgun under federal and State law. *Id.*

Applicants must also complete four hours of training, pass a proficiency examination, and submit identifying information including two sets of fingerprints, photographs, residence and business addresses for the preceding five years, height, weight, driver license number, criminal history, and history of psychiatric hospitalization and treatment for drugs or alcohol. *Id.* §§411.188, 411.174. DPS verifies this information, and has authority to conduct any investigation it determines necessary to ensure it is complete and accurate. *Id.* §411.176. If a license is not issued or denied within 90 days, it is considered denied. *Id.* §411.177(b); (c). Upon request from any local law enforcement agency, DPS "shall notify the agency of the licenses that have been issued to license holders who reside in the county in which the agency is located." *Id.* §411.178. If a licensee fails to inform DPS of any change of name, address or status; commits an act of family violence and is subject to a protective order; or is charged with a Class A or B misdemeanor or equivalent offense, an offense under §42.01 of the Penal Code, or a felony under an information or indictment; her license is suspended. *Id.* §411.187. If

a licensee otherwise becomes ineligible under §411.172, her license is revoked. *Id.* §411.186. Complete

eligibility requirements and restrictions are available on the DPS website.[1]

## II.     The UT Defendants' Policy

### a.   President Creates Working Group to Issue Policy Recommendations

Given §411.2031's requirement that the President "establish rules, regulations, or other

provisions regarding the carrying of concealed handguns by license holders," President Fenves

established the Campus Carry Policy Working Group ("Working Group"). The Working Group's 19

members included faculty, staff, students, an alumnus, a parent, and University administrators. They

were tasked with recommending the campus carry policies required under §411.2031(d-1) to the

President, which they did in their Final Report. Joint Stipulated Ex. 3 (Doc. 35-3). The final report

details the Working Group's extensive consultation with the University community in issuing its

recommendations, which included an online survey that generated over 3,300 comments; two public

forums attended by roughly 400 people with 75 speakers (which were posted online); surveys seeking

input about possible gun exclusion zones; attendance at various University meetings to speak and

answer questions; informal communication with University community members; and review of

additional comments, petitions, and resolutions from various interested parties. *Id.*

In addition to this consultation with the University community, the Working Group met

weekly during the Fall 2015 semester to deliberate regarding the best way to implement the statute's

requirements while maximizing campus safety, alleviating fears, and enhancing UT Austin's role in the

study of gun violence. *Id.* The Working Group studied the available data to estimate how many

students were likely to have licenses (less than one percent),[2] considered other states' experiences with

---

[1] http://txdps. state.tx.us/RSD/CHL/index.htm.
[2] Joint Stipulated Ex. 3 at 13.

laws permitting campus carry (there have been no incidents of classroom violence by individuals lawfully carrying on campus),[3] and considered the results of legal challenges to other states' campus carry statutes (all challenges have failed).[4]

After this consultative and deliberative process, the Working Group issued its Final Report in December, 2015. *Id.* The Report made 25 recommendations, and detailed the reasons for each. *Id.* at 16-26. The recommendations explain how handguns must be carried and stored, identify gun exclusion zones, and provide incidental implementation and proactive measures. *Id.* Every member of the Working Group, including those who are gun owners and license holders, expressed a personal preference against guns in classrooms. *Id.* at 26. Nevertheless, because it was charged with implementing the law—which requires that UT Austin's policies not have the "effect of generally prohibiting license holders from carrying their handguns on the campus"—they did not recommend that classrooms be identified as gun exclusion zones. *Id.*[5] The Working Group recommended six areas—other than places where carrying is already prohibited under applicable law—as gun exclusion zones where concealed carry should be banned. *Id.* at 4-5. [6]

_____

[3] *Id.* at 14.

[4] *Id.* at 14, 28.

[5] The Working Group concluded that "excluding handguns from classrooms would effectively prohibit license holders from carrying their handguns and so would violate S.B. 11." *Id.* at 26. It considered that the only way to make classrooms gun exclusion zones while satisfying the requirement that the policies not effectively prohibit concealed carry on campus would be to provide gun lockers at strategic locations around campus, so licensees could store handguns before entering class. *Id* at 27. The Working Group rejected this approach, because "[a] policy that increases the number of instances in which a handgun must be stored multiplies the danger of accidental discharge" and "the risks to human life of placing gun lockers around campus would substantially outweigh any benefit that would accrue from banning concealed handguns in classrooms." *Id.*

[6] Those areas are: (1) areas where federal or another state law, licensing requirements, or contracts require gun exclusion (e.g., Nuclear Engineering Teaching Laboratory and child care facilities); (2) patient-care areas, including where professional mental health services are provided (e.g., University Health Services and Counseling and Mental Health Center); (3) areas where formal hearings are conducted pursuant to institutional disciplinary and grievance rules (e.g., formal hearings conducted by Student Judicial Services); (4) areas where firearm discharge might cause great harm (e.g.,

### b. President Accepts Working Group's Policy Recommendations and Submits them to the Board of Regents for Review

President Fenves considered the Working Group's recommendations, which he alone retained the authority to accept, modify, or ignore. *See* TEX. GOV'T CODE §411.2031(d-1). President Fenves then accepted the Working Group's recommendations, and in February, 2016, those recommendations were compiled into a policy document detailing his decision, entitled "Campus Carry Policies and Implementation Strategies." Joint Stipulated Ex. 1 (Doc. 35-1) at 3-13. The Campus Carry Policies and Implementation Strategies list 25 "policy statements," the findings that support each statement, and the applicable implementation strategy and criteria. *Id.* The gun exclusion zones identified in the Campus Carry Policies and Implementation Strategies[7] are summarized as follows:

- **Policy Statement No. 9** prohibits concealed carry in areas where federal or state law, licensing requirements, or contracts require guns be excluded in order to minimize risk based on safety, security, and other special circumstances. Stipulated Joint Ex. 1, Campus Carry Policies and Implementation Strategies at 6.

- **Policy Statement No. 10** prohibits concealed carry in patient care areas including where professional mental health services are provided because these are unique environments with significant safety risk to health care providers, patients, and others present in these areas. *Id.* at 6-7.

- **Policy Statement No. 11** prohibits concealed carry in areas where formal hearings are conducted pursuant to institutional disciplinary and grievance rules because these environments present the same safety concerns present in a government court or office utilized by a court. Because rights and privileges are being heard and adjudicated, these are unique environments with specific safety considerations. *Id.* at 7.

