IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DR. JENNIFER LYNN GLASS, *et al.,* | § | |
|     *Plaintiffs,* | § | |
| | § | |
| v. | § | No. 1:16-CV-845 |
| | § | |
| KEN PAXTON, IN HIS OFFICIAL CAPACITY AS | § | |
| ATTORNEY GENERAL OF TEXAS, *et al.,* | § | |
|     *Defendants.* | § | |

## UT DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)

Defendants Gregory L. Fenves, President of The University of Texas at Austin ("UT Austin"), and the Board of Regents for The University of Texas System, in their official capacities, including Paul L. Foster, R. Steven Hicks, Jeffery D. Hildebrand, Ernest Aliseda, David J. Beck, Alex M. Cranberg, Wallace L. Hall, Jr., Brenda Pejovich, and Sara Martinez Tucker[1] (collectively "UT Defendants") move for dismissal of this case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim on which relief may be granted.

## LEGAL AND FACTUAL BACKGROUND

### I.     The Campus Carry Law

Under Texas Government Code §411.2031(d-1)—often called the "campus carry" law,"

> [a]fter consulting with students, staff, and faculty of the institution regarding the nature
> of the student population, specific safety considerations, and the uniqueness of the
> campus environment, the president or other chief executive officer of an institution
> of higher education in this state shall establish reasonable rules, regulations, or other
> provisions regarding the carrying of concealed handguns by license holders on the

---

[1] Plaintiffs initially sued student regent Varun P. Joseph, but have voluntarily dismissed him citing Texas Education Code §51.355(e), which Plaintiffs describe as "specifically provid[ing] that a student regent is not a member of the Board of Regents of the University of Texas." Clerk's Doc. 55 at 1. Of further note, under §51.355(e)(1), the student regent "may not vote on any matter before the board[.]"

campus of the institution or on premises located on the campus of the institution. *The president or officer may not establish provisions that generally prohibit or have the effect of generally prohibiting license holders from carrying concealed handguns on the campus of the institution.*

TEX. GOV'T. CODE §411.2031(d-1) (emphasis supplied). "Campus" includes "all land and buildings owned or leased by" the higher education institution. *Id.* §411.2031(a)(1). The law further provides that the required "rules, regulations or other provisions" are to be reviewed by the institution's board, which may wholly or partially amend them by a two thirds vote. *Id.* §411.2031(d-2).

To become a "license holder," Texas residents must satisfy 14 requirements administered by the Department of Public Safety ("DPS"). *Id.* §411.172. Applicants, *inter alia*, must be at least 21 (except for military members or veterans); cannot have been convicted of a felony; cannot have been convicted of a Class A or B misdemeanor in the past five years; cannot be charged with a Class A or B misdemeanor or a felony; cannot be subject to a protective or restraining order; cannot be chemically dependent; must be capable of exercising sound judgment regarding proper handgun use and storage; and must be qualified to purchase a handgun under federal and State law. *Id.*

Applicants must also complete four hours of training, pass a proficiency examination, and submit identifying information including two sets of fingerprints, photographs, residence and business addresses for the preceding five years, height, weight, driver license number, criminal history, and any history of psychiatric hospitalization and treatment for drugs or alcohol. *Id.* §§411.188, 411.174. DPS verifies this information, and has authority to conduct any investigation necessary to ensure it is complete and accurate. *Id.* §411.176. If a license is not issued or denied within 90 days, it is considered denied. *Id.* §411.177(b); (c). Upon request from any local law enforcement agency, DPS "shall notify the agency of the licenses that have been issued to license holders who reside in the county in which the agency is located." *Id.* §411.178. If a license holder fails to inform DPS of any change of name, address or status; commits an act of family violence and is subject to a protective order; or is charged with a Class A or B misdemeanor or equivalent offense, an offense under §42.01 of the Penal Code,

or a felony under an information or indictment; her license is suspended. *Id.* §411.187. If a license holder otherwise becomes ineligible under §411.172, her license is revoked. *Id.* §411.186. Complete eligibility requirements and restrictions are available on the DPS website.[2]

Texas law provides for the "[c]onfidentiality of [r]ecords" related to license holders. TEX. GOV'T CODE §411.192. In particular, "on request and payment of a reasonable fee to cover costs of copying," DPS is to provide "a statistical report that includes the number of licenses issued, denied, revoked, or suspended by the department during the preceding month, listed by age, gender, race, and zip code of the applicant or license holder." *Id.* §411.193.[3] Additionally, DPS "shall disclose to a criminal justice agency information contained in its files and records regarding whether a named individual or any individual named in a specified list is licensed under this subchapter." *Id.* §411.192(a).[4] In addition to such requests, a magistrate or peace officer may learn this information only in very specific circumstances. *See id.* §411.205. "[A]ll other records maintained under this subchapter are confidential" and exempted from disclosure under the open records law. *Id.* In short, only law enforcement has any means to learn whether an individual has a concealed handgun license. As Plaintiffs acknowledge, "[l]icensees' anonymity is protected by Texas law." Am. Compl. ¶37.

---

[2] http://txdps. state.tx.us/RSD/CHL/index.htm.

[3] DPS currently makes these records available by both calendar and fiscal year on its website. *Reports and Statistics*, TEXAS DEPARTMENT OF PUBLIC SAFETY, https://www.txdps.state.tx.us/rsd/chl/reports/demographics.htm (last accessed 8 September 2016).

[4] *See also* TEX. GOV'T CODE §411.178 ("On request of a local law enforcement agency, the department shall notify the agency of the licenses that have been issued to license holders who reside in the county in which the agency is located.") If a criminal justice agency requests information about a license holder, "[t]he department shall notify a license holder of any request that is made for information relating to the license holder under this section and provide the name of the agency making the request." *Id.* §411.192(c). In this way, the Legislature further emphasized that an individual's status as a license holder is confidential unless the individual elects to share it.

## II.     The UT Defendants' Policy

### a.  President Creates Working Group to Issue Policy Recommendations

Given §411.2031's requirement that the President "establish rules, regulations, or other provisions regarding the carrying of concealed handguns by license holders," President Fenves established the Campus Carry Policy Working Group ("Working Group"). The Working Group's 19 members included faculty, staff, students, an alumnus, a parent, and University administrators. They were tasked with recommending the campus carry policies required under §411.2031(d-1) to the President, which they did in their Final Report. Joint Stip. Ex. 3 (Doc. 35-3). The final report details the Working Group's extensive consultation with the University community in issuing its recommendations, which included an online survey that generated over 3,300 comments; two public forums attended by roughly 400 people with 75 speakers (which were posted online); surveys seeking input about possible gun exclusion zones; attendance at various University meetings to speak and answer questions; informal communication with University community members; and review of additional comments, petitions, and resolutions from various interested parties. *Id.*

In addition to this consultation with the University community, the Working Group met weekly during the Fall 2015 semester to deliberate regarding the best way to implement the statute's requirements while maximizing campus safety, alleviating fears, and enhancing UT Austin's role in the study of gun violence. *Id.* The Working Group studied the available data to estimate how many students were likely to have licenses (less than one percent),[5] considered other states' experiences with laws permitting campus carry (there have been no incidents of classroom violence by individuals lawfully carrying on campus),[6] and considered the results of legal challenges to other states' campus carry statutes (all challenges have failed).[7]

---

[5] Joint Stip. Ex. 3 at 13.
[6] *Id.* at 14.
[7] *Id.* at 14, 28.