- **Policy Statement No. 13** prohibits concealed carry in areas where firearm discharge might cause great harm because of the presence of hazardous chemicals, gases, or agents or equipment with powerful magnets. This furthers the special safety concerns present in such environments. *Id.* at 8.

---

laboratories with dangerous chemicals, biological agents, or explosive agents); (5) on-campus residence halls (with limited exceptions); and (6) sole-occupant offices, if the occupant gives notice. *Id.* at 4-5.

[7] The Campus Carry Policies and Implementation Strategies contain eight separate gun exclusion zones, which fall within the six areas identified in the Working Group's Final Report, and include areas other than those covered as exclusions under applicable law.

- **Policy Statement No. 14** prohibits concealed carry in animal-research facilities and care facilities where rules of ingress and egress create an increased risk of accidental discharge, contamination, or a handgun being separated from a license holder. *Id.*

- **Policy Statement No. 15** prohibits concealed carry for counselors, staff, and volunteers on the grounds or in buildings where campus programs for minors occur because these areas present the same concerns present in pre-K-12 schools, where handguns are prohibited. *Id. See also* TEX. PENAL CODE §46.03(a)(1).

- **Policy Statement No. 16** prohibits concealed carry in certain University residences because of the special risks of loss, theft or misuse by roommates. *Id.* at 9.

- **Policy Statement No. 18** prohibits concealed carry in single occupant offices that are not generally open to the public when the occupant so chooses. This furthers the substantial control that occupants generally enjoy over their offices and is based on the nature of communications that readily occur in these offices, including one-on-one discussions related to things like student performance or discipline. *Id.* at 10.

The President sent the Campus Carry Policies and Implementation Strategies to the Board of Regents on February 17, 2016. *Id.* at 1. His transmittal letter noted the imperative to comply with the law, whether or not he agrees with it.[8] President Fenves also noted that, "[u]nless the Board of Regents amends the policies transmitted herein by two-thirds vote within 90 days, these policies and the resulting guidelines and rules will go into effect at [UT] Austin on August 1, 2016." *Id.* at 2.

### c.   Board of Regents Amends by Eliminating One Policy Recommendation

The Board of Regents amended the Campus Carry Policies and Implementation Strategies by removing Policy Statement No. 3, which would have required a license holder carrying a semiautomatic handgun on campus to do so without a chambered round of ammunition. *Id.* at 4-5.[9] As a result, the Campus Carry Policies and Implementation Strategies submitted by the President, as amended by the Board of Regents, took effect August 1, 2016. TEX. GOV'T. CODE §411.2031(d-2).

---

[8] Stipulated Joint Ex. 1 at 1-2 ("Based on due deliberations of the working group recommendations, I have made my decision on implementing SB 11. . . .The implementation of SB 11 will test our ability to comply with the law without compromising the teaching, learning and research environments that makes UT Austin one of the best public universities in the nation.").
[9] This recommendation is reflected at ECF pages 4-5, which are numbered 2-3 within the "Campus Carry Policies and Implementation Strategies" document.

### d.   UT Austin Incorporates Campus Carry Policies and Implementation Strategies into its Handbook of Operating Procedures

Each institution within The University of Texas System maintains a Handbook of Operating Procedures ("HOP"), which details the institution's governing policies. Rule 20101: "Presidents" at §4.9 Regents' *Rules and Regulations*, UNIVERSITY OF TEXAS SYSTEM (amended February 11, 2016) ("[T]he president is expected, with the appropriate participation of staff, to [c]ause to be prepared and submitted to the appropriate Executive Vice Chancellor and the Vice Chancellor and General Counsel for approval, the rules and regulations for the governance of the institution and any related amendments. Such rules and regulations shall constitute the Handbook of Operating Procedures for that institution.") UT Austin incorporated the Campus Carry Policies and Implementation Strategies as amended by the Board of Regents into its Handbook of Operating Procedures as HOP 8-1060 ("Campus Concealed Carry"). Stipulated Joint Ex. 4.

HOP 8-1060 is UT Austin's campus carry policy. Under the heading "Reasons for Policy," HOP 8-1060 explains "[t]his policy memorializes the rules and regulations enacted by the president regarding the carrying of concealed handguns by license holders on campus or University owned property." Joint Stipulated Ex. 4 Part II. HOP 8-1060 fully adopts the Campus Carry Policies and Implementation Strategies, as accepted by the President and amended by the Board of Regents. *See* Table 1 (demonstrating where each policy statement in the Campus Carry Policies and Implementation Strategies is incorporated into HOP-81060).

## III.   Potential Consequences for Faculty Violations of University Policy and State Law

Any professor's attempt to ban guns from a classroom is inconsistent with §411.2031. There are two reasons for this. First, professors lack the authority to specify gun exclusion zones. Second, UT Austin concluded that banning licensees from carrying in classrooms would have the effect of generally prohibiting them from carrying on campus.

Indeed, the President is the sole individual authorized to establish gun exclusion zones on UT Austin's campus.[10] He has not designated classrooms as gun exclusion zones. As a result, as a matter of Texas law, "[a] license holder may carry a concealed handgun on or about the license holder's person while the license holder is on the campus of" UT Austin, including in classrooms not designated as gun exclusion zones under HOP 8-1060. TEX. GOV'T. CODE §411.2031(b). Section 411.2031(d-1) does not give individual professors the authority to designate classrooms as gun exclusion zones—only the President can do that. *Id.* Thus, a professor's attempt to do so is legally ineffective, because it cannot substitute for the President's exclusive authority under §411.2031(d-1).

Additionally, Texas Government Code §411.209, entitled "Wrongful Exclusion of Concealed Handgun License Holder" provides that

> [a] state agency or a political subdivision of the state may not provide notice by a communication described by [§]30.06, Penal Code, or by any sign expressly referring to that law or to a concealed handgun license, that a license holder carrying a handgun under the authority of this subchapter is prohibited from entering or remaining on a premises or other place owned or leased by the governmental entity unless license holders are prohibited from carrying a handgun on the premises or other place by [§]46.03 or 46.035, Penal Code.

TEX. GOV'T CODE §411.209(a). Violators are subject to a civil penalty. *Id.* §411.209(b), (c). UT Austin is a political subdivision of the State. TEX. CONST. art. VII §10. Thus, depending upon the particular facts, there is a question of whether a faculty member's actions could subject the University to such civil penalties. That is, even though a professor's attempt to exclude licensees from a classroom is invalid, it nevertheless could possibly subject the University to legal exposure.