After this consultative and deliberative process, the Working Group issued its *Final Report* in December, 2015. *Id.* The Report made 25 recommendations, and detailed the reasons for each. *Id.* at 16-26. These explain how handguns must be carried and stored, identify gun exclusion zones, and provide incidental implementation and proactive measures. *Id.* Every member of the Working Group, including those who are gun owners and license holders, expressed a personal preference against guns in classrooms. *Id.* at 26. Nevertheless, because the Working Group was charged with implementing the law—which requires that UT Austin's policies not have the "effect of generally prohibiting license holders from carrying their handguns on the campus"—it did not recommend that classrooms be identified as gun exclusion zones. *Id.*[8] The Working Group recommended six areas—other than places where carrying is already prohibited under applicable law—as gun exclusion zones where concealed carry should be banned. *Id.* at 4-5. [9]

### b. President Accepts Working Group's Policy Recommendations and Submits them to the Board of Regents for Review

President Fenves considered the Working Group's recommendations, which he alone retained the authority to accept, modify, or ignore. *See* TEX. GOV'T CODE §411.2031(d-1). President Fenves

---

[8] The Working Group noted that "excluding handguns from classrooms would effectively prohibit license holders from carrying their handguns and so would violate S.B. 11." *Id.* at 26. It considered that the only way to make classrooms gun exclusion zones while satisfying the requirement that the policies not effectively prohibit concealed carry on campus would be to provide gun lockers throughout campus so license holders could store handguns before entering class. *Id* at 27. The Working Group rejected this approach, because "[a] policy that increases the number of instances in which a handgun must be stored multiplies the danger of accidental discharge" and "the risks to human life of placing gun lockers around campus would substantially outweigh any benefit that would accrue from banning concealed handguns in classrooms." *Id.*

[9] Those areas are: (1) areas where federal or another state law, licensing requirements, or contracts require gun exclusion (e.g., Nuclear Engineering Teaching Laboratory and child care facilities); (2) patient-care areas, including where professional mental health services are provided (e.g., University Health Services and Counseling and Mental Health Center); (3) areas where formal hearings are conducted pursuant to institutional disciplinary and grievance rules (e.g., formal hearings conducted by Student Judicial Services); (4) areas where firearm discharge might cause great harm (e.g., laboratories with dangerous chemicals, biological agents, or explosive agents); (5) on-campus residence halls (with limited exceptions); and (6) sole-occupant offices, if the occupant gives notice. *Id.* at 4-5.

accepted the Working Group's recommendations, and in February, 2016, those recommendations were compiled into a policy document entitled "Campus Carry Policies and Implementation Strategies." Joint Stip. Ex. 1 (Doc. 35-1) at 3-13. The Campus Carry Policies and Implementation Strategies list 25 "policy statements," the findings that support each statement, and the applicable implementation strategy and criteria. *Id.* The gun exclusion zones identified in the Campus Carry Policies and Implementation Strategies[10] are summarized as follows:

- **Policy Statement No. 9** prohibits concealed carry in areas where federal or state law, licensing requirements, or contracts require guns be excluded to minimize risk based on safety, security, and other special circumstances. Joint Stip. Ex. 1, Campus Carry Policies and Implementation Strategies at 6.

- **Policy Statement No. 10** prohibits concealed carry in patient care areas including where professional mental health services are provided because these are unique environments with significant safety risk to health care providers, patients, and others present in these areas. *Id.* at 6-7.

- **Policy Statement No. 11** prohibits concealed carry in areas where formal hearings are conducted pursuant to institutional disciplinary and grievance rules because these environments present the same safety concerns present in a government court or office utilized by a court. Because rights and privileges are being heard and adjudicated, these are unique environments with specific safety considerations. *Id.* at 7.

- **Policy Statement No. 13** prohibits concealed carry in areas where firearm discharge might cause great harm because of the presence of hazardous chemicals, gases, or agents or equipment with powerful magnets. This furthers the special safety concerns present in such environments. *Id.* at 8.

- **Policy Statement No. 14** prohibits concealed carry in animal-research facilities and care facilities where rules of ingress and egress create an increased risk of accidental discharge, contamination, or a handgun being separated from a license holder. *Id.*

- **Policy Statement No. 15** prohibits concealed carry for counselors, staff, and volunteers on the grounds or in buildings where campus programs for minors occur because these areas present the same concerns present in pre-K-12 schools, where handguns are prohibited. *Id. See also* TEX. PENAL CODE §46.03(a)(1).

---

[10] The Campus Carry Policies and Implementation Strategies contain eight separate gun exclusion zones, which fall within the six areas identified in the Working Group's Final Report, and include areas other than those covered as exclusions under applicable law.

- **Policy Statement No. 16** prohibits concealed carry in certain University residences because of the special risks of loss, theft or misuse by roommates. *Id.* at 9.

- **Policy Statement No. 18** prohibits concealed carry in single occupant offices that are not generally open to the public when the occupant so chooses. This furthers the substantial control that occupants generally enjoy over their offices and is based on the nature of communications that readily occur in these offices, including one-on-one discussions related to things like student performance or discipline. *Id.* at 10.

The President sent the Campus Carry Policies and Implementation Strategies to the Board of Regents on February 17, 2016. *Id.* at 1. His transmittal letter noted the imperative to comply with the law, whether or not he agrees with it.[11] President Fenves also noted that, "[u]nless the Board of Regents amends the policies transmitted herein by two-thirds vote within 90 days, these policies and the resulting guidelines and rules will go into effect at [UT] Austin on August 1, 2016." *Id.* at 2.

### c. Board of Regents Amends by Eliminating One Policy Recommendation

The Board of Regents amended the Campus Carry Policies and Implementation Strategies by removing Policy Statement No. 3, which would have required a license holder carrying a semiautomatic handgun on campus to do so without a chambered round of ammunition. *Id.* at 4-5.[12] Thus, the Campus Carry Policies and Implementation Strategies submitted by the President, as amended by the Board of Regents, took effect August 1, 2016. TEX. GOV'T. CODE §411.2031(d-2).