---

[10] As explained above, the Board of Regents may "by a vote of not less than two-thirds…amend wholly or partly" the provisions established by the President. TEX. GOV'T. CODE §411.2031(d-2). Thus, no individual other than the President has unilateral authority to make this determination.

In addition, under the Regents' Rules of The University of Texas System[11] "[e]very employee is expected to obey all federal, State and local laws, and particularly," among other laws, "[Penal Code] Section 46.03."[12] Rule 30103: "Standards of Conduct" §1, Regents' *Rules and Regulations*, UNIVERSITY OF TEXAS SYSTEM (amended February 11, 2016).[13] Regents' Rule 30103 is clear that "any employee who violates any provision of these statutes is subject to disciplinary action[.]" *Id.* Faculty, like all employees, are expected to abide by the University's policies. If they do not, the administration has the right to take corrective action. UT Austin's Faculty Grievance Procedure, HOP 2-2310, a copy of which is attached to this filing as Exhibit 1, reiterates that "[t]he administration has the right to discipline members of the faculty." HOP 2-2310(I)(C). In the event that a faculty member is subject to discipline, the Faculty Grievance Procedure provides the specific procedures for imposing that discipline, which include notice and an opportunity to be heard. *Id.*

Of course, UT Austin's HOP does not spell out specific discipline for every possible policy violation in which an employee or faculty member might engage. Instead, it vests the administration with discretion to determine the appropriate discipline in a particular scenario. The Faculty Grievance Procedure is incorporated into the Concealed Campus Carry Policy by reference, reiterating to faculty that violation of that policy subjects them to discipline. Joint Stipulated Ex. 4 Part X, *see also* Ex. 1.

In short, faculty members are subject to corrective action for violating State or federal law or University policy, although the particular consequences depend upon the specific facts involved. Faculty members are aware that State law provides that guns can be carried on campus, and that the president has not made a rule excluding them from classrooms. As a result, any individual professor

---

[11] The University of Texas System governs UT Austin and the 13 other institutions and entities under its purview. *See* TEX. EDUC. CODE §65.02.

[12] This law expressly provides for licensees to "possess[] or go[] with a concealed handgun that the person is licensed to carry under Subchapter H, Chapter 411, Government Code…on the premises of an institution of higher education[.]" TEX. PENAL CODE §46.03(a)(1)(B).

[13] Rule 30103 may be found at Joint Stipulated Ex. 5 (Doc. 35-5, ECF page no. 131).

who attempts to establish such prohibition is subject to discipline. Any such discipline would occur pursuant to HOP 2-2310 and all applicable Rules of the Board of Regents.

### IV.    Plaintiffs

Plaintiffs are professors at UT Austin. They filed their Complaint on July 6, 2016, requesting "a federal injunction, based on rights asserted under the United States Constitution's First, Second and Fourteenth Amendments." Compl. (Doc. 1) at 1. Plaintiffs bring four specific claims. First, Plaintiffs bring a First Amendment claim premised upon "rights to academic freedom." Compl. ¶46. Second, Plaintiffs assert an Equal Protection claim, alleging that "university policies that prohibit Plaintiffs from exercising their individual option to forbid handguns in their classrooms violate[] their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." Compl. ¶50. Third, Plaintiffs claim a "Second Amendment right to defend themselves and others in their classrooms from handgun violence by compelling them as public employees to passively acquiesce in the presence of loaded weaponry in their place of public employment without the individual possession and use of such weaponry in public being well-regulated." Compl. ¶48. Finally, Plaintiffs claim that "university policies that prohibit Plaintiffs from exercising their individual option to forbid handguns in their classrooms violate[] their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Compl. ¶52. In support, Plaintiffs offer affidavits explaining their academic qualifications and experience, and aver their fear that guns in the classroom will limit classroom discussion.[14]

---

[14] Declaration of Dr. Jennifer Lynn Glass (Doc. 20-1); Declaration of Dr. Lisa Moore (Doc. 20-2); Declaration of Dr. Mia Carter (Doc. 20-3). While no doubt genuinely believed by the affiants, many statements in the affidavits are, legally speaking, conclusory, speculative, and lack adequate foundation. *See, e.g., Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("Needless to say, unsubstantiated assertions are not competent…evidence."). *See also* Fed. R. Evid. 401 ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action.") Defendants object to the Court's

As relief, Plaintiffs seek preliminary and permanent injunctions that prohibit "any statute, rule, regulation, or policy compelling Plaintiffs to allow the concealed carrying of handguns in their classrooms or authorizing imposition of sanctions of any sort as to Plaintiffs if they bar the carrying of concealed handguns in their classrooms." Compl. ¶53(b), (d). Plaintiffs further request "a declaratory judgment that any state statute, regulation, or policy which would compel Plaintiffs to allow the concealed carrying of handguns in their classrooms or which would authorize imposition of sanctions of any sort as to Plaintiffs if they bar the carrying of concealed handguns in their classrooms would violate the First Amendment, the Second Amendment, the Due Process Clause of the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." *Id.* ¶53(c). Plaintiffs further request attorney's fees and costs. *Id.* ¶53(e).

<u>**ARGUMENT & AUTHORITIES**</u>

I.     **Plaintiffs' case should be dismissed under Rule 12(b)(1).**

a.   **Standard for Dismissal under Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. When a court lacks statutory or constitutional power to adjudicate a case, the case must be dismissed for lack of subject-matter jurisdiction. *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015). Standing is "an indispensable part of the plaintiff's case," and the party seeking to establish jurisdiction bears the burden to establish all three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, a plaintiff must show: (1) an injury-in-fact; (2) that is traceable to the defendant's challenged conduct (causation); and (3) that is likely to be redressed by a favorable decision in the district court (redressability). *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528

---

consideration of these affidavits to the extent they contain legally conclusory, unsubstantiated statements lacking probative value.

U.S. 167, 180–81 (2000). If a party lacks standing to bring a claim, the court lacks subject-matter jurisdiction over that claim, and it is dismissed. *See Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015).