### d. UT Austin Incorporates Campus Carry Policies and Implementation Strategies into its Handbook of Operating Procedures

Each institution within The University of Texas System maintains a Handbook of Operating Procedures ("HOP"), which details the institution's governing policies. Rule 20101: "Presidents" at §4.9 Regents' *Rules and Regulations*, UNIVERSITY OF TEXAS SYSTEM (amended February 11, 2016). UT

---

[11] Joint Stip. Ex. 1 at 1-2 ("Based on due deliberations of the working group recommendations, I have made my decision on implementing SB 11. . . .The implementation of SB 11 will test our ability to comply with the law without compromising the teaching, learning and research environments that makes UT Austin one of the best public universities in the nation.").
[12] This recommendation is reflected at pages 4-5 of the Clerk's Doc., which are numbered 2-3 within the "Campus Carry Policies and Implementation Strategies" document.

Austin incorporated the Campus Carry Policies and Implementation Strategies as amended by the Board of Regents into its HOP as HOP 8-1060 ("Campus Concealed Carry"). Joint Stip. Ex. 4.

HOP 8-1060 is UT Austin's campus carry policy. Under the heading "Reasons for Policy," HOP 8-1060 explains "[t]his policy memorializes the rules and regulations enacted by the president regarding the carrying of concealed handguns by license holders on campus or University owned property." Joint Stip. Ex. 4, Part II. HOP 8-1060 fully adopts the Campus Carry Policies and Implementation Strategies, as accepted by the President and amended by the Board of Regents. *See* Clerk's Doc. 41-3 at Table 1 (demonstrating where each policy statement in the Campus Carry Policies and Implementation Strategies is incorporated into HOP 8-1060).

### III.   Potential Consequences for Faculty Violations of University Policy and State Law

Any professor's attempt to ban guns from a classroom is inconsistent with §411.2031. There are two reasons for this. First, professors lack the authority to specify gun exclusion zones. Second, UT Austin concluded that banning license holders from carrying in classrooms would have the effect of generally prohibiting them from carrying on campus.

The President is the sole individual authorized to establish gun exclusion zones on UT Austin's campus.[13] He has not designated classrooms as gun exclusion zones. As a result, as a matter of Texas law, "[a] license holder may carry a concealed handgun on or about the license holder's person while the license holder is on the campus of" UT Austin, including in classrooms not designated as gun exclusion zones under HOP 8-1060. Tex. Gov't. Code §411.2031(b). Under §411.2031(d-1), individual professors lack the authority to designate gun exclusion zones—only the President can do so. *Id.* A professor's attempt to designate a classroom as a gun exclusion zone is legally ineffective, because it cannot substitute for the President's exclusive authority under §411.2031(d-1).

---

[13] As explained above, the Board of Regents may "by a vote of not less than two-thirds…amend wholly or partly" the provisions established by the President. Tex. Gov't. Code §411.2031(d-2). Thus, no individual other than the President has unilateral authority to make this determination.

Additionally, Texas Government Code §411.209, entitled "Wrongful Exclusion of Concealed Handgun License Holder" provides that

> [a] state agency or a political subdivision of the state may not provide notice by a communication described by [§]30.06, Penal Code, or by any sign expressly referring to that law or to a concealed handgun license, that a license holder carrying a handgun under the authority of this subchapter is prohibited from entering or remaining on a premises or other place owned or leased by the governmental entity unless license holders are prohibited from carrying a handgun on the premises or other place by [§]46.03 or 46.035, Penal Code.

TEX. GOV'T CODE §411.209(a). Violators are subject to a civil penalty. *Id.* §411.209(b), (c). UT Austin is a political subdivision of the State. TEX. CONST. art. VII §10. Thus, depending upon the particular facts, there is a question of whether a faculty member's actions could subject the University to such civil penalties. That is, even though a professor's attempt to exclude license holders from a classroom is invalid, it nevertheless could possibly subject the University to legal exposure.

Since Texas law provides no basis for individuals other than law enforcement to learn whether an individual has a concealed handgun license or is carrying a concealed handgun pursuant to such license, a professor's attempt to force license holders to self-identify would also be inconsistent with the law. *See* TEX. GOV'T CODE §§411.192-.193. This aspect of the law is not disputed. *See* Am. Compl. ¶37 (acknowledging that license holders' anonymity is protected by Texas law).

In addition, under the Regents' Rules of The University of Texas System[14] "[e]very employee is expected to obey all federal, State and local laws, and particularly," among others, "[Penal Code §] 46.03."[15] Rule 30103: "Standards of Conduct" §1, Regents' *Rules and Regulations*, UNIVERSITY OF TEXAS SYSTEM (amended February 11, 2016).[16] Regents' Rule 30103 is clear that "any employee who violates

---

[14] The University of Texas System governs UT Austin and the 13 other institutions and entities under its purview. TEX. EDUC. CODE §65.02.

[15] This law expressly provides for license holders to "possess[] or go[] with a concealed handgun that the person is licensed to carry under Subchapter H, Chapter 411, Government Code…on the premises of an institution of higher education[.]" TEX. PENAL CODE §46.03(a)(1)(B).

[16] Rule 30103 may be found at Joint Stip. Ex. 5 (Doc. 35-5, ECF page no. 131).

any provision of these statutes is subject to disciplinary action[.]" *Id.* Faculty, like all employees, are expected to abide by University policy. If they do not, the administration has the right to take disciplinary action. UT Austin's Faculty Grievance Procedure, HOP 2-2310, which is included in the record at Clerk's Doc. 48-1 and available on the University's website,[17] reiterates that "[t]he administration has the right to discipline members of the faculty." HOP 2-2310(I)(C). In the event that a faculty member is subject to discipline, the Faculty Grievance Procedure provides the specific procedures for imposing that discipline, which include notice and an opportunity to be heard. *Id.*

Of course, UT Austin's HOP does not spell out specific discipline for every possible policy violation in which an employee or faculty member might engage. Instead, it vests the administration with discretion to determine the appropriate discipline in a particular scenario. The Faculty Grievance Procedure is incorporated into the Concealed Campus Carry Policy by reference, reiterating to faculty that violation of that policy subjects them to discipline. Joint Stip. Ex. 4 Part X; HOP 2-2310.

In short, faculty members are subject to discipline for violating State or federal law or University policy, although the particular consequences depend upon the specific facts involved. Faculty members are aware that State law provides that guns can be carried on campus, and that the President has not made a rule excluding them from classrooms. They are also aware that the law protects license holder anonymity. As a result, any individual professor who attempts to establish a classroom prohibition, or to force license holders to self-identify, is subject to discipline. Any such discipline would occur pursuant to HOP 2-2310 and all applicable Rules of the Board of Regents.