The Eleventh Amendment bars official capacity suits against state officials in federal court absent a valid waiver of sovereign immunity. U.S. CONST. Amend. XI; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984); *Edelman v. Jordan*, 415 U.S. 651, 663-69 (1974). Under the narrow *Ex parte Young* exception to sovereign immunity a federal court may, consistent with the Eleventh Amendment, enjoin state officials to conform their future conduct to the requirements of federal law. *Pennhurst*, 465 U.S. at 102-103; *Quern v. Jordan*, 440 U.S. 332, 337 (1979). The relief that may be awarded against the state is limited to prospective injunctive relief from an ongoing violation of federal law. *See Edelman v. Jordan*, 415 U.S. at 666–69, 677 (discussing that retroactive relief is barred by the Eleventh Amendment); *Pennhurst*, 465 U.S. at 103-06 (discussing that equitable relief may be barred by the Eleventh Amendment, and noting that *Ex parte Young* exception to immunity does not apply to claims against a state on the basis of state law). Moreover, to overcome the Eleventh Amendment bar through the *Ex parte Young* fiction, the defendant state official must have "'some connection with the enforcement of the act' in question or be 'specially charged with the duty to enforce the statute.'" *Okpalobi v. Foster*, 244 F.3d 405, 414-15 (5th Cir. 2001) (citation omitted).

> **b. Because Plaintiffs have failed to state a valid constitutional claim, they lack standing and the Court lacks jurisdiction.**

Here, the Court lacks subject matter jurisdiction to consider Plaintiffs' claims. To start with, Plaintiffs lack standing to assert their claims. Plaintiffs cannot satisfy the injury-in fact requirement, because, as shown below, they do not have a First, Second, or Fourteenth Amendment right to ban licensees from the UT Austin classrooms where they teach. Because they have not been deprived of any constitutionally protected interest, Plaintiffs lack standing. *E.g., Lujan,* 504 U.S. at 561. Moreover, this lack of injury means Plaintiffs do not complain of an ongoing violation of federal law, as required

to invoke the *Ex Parte Young* exception to sovereign immunity. Accordingly, the Eleventh Amendment bars this suit against the UT Defendants in their official capacities.[15] *See, e.g., Edelman v. Jordan*, 415 U.S. at 666–69, 677; *Pennhurst*, 465 U.S. at 103-06.

Moreover, as the Student Regent, Varun P. Joseph lacks voting authority. TEX. EDUC. CODE §51.355. As a result, he is not a proper defendant within the *Ex parte Young* exception to immunity, because he lacks the requisite connection to the Campus Carry Policy. *Okpalobi*, 244 F.3d at 414-15.

### c. Plaintiffs further fail to establish standing under the First Amendment because their allegations of future self-censorship are legally unreasonable.

In asserting a pre-enforcement First Amendment challenge based upon "chilling" of speech, a plaintiff must establish an objectively reasonable basis to believe such chilling will occur. Of course, "governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 12–13 (1972). But this has "in no way eroded the 'established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action.'" *Id.* (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937)) (alteration omitted). When a plaintiff asserts that a given law or policy will chill future speech, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.'" *Id.* at 13-14 (quoting *United Pub. Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)).

---

[15] Plaintiffs also purport to bring their official capacity claims for injunctive relief under §1983. Compl. ¶2. But State officials, in their official capacities, are not "persons" for purposes of asserting a §1983 claim. *Okpalobi*, 244 F.3d at 412 (citation omitted). Thus, if Plaintiffs seek relief against the UT Defendants in their official capacities under §1983, those claims must also be dismissed.

Plaintiffs seek to recover under the First Amendment based upon the assertion that "they sometimes have to engage in difficult discussions of controversial, emotionally-laden topics." Compl. ¶34. They also state that:

> [i]t is inevitable that they will have to pull back, consciously or sub-consciously, at important junctures in classroom exposition and discussion. Licensees' anonymity is protected by Texas law, so a professor cannot anticipate whether any particular student has the present wherewithal for violent classroom action with a gun. But robust academic debate in the classroom inevitably will be dampened to some degree by the fear that it could expose other students or themselves to gun violence by the professor's awareness that one or more students has one or more handguns hidden but at the ready if the gun owner is moved to anger and impulsive action.

*Id.*

But as passionately as they may believe these statements, Plaintiffs cannot show that these speculative assertions are reasonable as a matter of law. The only evidence they offer at all on this point is opinion testimony that the possibility that license holders could bring concealed firearms into a classroom will make some people reticent to discuss certain topics or espouse certain views. *See generally,* Glass Decl.; Moore Decl.; Carter Decl. This assumes (without evidence) that (1) license holders, as a class, share the same views,[16] (2) license holders will be inclined to use legal handguns in response to an individual voicing a different view, and (3) other students will refrain from robust intellectual debate as a result. These opinions are not based upon any evidence, studies, or other empirical data to support them. *See id.*; Glass Decl. ¶15; Moore Decl. ¶11; Carter Decl. ¶19. Moreover, Plaintiffs do not claim any expertise on firearms, concealed firearms, Texas' process to obtain a handgun license, violence in the classroom generally, violence in the classroom in response to

---

[16] *See, e.g.,* Glass Decl. ¶15 ("Most of the openly libertarian students in my undergraduate classes are male and overtly hostile to women's rights…I strongly suspect that they are more likely to own guns given their distaste for government and law enforcement."); Moore Decl. ¶11 ("On one occasion, on the first day of class, a student announced that she was enrolled to monitor and report on my 'homosexual agenda.' It resulted in a dampening of classroom discussion and participation, which would have been worse if the possibility that she, or some other student was carrying a loaded gun.").

particular topics, campus carry, campus security, or any of the other fields of study that would give these beliefs evidentiary significance or otherwise render them reasonable.

Moreover, the testimony Plaintiffs offer does not involve lawful handgun license holders. Individuals currently exercise their freedom of speech in public parks, office buildings, shopping malls, DPS offices, and numerous other locations where concealed carry is allowed. In fact, "concealed carry has been allowed on campus grounds since 1995, including the West Mall and other outdoor areas where protests and heated debates have occurred without a single incident related to concealed carry." Joint Stip. Ex. 3 at 27. Plaintiffs offer no evidence that speech is chilled in these locations just because an individual may be carrying a concealed firearm. Instead, "[t]h[e] alleged 'chilling' effect may perhaps be seen as arising from [Plaintiffs'] very perception of the system as inappropriate," and this is insufficient to confer standing. *Laird v. Tatum*, 408 U.S. at 13.

## II.   This case should be dismissed under Rule 12(b)(6), because Plaintiffs have failed to state a claim upon which relief may be granted.

### a.   Standard for Dismissal under Rule 12(b)(6)

Dismissal is proper under Federal Rule of Civil Procedure 12(b)(6) when a complaint fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Though courts accept well-pleaded facts as true and construe them in favor of the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a Rule 12(b)(6) motion, the complaint must provide "more than labels and conclusions, and a formulaic recitation of a cause of action's elements." *Funk v. Stryker Corp.*, 673 F. Supp. 2d 522, 525 (S.D. Tex. 2009), *aff'd* 631 F.3d 777 (5th Cir. 2011) (citing *Twombly*, 550 U.S. at 555). Instead, the factual allegations must be

enough to "raise a right of relief above the speculative level," on the assumption that the factual allegations are true. *Twombly,* 550 U.S. at 555.