## IV.   Plaintiffs

Plaintiffs are professors at UT Austin. They filed their Complaint on July 6, 2016, requesting injunctive relief and asserting four counts under the United States Constitution's First, Second and Fourteenth Amendments. Compl. (Clerk's Doc. 1) at 1. On August 29, 2016, after Defendants filed

---

[17] https://www.policies.utexas.edu/policies/faculty-grievance-procedure.

motions to dismiss and the Court denied Plaintiffs' motion for preliminary injunctive relief (Clerk's Doc. 54), Plaintiffs filed an Amended Complaint ("Am. Compl.").

The Amended Complaint asserts three claims which were asserted in the original Complaint, and adds a fourth alternative claim.[18] In Count 1, Plaintiffs assert a First Amendment right to academic freedom which allows them the "individual option to forbid handguns in their classroom." Am. Compl. ¶50; *see also* Compl ¶46. In Count 2, Plaintiffs assert a "Second Amendment right to defend themselves and others in their classrooms from handgun violence by compelling them as public employees to passively acquiesce in the presence of loaded weaponry in their place of public employment without the individual possession and use of such weaponry in public being well-regulated." Am. Compl. ¶52; *see also* Compl ¶48. Count 3 claims that "university policies that prohibit Plaintiffs from exercising their individual option to forbid handguns in their classrooms" violate the Equal Protection Clause, because "there is no rational basis for the division in the state's policies between where concealed carry of handguns is permitted and where it may be prohibited." Am. Compl. ¶54; *see also* Compl ¶50. In Count 4, which Plaintiffs assert "[i]n the alternative only," Plaintiffs claim that University policy violates the First and Second Amendments "to the extent that [it] prohibit[s] Plaintiffs from requiring those in their classroom carrying a concealed weapon to identify themselves." Am. Compl. ¶56.

In support, Plaintiffs offer affidavits explaining their academic qualifications and experience, and averring their fears that guns in the classroom will limit discussion.[19] In particular, each Plaintiff

---

[18] The original Complaint asserted a "Due Process-Void for Vagueness" claim. Compl. ¶52. The Court rejected—and the Amended Complaint abandons—this claim. *See* Clerk's Doc. 54 at 4-5 (Order denying Motion for Preliminary Injunction); Am. Compl.

[19] Declaration of Dr. Jennifer Lynn Glass (Doc. 20-1); Declaration of Dr. Lisa Moore (Doc. 20-2); Declaration of Dr. Mia Carter (Doc. 20-3). While no doubt genuinely believed by the affiants, many statements in the affidavits are legally conclusory, and therefore not entitled to the otherwise applicable presumption of truth at the motion to dismiss stage. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Defendants have objected to the Court's consideration of those affidavits to the extent they are legally

fears for her safety because of "her inability to bar concealed carry in her classroom." Am. Compl. ¶¶39, 40, 41. Professor Glass teaches a course that includes discussion of "abortion and unwanted pregnancies." Am. Compl. ¶39. Professor Moore teaches a course entitled "'LGBT Literature and Culture.'" Am. Compl. ¶40. Professor Carter teaches courses "which include controversial topics such as imperialism and power structures related to sexuality and gender." Am. Compl. ¶41. Generally speaking, they believe that the potential presence of license holders in class will reduce the scope of discussion of these topics. *See, e.g.,* Compl. ¶¶39-41.

The Amended Complaint adds opinions aired in two media outlets—a website called "Click2Houston.com" and *The New Yorker* magazine—about the quality of training for license holders and those whose out-of-State licenses are recognized in Texas. Am. Compl. ¶15.[20] It notes that, according to recent statistics, 11% of UT's student body is from out of State. Am. Compl. ¶15a. It claims that, in Plaintiffs' experience, the UT Austin community disagrees with the campus carry law. Am. Compl. ¶29. Finally, it alleges the existence of "peer-reviewed academic studies about the effects the presence of weapons has on the person possessing the weapons as well as those nearby and aware generally that guns are about the premises." Am. Compl. ¶38.

As relief, Plaintiffs seek a permanent injunction prohibiting enforcement of "any statute, rule, regulation, or policy compelling Plaintiffs to allow the concealed carrying of handguns in their classrooms or authorizing imposition of sanctions of any sort as to Plaintiffs if they bar the carrying of concealed handguns in their classrooms." Am. Compl. ¶53(d). Plaintiffs further request a

---

conclusory and lacking probative value (Doc. 48 at n. 14), and renew those objections here, to the extent the Court would rely upon these affidavits at this stage of the proceedings.

[20] Newspaper articles offered for their truth are hearsay not subject to an exception and not properly considered by the Court at any stage. *E.g.,* FED. R. EVID. 802; *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005). Here, Plaintiffs offer these media articles in support of a legal conclusion about whether license holders from other States are subject to "discipline and training" within the meaning of the Second Amendment. Though the Court takes well-pleaded facts as true in deciding motions to dismiss, this presumption does not apply to legal conclusions, like those for which Plaintiffs cite these articles. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. at 678 (2009).

declaration that "any state statute, regulation, or policy which would compel Plaintiffs to allow the concealed carrying of handguns in their classrooms or which would authorize imposition of sanctions of any sort as to Plaintiffs if they bar the carrying of concealed handguns in their classrooms would violate the First Amendment, the Second Amendment, the Due Process Clause of the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." *Id.* ¶57(c). In the alternative to their request for this declaration, Plaintiffs request either (1) a declaration that preventing Plaintiffs from "requiring those with concealed handguns in their classrooms to identify themselves" violates the First and Second Amendments, or (2) an injunction "permanently prohibiting enforcement of any state statute, rule, regulation, or policy which would prevent Plaintiffs from requiring those with concealed handguns in their classrooms to identify themselves. *Id.* ¶57(e), (f). Finally, Plaintiffs request attorney's fees and costs. *Id.* ¶53(e).

<u>**ARGUMENT & AUTHORITIES**</u>

**I.      Plaintiffs' case should be dismissed under Rule 12(b)(1).**

**a.    Standard for Dismissal under Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. When a court lacks statutory or constitutional power to adjudicate a case, it must be dismissed for lack of subject-matter jurisdiction. *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015). Standing is "an indispensable part of the plaintiff's case," and the party seeking to establish jurisdiction bears the burden to establish all three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, a plaintiff must show: (1) an injury-in-fact; (2) that is traceable to the defendant's challenged conduct (causation); and (3) that is likely to be redressed by a favorable decision in the district court (redressability). *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167,

180–81 (2000). If a party lacks standing to bring a claim, the court lacks subject-matter jurisdiction over that claim, and it is dismissed. *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015).