> **b. The Complaint fails to state a First Amendment claim, because the UT Defendants' policies do not implicate any First Amendment right.**
>
> > **i. The right to academic freedom does not capture restrictions that are neither direct nor content-based.**

Plaintiffs assert a First Amendment right to academic freedom as individual professors. Compl. ¶33. But no Court has ever held that a professor has a First Amendment right to challenge a University policy wholly unrelated to her teaching. Instead, the academic freedom jurisprudence limits professors' challenges to their governmental employer's restrictions on speech that are both (1) direct and (2) content based. *Univ. of Pennsylvania v. E.E.O.C.,* 493 U.S. 182, 197 (1990). Because the UT Defendants' Campus Carry Policy is neither, the Complaint does not state a First Amendment claim. Moreover, to the extent the Plaintiffs wish—with their speech—attempt to violate the law, such speech is not protected.

Though not mentioned in the First Amendment, the Supreme Court has recognized a level of constitutional protection for academic freedom. *Sweezy v. New Hampshire*, 354 U.S. 234, 262-64 (1957) (Frankfurter, J., concurring) (academic freedom protects against "governmental intervention into the *intellectual* life of a university") (emphasis supplied); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978). The first case to suggest a right to academic freedom, *Sweezy*, considered a state investigation into the content of a lecture given by a guest lecturer at the University of New Hampshire, who was accused of being a "subversive person." 354 U.S. at 246-47. The Court concluded that the investigation into the content of the professor's classroom speech and political associations violated his rights to due process and freedom of association, concluding, "[w]e believe that there unquestionably was an invasion of petitioner's liberties in the areas of academic freedom and political expression—areas in which government should be extremely reticent to tread." *Id.* at 250.

Many subsequent "academic freedom" cases invalidated similar McCarthy-era provisions, designed to root out anti-American sentiment among government employees. For example, in *Keyishian v. Board of Regents of the University of the State of New York*, several public university professors and a faculty member challenged a statute that required termination of public employment for "treasonable or seditious" utterances or acts. 385 U.S. 589, 597 (1967). The statute did not define "treasonable" or "seditious." *Id.* The Court invalidated the statute as unconstitutionally vague in violation of the First Amendment, because "one must guess what conduct or utterance may lose him his position," and in such cases, "one necessarily will 'steer far wider of the unlawful zone'" of speech. 385 U.S. at 604 (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). Thus, the New York statute at issue there plainly imposed a direct regulation on speech (it prohibited utterances or acts) and did so based upon their content (treasonable or seditious).

The UT Defendants' policy, on the other hand, simply provides for implementation of the legislature's provision that licensees may carry on campus. It therefore does not implicate Plaintiffs' First Amendment right to academic freedom.[17]

### ii. Any incidental impact on Plaintiffs' speech does not violate the First Amendment.

Even if the UT Defendants' policy had some incidental impact on Plaintiffs' speech, that impact does not implicate any interest that the First Amendment protects. The Supreme Court's latest relevant pronouncement on government employee speech, *Garcetti v. Ceballos*, mentioned the specific context at issue here—employment in public academia—in dicta and dissent. 547 U.S. 410, 425 (2006); *see also id.* at 438 (Souter, J., dissenting). The plaintiff in *Garcetti* was a deputy district attorney who

---

[17] It is also worth noting—as the Working Group did—that courts in other states with campus carry statutes have considered legal challenges to those statutes. While those cases are distinct from the facts here, none recognized academic freedom as a basis to override a legislative provision for campus carry. Ex. B at 28, n.28 (citing *University of Utah v. Shurtleff*, 144 P.3d 1109, 1122-28 (Utah 2006); *Regents of Univ. of Colo. v. Students for Concealed Carry on Campus, LLC*, 271 P.3d 496 (Colo. 2012); *Ore. Firearms Educ. Found. v. Bd. of Higher Educ.*, 264 P.3d 160 (Ore. Ct. App. 2011)).

prepared a memorandum attacking the veracity of an affidavit used in a prosecution by his employer, and claimed he suffered adverse employment action as a result. The *Garcetti* Court's analysis began with the *Pickering v. Board of Education*, the first case to hold that a public employee could not be summarily discharged for exercising the right to free speech. 391 U.S. 563 (1968). Over the intervening years, the current two-prong test for whether public employee speech is entitled to First Amendment protection emerged. The first prong "requires determining whether the employee spoke as a citizen on a matter of public concern." *Garcetti,* 547 U.S. at 418 (citing *Pickering,* 391 U.S., at 568; *Connick v. Myers,* 461 U.S. 138 (1983)). If not, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* If yes, the employer must present "an adequate justification for treating the employee differently from any other member of the general public." *Id.* The Court also noted that, when "employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 419 (citing *Connick,* 461 U.S. at 147).

Applying that test, the *Garcetti* Court held that the plaintiff there did not have a First Amendment right to be free from adverse employment consequences based upon the content of the memorandum he wrote pursuant to his official duties. He was, after all, speaking as an employee, rather than as a citizen. *Id.* at 421. Thus, it was immaterial whether his speech related to a matter of public concern. *Id.* at 423. The Court explained that government "employees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit." *Id.* at 422.

As Plaintiffs have noted, *Garcetti* recognized "some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Id.* at 425. Be that as it may, to the extent Plaintiffs might *use* speech or other expressive activity as a means to violate the

UT Defendants' policy or State law, the First Amendment will not protect that speech—it is plainly "necessary for their employer[] to operate efficiently and effectively," in particular, by following the laws of the State. *Id.* at 419. Indeed, it has always been clear that, "[w]hile a teacher does not surrender constitutionally protected rights of freedom of expression as a condition of public employment, that freedom is not absolute or unlimited." *Kelleher v. Flawn*, 761 F.2d 1079, 1084 (5th Cir. 1985) (citation omitted). For example, "the First Amendment's shield does not extend to speech and conduct amounting to insubordination directed at school officials." *Id.*[18] Thus, the First Amendment plainly does not give the Plaintiffs a right to violate the UT Defendants' policy—even if they endeavor to do so via expressive conduct.