The Eleventh Amendment bars official capacity suits against state officials in federal court absent a valid waiver of sovereign immunity. U.S. CONST. Amend. XI; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984); *Edelman v. Jordan*, 415 U.S. 651, 663-69 (1974). Under the narrow *Ex parte Young* exception to sovereign immunity a federal court may, consistent with the Eleventh Amendment, enjoin state officials to conform their future conduct to the requirements of federal law. *Pennhurst*, 465 U.S. at 102-103; *Quern v. Jordan*, 440 U.S. 332, 337 (1979). The relief that may be awarded under *Ex parte Young* is limited to prospective injunctive relief from an ongoing violation of federal law. *See Edelman v. Jordan*, 415 U.S. at 666–69, 677 (discussing that retroactive relief is barred by the Eleventh Amendment); *Pennhurst*, 465 U.S. at 103-06 (discussing that equitable relief may be barred by the Eleventh Amendment, and noting that *Ex parte Young* exception to immunity does not apply to claims against a state on the basis of state law).

> **b. Since Plaintiffs do not allege facts showing any cognizable injury or an ongoing violation of federal law, the Court lacks jurisdiction to consider their claims.**

Here, the Court lacks subject-matter jurisdiction to consider Plaintiffs' claims. To start with, Plaintiffs lack standing. Plaintiffs cannot satisfy the injury-in fact requirement, because, as shown below, they do not have a First, Second, or Fourteenth Amendment right to ban license holders from the UT Austin classrooms where they teach. *Infra* part II(b)-(d). Nor do they have a First or Second Amendment right to force students to disclose whether they are license holders lawfully carrying concealed handguns. *Infra* part II(e). Inability to do something which the law secures no right to do does not amount to cognizable injury. *See, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. at 560 (defining injury as "an invasion of a *legally protected* interest") (emphasis supplied). Because, as explained *infra*, Plaintiffs

lack a constitutional right to ban licensees from class or require them to self-identify, they have not been deprived of any legally protected interest, and they lack standing.

Moreover, this lack of injury—and as set out below, failure to state a viable claim—means Plaintiffs do not complain of an ongoing violation of federal law. Without identifying an ongoing violation of federal law, the Eleventh Amendment bars this suit against the UT Defendants, because as State officials, they are entitled to sovereign immunity. *E.g., Edelman v. Jordan*, 415 U.S. at 666–69, 677; *Pennhurst*, 465 U.S. at 103-06.[21]

### c. Plaintiffs further fail to establish standing under the First Amendment because their allegations of future self-censorship do not constitute a cognizable injury.

Plaintiffs seek to recover under the First Amendment based upon a theory of "chilled" speech. Am. Compl. ¶36. In asserting a pre-enforcement First Amendment challenge based upon such chill, a plaintiff must establish an objectively reasonable basis to believe such chilling will occur. Of course, "governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 12–13 (1972). But this has "in no way eroded the 'established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action.'" *Id.* (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937)) (alteration omitted). When a plaintiff asserts that a given law or policy will chill future speech, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts

---

[21] Bringing this case under 42 U.S.C. §1983, Am. Compl. ¶2, does not save it, because the UT Defendants do not otherwise qualify as "persons" within the meaning of that provision. *Okpalobi v. Foster*, 244 F.3d 405, 412 (5th Cir. 2001) (citation omitted). Only where a §1983 claim fits within the *Ex parte Young* exception (to enjoin an ongoing violation of federal law) is it viable against an official in her official capacity. Thus, if Plaintiffs seek other relief against the UT Defendants in their official capacities under §1983—for claims outside the *Ex parte Young* exception—those claims must also be dismissed for failure to state a claim under Rule 12(b)(6). *Okpalobi v. Foster*, 244 F.3d at 412.

established pursuant to Article III of the Constitution do not render advisory opinions.'" *Id.* at 13-14

(quoting *United Pub. Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)).

Plaintiffs seek to recover under the First Amendment based upon the assertion that "they

sometimes have to engage in difficult discussions of controversial, emotionally-laden topics." Am.

Compl. ¶37. They also state that:

> [i]t is inevitable that they will have to pull back, consciously or sub-consciously, at
> important junctures in class-room exposition and discussion. Licensees' anonymity is
> protected by Texas law, so a professor cannot anticipate whether any particular student
> has the present wherewithal for violent class-room action with a gun. But robust
> academic debate in the classroom inevitably will be dampened to some degree by the
> fear that it could expose other students or themselves to gun violence by the
> professor's awareness that one or more students has one or more handguns hidden
> but at the ready if the gun owner is moved to anger and impulsive action.

*Id.*

But as passionately as they may believe these statements, Plaintiffs cannot show that these

speculative assertions are reasonable as a matter of law. They offer only opinion testimony that the

possibility that license holders could bring concealed firearms into a classroom will make some people

reticent to discuss certain topics or espouse certain views. *See generally*, Glass Decl.; Moore Decl.; Carter

Decl. This assumes (without a credible factual basis to support that assumption) that (1) license

holders, as a class, share the same views,[22] (2) license holders will be inclined to use legal handguns in

response to an individual voicing a different view, and (3) other students will refrain from robust

intellectual debate as a result. These are not factual allegations of the type a court must construe as

true in considering a motion under Rule 12(b). Instead, they are a series of speculations about future

possible events that all depend on the preceding event occurring. *See id.*; Glass Decl. ¶15; Moore Decl.

---

[22] *See, e.g.,* Glass Decl. ¶15 ("Most of the openly libertarian students in my undergraduate classes are male and overtly hostile to women's rights…I strongly suspect that they are more likely to own guns given their distaste for government and law enforcement."); Moore Decl. ¶11 ("On one occasion, on the first day of class, a student announced that she was enrolled to monitor and report on my 'homosexual agenda.' It resulted in a dampening of classroom discussion and participation, which would have been worse if the possibility that she, or some other student was carrying a loaded gun.").

¶11; Carter Decl. ¶19. Moreover, Plaintiffs do not claim any expertise on firearms, concealed firearms, Texas's process to obtain a handgun license, violence in the classroom generally, violence in the classroom in response to particular topics, campus carry, campus security, or any of the other fields of study that would might convert these beliefs from mere speculation to reasonable fears about chilling of speech under the First Amendment jurisprudence.

Additionally, the testimony Plaintiffs offer does not involve license holders. Individuals exercise free speech in parks, offices, malls, and numerous other locations where concealed carry is allowed. In fact, "concealed carry has been allowed on campus grounds since 1995, including the West Mall and other outdoor areas where protests and heated debates have occurred without a single incident related to concealed carry." Joint Stip. Ex. 3 at 27. Plaintiffs make no allegation that speech is chilled in these locations just because an individual may be carrying a concealed firearm. Instead, "[t]h[e] alleged 'chilling' effect may perhaps be seen as arising from [Plaintiffs'] very perception of the system as inappropriate," and this is insufficient to confer standing. *Laird v. Tatum*, 408 U.S. at 13.

## II.   This case should be dismissed under Rule 12(b)(6), because Plaintiffs have failed to state a claim upon which relief may be granted.