Finally, Plaintiffs' claims are based upon assertions that lack the legal foundation to support a right to recovery under the First Amendment. This is because they assume without probative evidence that (1) hypothetical students will refrain from expressing (2) hypothetical viewpoints because of the (3) hypothetical presence of a legal handgun which might cause a (4) hypothetical violent reaction using that handgun. *See, e.g.,* Compl. ¶¶34, Glass Decl. ¶15; Moore Decl. ¶11; Carter Decl. ¶19. To the extent this lack of an evidentiary basis does not wholly divest Plaintiffs of standing under the First Amendment, *see supra* Part I(c), such attenuated assumptions are insufficient to "raise a right of relief above the speculative level," and this claim should be dismissed. *Twombly,* 550 U.S. at 555.

### c. The Second Amendment does not entitle the Plaintiffs to ban lawful handguns from their presence, thus, they fail to state a Second Amendment claim.

---

[18] *See also, e.g., Hillis v. Stephen F. Austin University*, 665 F.2d 547, 550-51 (5th Cir. 1982), cert. denied, 457 U.S. 1106 (1982) (expressions of "plain insubordination" and "lack of cooperation" with public university employer not protected); *Chitwood v. Feaster*, 468 F.2d 359, 361 (4th Cir. 1972) (public college "has a right to expect teacher to follow instructions and to work cooperatively and harmoniously" with superiors); *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir. 1972), cert. denied, 411 U.S. 972 (1973) (First Amendment does not protect speech expressing refusal to comply with public university's guidelines); *Palmer v. Board of Education of City of Chicago*, 603 F.2d 1271, 1272-74 (7th Cir. 1979), cert. denied, 444 U.S. 1026 (1980) (public school teacher is not free to disregard, for First Amendment reasons, curriculum concerning patriotic matters).

Plaintiffs claim to be deprived "of their Second Amendment right to defend themselves and others in their classrooms from handgun violence by compelling them as public employees to passively acquiesce in the presence of loaded weaponry in their place of public employment without the individual possession and use of such weaponry in public being well-regulated." Compl. ¶48. This fails to state a claim upon which relief may be granted.

Though the UT Defendants do not opine on the prudence of §411.2013, the Second Amendment does not give Plaintiffs a right to exclude individuals lawfully carrying handguns from classrooms. The Supreme Court has recognized that there is "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller,* 554 U.S. 570, 595 (2008) (invalidating DC's prohibition on useable guns in the home) (citation omitted). *See also McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) ("the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*" to the States). Of course, *Heller* did not invalidate "laws forbidding firearms in sensitive places," 554 U.S. at 672, and Texas has some such prohibitions. *See, e.g.,* TEX. PENAL CODE §§46.03; 46.035.

The Texas Legislature has, however, elected to allow individuals licensed by the State to carry a concealed handgun in public, including in the buildings of State funded universities. *See* TEX. GOV'T CODE §411.171 *et seq*; *id.* §411.2031(a)(1). In doing so, the legislature charged President Fenves with establishing "reasonable rules, regulations, or other provisions regarding the carrying of concealed handguns by license holders" in buildings on UT Austin's campus. *Id.* §411.2031(d-1). The statute is clear that the President "may not establish provisions that generally prohibit or have the effect of generally prohibiting license holders from carrying concealed handguns on the campus of the institution." *Id.* §411.2031(d-1). Thus, to comply with this directive in the safest way possible, the UT

Defendants' policy permits licensees to carry in classrooms that do not present special safety considerations. *See supra* n.6 and accompanying text.

Plaintiffs' position that the Second Amendment provides them an affirmative right to *ban* guns from these locations lacks legal support. They chiefly rely upon the decision of a limited *en banc* court, comprised of eleven judges of the Court of Appeals for the Ninth Circuit. *See, e.g.,* Pl.'s Mem. of Law in Support of Prelim. Injunction (Doc. 21) at 2 (citing *Peruta v. Cnty. of San Diego*, 2016 WL 3194315, at *6 (9th Cir. June 9, 2016) (pet. for rehr'g by entire *en banc* Court filed June 23, 2016)). Plaintiffs characterize *Peruta* as holding that the Second Amendment does not guarantee individuals a right to carry firearms in public. *Id.* But in fact, the *Peruta* majority considered only whether the plaintiffs had a constitutional right to obtain a concealed carry permit without first showing "good cause," as required by local law. *Id.* at *2. The seven judges in the majority concluded that California's San Diego and Yolo counties could constitutionally require an individual to show good cause in order to obtain a concealed carry permit. Nevertheless, they "d[id] not reach the question whether the Second Amendment protects some ability to carry firearms in public[.]" *Id.* at *5.[19]

Of course, *Peruta* does not bind this Court, and at least three other federal Courts of Appeals have reached the opposite result.[20] Moreover, *Peruta* is inapposite because it speaks to the affirmative rights of individuals who wish to carry guns. But the question here is not the scope of the right that the Second Amendment secures to individuals wishing to carry guns. Rather, the question is whether the Second Amendment secures the Plaintiffs an affirmative right to exclude guns from classrooms

---

[19] The limited *en banc* holding in *Peruta* reversed an earlier Ninth Circuit panel holding concluding that "the right to bear arms includes the right to carry an operable firearm outside the home for the lawful purpose of self-defense." *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1166 (9th Cir. 2014).

[20] *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012) (a right to bear arms "implies a right to carry a loaded gun outside the home"); *Woollard v. Gallagher*, 712 F.3d 865, 878 (4th Cir. 2013) (assuming a "Second Amendment right of law-abiding, responsible citizens to carry handguns in public for the purpose of self-defense"); *Kachalsky v. Cty. of Westchester,* 701 F.3d 81, 96 (2d Cir. 2012) ("our tradition [] clearly indicates a substantial role for state regulation of the carrying of firearms in public[.]")

on UT Austin's campus. Without an affirmative right to exclude guns from classrooms, Plaintiffs cannot sue to enforce that right. And without legal authority to support such a right, they have failed to state a claim upon which relief may be granted under the Second Amendment.

Plaintiffs' assertion that "in Texas, the carrying of handguns is not 'well-regulated' within the meaning of the Second Amendment because there has not been the imposition of proper discipline and training," Compl. ¶16, does not save this claim. "The adjective 'well-regulated' implies nothing more than the imposition of proper discipline and training." *Heller*, 554 U.S. at 597 (citation omitted). Texas Government Code requires provides for licensee discipline and training.[21] Thus, Plaintiffs' Second Amendment claim should be dismissed under Rule 12(b)(6).

### d. Plaintiffs fail to state a claim under the Due Process Clause, because they have identified no unconstitutional vagueness.