### a.   Standard for Dismissal under Rule 12(b)(6)

Dismissal is proper under Federal Rule of Civil Procedure 12(b)(6) when a complaint fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Though courts accept well-pleaded facts as true and construe them in favor of the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion, the complaint must provide "more than labels and conclusions, and a formulaic recitation of a cause of action's elements." *Funk v. Stryker Corp.*, 673 F. Supp. 2d 522, 525 (S.D. Tex.

2009), *aff'd* 631 F.3d 777 (5th Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. at 555). Instead, the factual allegations must be enough to "raise a right of relief above the speculative level," on the assumption that the factual allegations are true. *Twombly,* 550 U.S. at 555.

> **b. The Complaint fails to state a First Amendment claim, because the UT Defendants' policies do not implicate any First Amendment right.**

> > **i. The right to academic freedom does not capture restrictions that are neither direct nor content-based.**

Plaintiffs assert a First Amendment right to academic freedom as individual professors, which would entitle them to ban carrying in classrooms. Am. Compl. ¶36. But no Court has ever held that a professor has a First Amendment right to challenge a University policy wholly unrelated to teaching. Instead, academic freedom jurisprudence limits professors' challenges to their governmental employer's restrictions on speech that are both (1) direct and (2) content based. *Univ. of Pennsylvania v. E.E.O.C.,* 493 U.S. 182, 197 (1990). Because the UT Defendants' Campus Carry Policy is neither, the Complaint does not state a First Amendment claim. Moreover, to the extent the Plaintiffs wish—with their speech—to attempt to violate the law, such speech is not protected.

Though not mentioned in the First Amendment, the Supreme Court has recognized a level of constitutional protection for academic freedom. *Sweezy v. New Hampshire*, 354 U.S. 234, 262-64 (1957) (Frankfurter, J., concurring) (academic freedom protects against "governmental intervention into the *intellectual* life of a university") (emphasis supplied); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978). The first case to suggest a right to academic freedom, *Sweezy*, considered a state investigation into the content of a lecture by a guest lecturer at the University of New Hampshire, who was accused of being a "subversive person." 354 U.S. at 246-47. The Court concluded that the investigation into the content of the professor's classroom speech and political associations violated his rights to due process and freedom of association, concluding, "[w]e believe that there

unquestionably was an invasion of petitioner's liberties in the areas of academic freedom and political expression—areas in which government should be extremely reticent to tread." *Id.* at 250.

Many subsequent "academic freedom" cases invalidated similar McCarthy-era provisions, designed to root out anti-American sentiment among government employees. For example, in *Keyishian v. Board of Regents of the University of the State of New York*, several public university professors and a faculty member challenged a statute that required termination of public employment for "treasonable or seditious" utterances or acts. 385 U.S. 589, 597 (1967). The statute did not define "treasonable" or "seditious." *Id.* The Court invalidated the statute as unconstitutionally vague in violation of the First Amendment, because "one must guess what conduct or utterance may lose him his position," and in such cases, "one necessarily will 'steer far wider of the unlawful zone'" of speech. 385 U.S. at 604 (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). The New York law imposed a direct regulation on speech (it prohibited utterances), based on its content (treasonable or seditious).

The UT Defendants' policy, on the other hand, simply implements the legislature's mandate that license holders may carry on campus. Texas law further protects license holder anonymity, except in limited law enforcement circumstances not present here. As a result, Plaintiffs' First Amendment right to academic freedom is not implicated by their desire to violate these provisions by either (1) banning concealed carry in UT Austin classrooms, or (2) compelling license holders to self-identify.[23]

### ii. Any incidental impact on Plaintiffs' speech does not violate the First Amendment.

Even if the UT Defendants' policy had some incidental impact on Plaintiffs' speech, that impact does not implicate any interest that the First Amendment protects. The Supreme Court's latest

---

[23] It is also worth noting—as the Working Group did—that other states' campus carry provisions have faced legal challenges. While those cases are distinct from the facts here, none recognized academic freedom as a basis to override a legislative provision for campus carry. Joint Stip. Ex. 3 at 28 n.28 (citing *Univ. of Utah v. Shurtless*, 144 P.3d 1109, 1122-28 (Utah 2006); *Regents of Univ. of Colo. v. Students for Concealed Carry on Campus, LLC*, 271 P.3d 496 (Colo. 2012); *Ore. Firearms Educ. Found. v. Bd. of Higher Educ.*, 264 P.3d 160 (Ore. Ct. App. 2011)).

relevant pronouncement on government employee speech, *Garcetti v. Ceballos*, mentioned the specific context at issue here—employment in public academia—in dicta and dissent. 547 U.S. 410, 425 (2006); *id.* at 438 (Souter, J., dissenting). The *Garcetti* plaintiff was a deputy district attorney who prepared a memorandum attacking the veracity of an affidavit used in a prosecution by his employer, and claimed he suffered adverse employment action as a result. The Court articulated the two-prong test for whether public employee speech receives First Amendment protection. The first prong "requires determining whether the employee spoke as a citizen on a matter of public concern." *Garcetti,* 547 U.S. at 418 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138 (1983)). If not, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* If so, the employer must present "an adequate justification for treating the employee differently from any other member of the general public." *Id.* The Court also noted that, when "employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 419 (citing *Connick*, 461 U.S. at 147).

Applying that test, the *Garcetti* Court held that the plaintiff there did not have a First Amendment right to be free from adverse employment consequences based upon the content of a memorandum he wrote pursuant to his official duties. He was, after all, speaking as an employee, rather than as a citizen. *Id.* at 421. Thus, it was immaterial whether his speech related to a matter of public concern. *Id.* at 423. The Court explained that government "employees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit." *Id.* at 422.

As Plaintiffs have noted, *Garcetti* recognized "some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *Id.* at 425. Be that

20

as it may, to the extent Plaintiffs might *use* speech or other expressive activity as a means to violate the UT Defendants' policy or State law, the First Amendment will not protect that speech—it is plainly "necessary for their employer[] to operate efficiently and effectively," in particular, by following the laws of the State. *Id.* at 419. Indeed, it has always been clear that, "[w]hile a teacher does not surrender constitutionally protected rights of freedom of expression as a condition of public employment, that freedom is not absolute or unlimited." *Kelleher v. Flawn*, 761 F.2d 1079, 1084 (5th Cir. 1985) (citation omitted). For example, "the First Amendment's shield does not extend to speech and conduct amounting to insubordination directed at school officials." *Id.*[24] Thus, the First Amendment does not give the Plaintiffs a right to violate the UT Defendants' policy or Texas law—even if they endeavor to do so via expressive conduct.