The Due Process Clause of the Fourteenth Amendment states: "[No State shall] deprive any person of life, liberty, or property, without due process of law." U.S. CONST. Amend. XIV, §1. "Due process has two major meanings: first, substantive due process may require courts to void certain types of government action that infringe on individual rights and individual freedom of action; second, procedural due process may require government to assure that individuals are afforded certain procedures before they are deprived of life, liberty, or property." *Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1528 (5th Cir. 1993) (citation omitted). Plaintiffs assert a "Due Process—Void for Vagueness" claim, complaining that they are "threatened with possible adverse employment sanctions for violating state and university policies that draw impermissibly vague and uncertain lines about an individual

---

[21] *See, e.g.,* TEX. GOV'T CODE §§411.172 (eligibility requirements for licensees include ability to exercise sound judgment regarding the proper use and storage of a handgun, and vetting of mental health and criminal history); 411.188 (requirement to attend training class and demonstrate proficiency with firearm to obtain license); 411.187 (suspension of license if licensee fails report change of name, address or status; commits an act of family violence and is subject to a protective order; or is charged with Class A or B misdemeanor or equivalent offense, an offense under Penal Code §42.01, or a felony); 411.186 (revocation of license if licensee otherwise becomes ineligible).

professor's exercise of control over the classroom by exercising the option of banning guns in that professor's own classroom." Compl. ¶52. They do not specify whether this is a substantive or procedural due process claim (and their Complaint is sufficiently confused that it might be read to assert both), but it necessarily fails whether substantive or procedural.

Vagueness claims under the Due Process Clause "rest on the lack of notice and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *United States v. Clark*, 582 F.3d 607, 613 (5th Cir. 2009) (same). To survive a vagueness challenge, a provision need not spell out with perfect precision what conduct it forbids, as "[w]ords inevitably contain germs of uncertainty." *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973). That is, unconstitutional vagueness is not present "merely because…an individual can raise uncertainty about [a provision's] application to the facts of their case." *Ford Motor Co. v. Texas Dept. of Transp.*, 264 F.3d 493, 509 (5th Cir. 2001). Instead, unconstitutional vagueness exists "'only where no standard of conduct is outlined at all; when no core of prohibited activity is defined.'" *Id.* 264 F.3d at 509 (quoting *Margaret S. v. Edwards*, 794 F.2d 994, 997 (5th Cir. 1986)).

Here, the conduct that is prohibited is unambiguous—professors may not ban license holders from carrying concealed handguns in class. *See, e.g.,* TEX. GOV'T. CODE §§411.2031(b) (providing that a license holder may carry a concealed handgun on campus), 411.209(a) (University liable for civil penalty for "Wrongful Exclusion of Concealed Handgun License Holder"); HOP 8-1060 (providing that "Individuals licensed to carry may do so on campus except in locations and at activities prohibited by law or by this policy[]"—and classrooms are not an identified location—and further providing that "[t]his policy applies to all students, employees, University affiliates, and visitors of the University while on campus or University owned property). This provision is clear, and the Complaint and affidavits provide no evidentiary or legal basis to conclude otherwise. That is, they do not provide facts to suggest that any particular provision fails to provide sufficient notice of the conduct prohibited

under the law. *Cf. Keyishian*, 385 U.S. at 604 (statute requiring termination of public employment for "treasonable or seditious" utterances or acts unconstitutionally vague). In fact, Plaintiffs' affidavits make clear that they understand that the policy prevents them from prohibiting licensees from carrying in UT Austin classrooms. Thus, they have failed to allege any violation of substantive due process.

Similarly, the UT Defendants' Faculty Grievance Procedure is not lacking in procedural due process. "'The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.' Thus, to recover under the Fourteenth Amendment in a §1983 action, a plaintiff must demonstrate that she was deprived of a liberty or property interest and that she was not afforded adequate procedural protection prior to or following the deprivation." *Kelleher v. Flawn*, 761 F.2d at 1086 (5th Cir. 1985) (quoting B*oard of Regents v. Roth*, 408 U.S. 564, 569 (1972)). Plaintiffs have not alleged either of these elements.

That is, as set forth herein, Plaintiffs lack any constitutionally valid "liberty or property" interest that is implicated by the UT Defendants' policy. Moreover, while tenured faculty members do have a protected property interest in their tenure, the UT Defendants have not deprived Plaintiffs of their tenure. Even if Plaintiffs were subject to future discipline implicating a protected property interest, such discipline would be governed by HOP 2-2310, which satisfies procedural due process requirements by providing them notice and an opportunity to be heard. *Compare, e.g., Jones v. Louisiana Bd. of Sup'rs of Univ. of Louisiana Sys.*, 809 F.3d 231, 236 (5th Cir. 2015) ("Where a tenured public university faculty member is terminated, due process requires both notice and an opportunity to be heard") *with* HOP 2-2310(I)(C) (setting out detailed notice and hearing procedures depending upon the type of discipline at issue); Rule 30103: "Termination of a Faculty Member" §2, Regents' *Rules and Regulations*, UNIVERSITY OF TEXAS SYSTEM (amended May 12, 2016).

In sum, there is no substantive due process claim, because Plaintiffs do no identified any conduct, the legality of which they cannot discern under the law. There is no procedural due process

claim, because Plaintiffs have no protected liberty or property interest at issue—let alone one which the UT Defendants have denied them. And even if they had, UT Austin's disciplinary framework expressly provides all process that is due. *See* HOP 2-2310(I)(C). Thus, Plaintiffs' void-for-vagueness claim rests on "naked assertion[s] devoid of further factual enhancement," and should be dismissed under Rule 12(B)(6). *Iqbal*, 556 U.S. at 678 (alteration original) (citations and quotation marks omitted).

### e.   Plaintiffs have failed to state a claim under the Equal Protection Clause.

The Court should similarly dispose of Plaintiffs' equal protection challenge. The Equal Protection Clause of the Fourteenth Amendment provides that a State cannot "deny to any person within its jurisdiction equal protection of the laws." U.S. CONST. amend. XIV, §1. That is not to say that it is impermissible for laws to differentiate, in some way. *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). And the legislature and State entities acting pursuant to statutory authority[22] enjoy a "latitude of discretion" that is "notably wide" in making these differentiations. *See id.* Plainly put, the Equal Protection Clause permits classifications with the caveat that governmental decision-makers should not treat differently those who are "in all relevant respects alike." *Nodlinger v. Hahn*, 505 U.S. 1, 10 (1992); se*e F.S. Royster Guano Co.*, 253 U.S. at 415.