Finally, Plaintiffs' claims are based upon assertions that lack the legal foundation to support a right to recovery under the First Amendment. This is because they assume and speculate that (1) hypothetical students will refrain from expressing (2) hypothetical viewpoints because of the (3) hypothetical presence of a legal handgun which might cause a (4) hypothetical violent reaction using that handgun. *See, e.g.*, Glass Decl. ¶15; Moore Decl. ¶11; Carter Decl. ¶19. To the extent their sheer speculation, which is their only purported injury, does not wholly divest Plaintiffs of standing under the First Amendment, *see supra* Part I(c), such attenuated assumptions are insufficient to "raise a right of relief above the speculative level," and this claim should be dismissed. *Twombly*, 550 U.S. at 555.

---

[24] *See also, e.g., Hillis v. Stephen F. Austin Univ.*, 665 F.2d 547, 550-51 (5th Cir. 1982), cert. denied, 457 U.S. 1106 (1982) (expressions of "plain insubordination" and "lack of cooperation" with university employer not protected); *Chitwood v. Feaster*, 468 F.2d 359, 361 (4th Cir. 1972) (college "has a right to expect teacher to follow instructions and to work cooperatively and harmoniously" with superiors); *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir. 1972), cert. denied, 411 U.S. 972 (1973) (First Amendment does not protect speech expressing refusal to comply with university guidelines); *Palmer v. Bd. of Educ. of Chicago*, 603 F.2d 1271, 1272-74 (7th Cir. 1979), cert. denied, 444 U.S. 1026 (1980) (teacher not free to disregard, for First Amendment reasons, curriculum concerning patriotic matters).

**c. The Second Amendment does not entitle the Plaintiffs to ban lawful handguns from their presence, thus, they fail to state a Second Amendment claim.**

Plaintiffs claim to be deprived "of their Second Amendment right to defend themselves and others in their classrooms from handgun violence by compelling them as public employees to passively acquiesce in the presence of loaded weaponry in their place of public employment without the individual possession and use of such weaponry in public being well-regulated." Am. Compl. ¶52. This fails to state a claim upon which relief may be granted under the Second Amendment.

Though the UT Defendants do not opine on the prudence of §411.2013, there is no legal authority under the Second Amendment that would support Plaintiffs' asserted right to exclude individuals lawfully carrying concealed handguns from classrooms at UT Austin. The Supreme Court has recognized that there is "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller,* 554 U.S. 570, 595 (2008) (invalidating DC's prohibition on useable guns in the home) (citation omitted). *See also McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) ("the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*" to the States). Of course, *Heller* did not invalidate "laws forbidding firearms in sensitive places," 554 U.S. at 672, and Texas has some such prohibitions. *See, e.g.,* TEX. PENAL CODE §§46.03; 46.035.

The Texas Legislature has, however, elected to allow individuals licensed by the State to carry a concealed handgun in public, including in the buildings of State funded universities. *See* TEX. GOV'T CODE §411.171 *et seq*; *id.* §411.2031(a)(1). In doing so, the legislature charged President Fenves with establishing "reasonable rules, regulations, or other provisions regarding the carrying of concealed handguns by license holders" in buildings on UT Austin's campus. *Id.* §411.2031(d-1). The statute is clear that the President "may not establish provisions that generally prohibit or have the effect of generally prohibiting license holders from carrying concealed handguns on the campus of the

institution." *Id.* §411.2031(d-1). Thus, to comply with this directive in the safest way possible, the UT Defendants' policy permits license holders to carry in classrooms that do not present special safety considerations. *See supra* n.8 and accompanying text.

There is no legal support for Plaintiffs' claim that the Second Amendment gives them an affirmative right to ban guns from classrooms on UT Austin's campus. Instead, the relevant jurisprudence—including the authorities Plaintiffs have invoked—focuses upon the scope of the right that the Second Amendment secures to individuals wishing to carry guns.[25] Without an affirmative right to exclude guns from UT Austin classrooms, Plaintiffs cannot sue to enforce that right. And without legal authority to support such a right, they have failed to state a claim upon which relief may be granted under the Second Amendment.

The Amended Complaint's addition of information about other states whose licenses Texas affords full faith and credit does not save this claim, because the Supreme Court has made clear that variance in handgun licensing requirements across states does not violate the Second Amendment. *See, e.g., McDonald v. City of Chicago*, 561 U.S. at 785 ("[s]tate and local experimentation with reasonable firearms regulation will continue under the Second Amendment.") Plaintiffs' Second Amendment claim should be dismissed under Rule 12(b)(6).

### d. Plaintiffs have failed to state a claim under the Equal Protection Clause.

The Court should similarly dispose of Plaintiffs' equal protection challenge. The Equal Protection Clause of the Fourteenth Amendment provides that a State cannot "deny to any person within its jurisdiction equal protection of the laws." U.S. CONST. amend. XIV, §1. That is not to say that it is impermissible for laws to differentiate, in some way. *F.S. Royster Guano Co. v. Virginia*, 253

---

[25] *See, e.g., Dist. of Columbia v. Heller,* 554 U.S. at 595; *McDonald v. City of Chicago*, 561 U.S. at 791; *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865, 878 (4th Cir. 2013).

U.S. 412, 415 (1920). And the legislature and State entities acting pursuant to statutory authority[26] enjoy a "latitude of discretion" that is "notably wide" in making these differentiations. *See id.* Plainly put, the Equal Protection Clause permits classifications with the caveat that governmental decision-makers should not treat differently those who are "in all relevant respects alike." *Nodlinger v. Hahn*, 505 U.S. 1, 10 (1992); see *F.S. Royster Guano Co.*, 253 U.S. at 415.

When no fundamental right is jeopardized, equal protection requires that any classification rationally further a legitimate state interest.[27] *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439–441 (1985). It "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *McGowan v. Maryland*, 366 U.S. 420, 425–46 (1961) (Generally, "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality."). This standard is met if there is a plausible policy reason for a classification,[28] the facts on which the classification is apparently based rationally may have been considered to be true by the decision maker,[29] and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational. *See Cleburne*, 473 U.S. at 446. "[A] state action viewed under the rational basis test is presumed to be valid."

---

[26] UT Austin's Campus Carry Policy was established by the President and amended by the Board of Regents by a two-thirds vote under the express statutory authority of §411.2031(d-1) and (d-2). It is therefore entitled to the same level of deference afforded to legislative enactments. *See, e.g. Foley v. Benedict*, 55 S.W.2d 805, 808 (Tex. 1932) ("Since the [B]oard of [R]egents exercises delegated powers, its rules are of the same force as would be a like enactment of the Legislature, and its official interpretation placed upon the rule so enacted becomes a part of the rule.").

[27] When a fundamental right is implicated, strict scrutiny applies and a law is upheld only when it is precisely tailored to further a compelling governmental interest. *Sonnier v. Quarterman*, 476 F.3d 349, 368 (5th Cir. 2007). In fact, even if the Campus Carry Policy did implicate a fundamental right, the Equal Protection Clause is still satisfied where that provision is "narrowly drawn and limited to define and punish specific conduct lying within the domain of state power[.]" *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 573–74 (1942). Here, the working group's studied, precise work to effectuate the directive of §411.2031 satisfies this standard.