When no fundamental right is jeopardized, equal protection requires that any classification rationally further a legitimate state interest.[23] *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439–

---

[22] UT Austin's Campus Carry Policy was established by the President and amended by the Board of Regents by a two-thirds vote under the express statutory authority of §411.2031(d-1) and (d-2). It is therefore entitled to the same level of deference afforded to legislative enactments. *See, e.g. Foley v. Benedict*, 55 S.W.2d 805, 808 (Tex. 1932) ("Since the [B]oard of [R]egents exercises delegated powers, its rules are of the same force as would be a like enactment of the Legislature, and its official interpretation placed upon the rule so enacted becomes a part of the rule.") Thus, it is entitled to the same level of deference as a legislative enactment.

[23] When a fundamental right is implicated, strict scrutiny applies and a law is upheld only when it is precisely tailored to further a compelling governmental interest. *Sonnier v. Quarterman*, 476 F.3d 349, 368 (5th Cir. 2007). In fact, even if the Campus Carry Policy did implicate a fundamental right, the Equal Protection Clause is still satisfied where that provision is "narrowly drawn and limited to define and punish specific conduct lying within the domain of state power[.]" *Chaplinsky v. State of New*

441 (1985). It "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *McGowan v. Maryland*, 366 U.S. 420, 425–46 (1961) (Generally, "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality."). This standard is met if there is a plausible policy reason for a classification,[24] the facts on which the classification is apparently based rationally may have been considered to be true by the decision maker,[25] and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational. *See Cleburne*, 473 U.S. at 446. "[A] state action viewed under the rational basis test is presumed to be valid." *Kite v. Marshall*, 661 F.2d 1027, 1030 (5th Cir. 1981). In such situations, "the burden is not upon the state to establish the rationality of its restriction, but is upon the challenger to show that the restriction is wholly arbitrary." *Karr v. Schmidt*, 460 F.2d 609, 617 (5th Cir. 1972) (*en banc*).

As explained above, Plaintiffs cannot carry their burden to show that the UT Defendants' policies implicate any of their constitutional rights. *See supra* Part II (b)-(c). Thus, the inquiry is whether the UT Defendants' distinction between classrooms and areas identified gun exclusion zones[26] rationally furthers a legitimate state interest. [27]

Apart from areas where other law prohibits campus carry, HOP 8-1060 identifies eight additional gun exclusion zones. Stipulated Joint Ex. 4. None of these is a typical classroom setting. *See id.* In fact, unless a classroom falls under one of these eight categories, or one set out in other law, campus carry is permitted and the professor lacks discretion to determine otherwise. *See id.* In this

---

*Hampshire*, 315 U.S. 568, 573–74 (1942). Here, the working group's studied, precise work in effectuate the directive of §411.2031 satisfies this standard.
[24] *See United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 174, 179 (1980).
[25] *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981).
[26] Plaintiffs focus on the policy's differing treatment of different areas as a proxy for the differing effect that it has on professors teaching in these areas—namely, the type of area where one teaches determines whether concealed carry is prohibited. Defendants' discussion on this point uses the treatment of different areas as a proxy for the same.
[27] Pl.'s Mem. at 11-13; Glass Decl. ¶¶13-14; Moore Decl. ¶10; Carter Decl. ¶17.

way, the policy uniformly treats those professors and areas that are "in all relevant respects alike." *Nodlinger*, 505 U.S. at 10 (1992). Plaintiffs have not and cannot show that HOP 8-1060 will impact them differently from other similarly situated professors at UT Austin.

Moreover, any notion that HOP 8-1060 is wholly arbitrary is dispelled by the Working Group report and Campus Carry Policies and Implementation Strategies that HOP 8-1060 is based upon. These documents detail the thoughtful, deliberative, and consultative process the University undertook, including how each gun exclusion zone was determined. Equal protection allows for such thoughtful classifications. As a constitutionally created political subdivision of the State, UT Austin has legitimate interests in promoting safety on campus and following the requirements of state law. For each area identified as a gun exclusion zone, the Working Group report expressly set out the specific factors warranting this treatment. The rational relationship between maximizing campus safety (while comporting with state law) and each gun exclusion zone is explicit. Regardless of whether the parties believe the policy determinations are wise, it is not a court's province to weigh in on "the wisdom, fairness, or logic" of such determinations. *Beach Commc'ns, Inc.*, 508 U.S. at 313. Therefore, Plaintiffs cannot overcome the presumption of the Campus Carry Policy's validity. *See id.*

## Conclusion & Prayer

For the reasons set forth herein, the Plaintiffs' case should be dismissed.

**Dated this 8th day of August, 2016.**

**Respectfully submitted,**

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO

Chief, General Litigation Division

/s/ Anne Marie Mackin
AMANDA J. COCHRAN-MCCALL
Deputy Chief, General Litigation Division
Texas Bar No. 24069526
amanda.cochran-mccall@texasattorneygeneral.gov
ANNE MARIE MACKIN
Assistant Attorney General
Texas Bar No. 24078898

OFFICE OF THE ATTORNEY GENERAL
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2120
(512) 320-0667 *Facsimile*
anna.mackin@texasattorneygeneral.gov

**ATTORNEYS FOR UT DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 8th day of August, 2016, a true and correct copy of the foregoing was filed electronically with the Court and delivered via the CM/ECF system to:

James George, Jr.
GEORGE, BROTHERS, KINCAID & HORTON LLP
114 W 7th Street, Ste. 1100
Austin, Texas 78701
512-495-1400
512-499-0094 Fax
State Bar No. 07810000
rjgeorge@gbkh.com

Malcolm Greenstein
GREENSTEIN & KOLKER
1006 E. Cesar Chavez Street
Austin, Texas 78702
512-472-6270
512-472-8263 Fax
State Bar No. 08403300
malcolm@greensteinandkolker.com

Renea Hicks
LAW OFFICE OF MAX RENEA HICKS
101 West 6th Street, # 504
Austin, Texas 78701

Prerak Shah
Senior Counsel to the Attorney General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
Texas Bar No. 24075053
prerak.shah@texasattorneygeneral.gov

**ATTORNEY FOR DEFENDANT PAXTON**

512-480-8231
512-480-9105
State Bar No. 09580400
rhicks@renea-hicks.com

**ATTORNEYS FOR PLAINTIFFS**

/s/Anne Marie Mackin
**ATTORNEY FOR UT DEFENDANTS**