[28] *See United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 174, 179 (1980).

[29] *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981).

*Kite v. Marshall*, 661 F.2d 1027, 1030 (5th Cir. 1981). In such situations, "the burden is not upon the state to establish the rationality of its restriction, but is upon the challenger to show that the restriction is wholly arbitrary." *Karr v. Schmidt*, 460 F.2d 609, 617 (5th Cir. 1972) (*en banc*).

As explained above, Plaintiffs cannot carry their burden to show that the UT Defendants' policies implicate any of their constitutional rights. *See supra* Part II (b)-(c). Thus, the inquiry is whether the UT Defendants' distinction between classrooms and areas identified gun exclusion zones[30] rationally furthers a legitimate state interest.

Apart from areas where other law prohibits campus carry, HOP 8-1060 identifies eight additional gun exclusion zones. Joint Stip. Ex. 4. None of these is a typical classroom setting. *See id.* In fact, unless a classroom falls under one of these eight categories or concealed handguns are otherwise prohibited under State or federal law, campus carry is permitted, and individual professors lack discretion to determine otherwise. *See id.* In this way, the policy uniformly treats those professors and areas that are "in all relevant respects alike." *Nodlinger*, 505 U.S. at 10 (1992). Plaintiffs have not and cannot show that HOP 8-1060 will impact them differently from other similarly situated professors at UT Austin.

Moreover, any notion that HOP 8-1060 is wholly arbitrary is dispelled by the Working Group report and Campus Carry Policies and Implementation Strategies that HOP 8-1060 is based upon. These documents detail the thoughtful, deliberative, and consultative process the University undertook, including how each gun exclusion zone was determined. Equal protection allows for such thoughtful classifications. As a constitutionally created political subdivision of the State, UT Austin has legitimate interests in promoting safety on campus and following the requirements of state law.

---

[30] Plaintiffs focus on the policy's differing treatment of different areas as a proxy for the differing effect that it has on professors teaching in these areas—namely, the type of area where one teaches determines whether concealed carry is prohibited. Defendants' discussion on this point uses the treatment of different areas as a proxy for the same.

For each area identified as a gun exclusion zone, the Working Group report expressly set out the specific factors warranting this treatment. The rational relationship between maximizing campus safety (while comporting with state law) and each gun exclusion zone is explicit. Regardless of whether the parties believe the policy determinations are wise, it is not the judicial province to weigh in on "the wisdom, fairness, or logic" of such determinations. *Beach Commc'ns, Inc.*, 508 U.S. at 313. Therefore, Plaintiffs cannot overcome the presumption of the Campus Carry Policy's validity. *See id.*

> **e.**  **Plaintiffs' alternative claim under the First and Second Amendments similarly fails, because Texas law protects the information Plaintiffs wish to force students to disclose.**

Finally, Plaintiffs' claim, in the alternative, that they have a First and Second Amendment right to require license holders who are carrying in class to identify themselves. Am. Compl. ¶56. This claim fails, because Texas law makes the identities of individuals who have concealed handgun licenses confidential, and expressly exempts this information from public disclosure. TEX. GOV'T CODE §411.192 ("Confidentiality of Records"). Only law enforcement agencies may obtain this information. *Id.* §§411.192(a), (c) (criminal justice agencies may ask DPS to confirm whether an individual is a license holder, but the request is then reported to the license holder); 411.205 (license holder to provide her concealed handgun license to a magistrate or peace officer who demands license holder's identification while license holder is carrying a lawful concealed handgun). In fact, Plaintiffs themselves recognize that this information is confidential under Texas law. *See, e.g.,* Am. Compl. ¶37. They offer no authority that either the First or Second Amendment gives the Plaintiffs a right to breach this confidentiality.

Of course, the UT Defendants have identified nothing in the law that prevents one person from asking another whether she has a concealed handgun license, or if she is carrying a concealed handgun. Similarly, the First Amendment generally protects the rights of individuals (including public university professors) to ask others (including students) about things those students have every right

to keep confidential. This includes such potentially charged topics as gender identity, sexual preference, abortion, religion, national origin, and the 2016 presidential election, to name a few. Of course, it is improper (and, depending upon the facts, very often illegal) to treat someone differently depending upon whether and how they choose to answer such questions.

Relevant here, the confidentiality of the license, and whether or not an individual is carrying a concealed handgun pursuant to such license, is the license holder's alone to waive to her university professor (and anyone else not entitled to the information under Texas law). It is also worth noting that the Penal Code imposes specific prohibitions on display of a lawful concealed handgun in a public place. TEX. PENAL CODE §46.035. This prohibition, an individual's fear that someone who disagrees with concealed carry might discriminate against them, or some other concern could give students reason to choose not to share the information. The law protects their right to keep it confidential.

**Conclusion & Prayer**

For the reasons set forth herein, the Plaintiffs' case should be dismissed.

**Dated this 12th day of September, 2016.**

**Respectfully submitted,**

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

/s/Anne Marie Mackin
AMANDA J. COCHRAN-MCCALL
Deputy Chief, General Litigation Division
Texas Bar No. 24069526
amanda.cochran-mccall@texasattorneygeneral.gov
ANNE MARIE MACKIN

Assistant Attorney General
Texas Bar No. 24078898
OFFICE OF THE ATTORNEY GENERAL
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2120
(512) 320-0667 *Facsimile*
anna.mackin@texasattorneygeneral.gov

**ATTORNEYS FOR UT DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 12th day of September, 2016, a true and correct copy of the foregoing was filed electronically with the Court and delivered via the CM/ECF system to:

James George, Jr.
GEORGE, BROTHERS, KINCAID & HORTON LLP
114 W 7th Street, Ste. 1100
Austin, Texas 78701
512-495-1400
512-499-0094 Fax
State Bar No. 07810000
rjgeorge@gbkh.com

Malcolm Greenstein
GREENSTEIN & KOLKER
1006 E. Cesar Chavez Street
Austin, Texas 78702
512-472-6270
512-472-8263 Fax
State Bar No. 08403300
malcolm@greensteinandkolker.com

Renea Hicks
LAW OFFICE OF MAX RENEA HICKS
101 West 6th Street, # 504
Austin, Texas 78701
512-480-8231
512-480-9105
State Bar No. 09580400
rhicks@renea-hicks.com

**ATTORNEYS FOR PLAINTIFFS**

Prerak Shah
Senior Counsel to the Attorney General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
Texas Bar No. 24075053
prerak.shah@texasattorneygeneral.gov

**ATTORNEY FOR DEFENDANT PAXTON**

/s/Anne Marie Mackin
**ATTORNEY FOR UT DEFENDANTS**