IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DR. JENNIFER LYNN GLASS, *et al.*, §<br>   *Plaintiffs*, §<br>              §<br>v.              §<br>                §<br>KEN PAXTON, IN HIS OFFICIAL CAPACITY AS §<br>ATTORNEY GENERAL OF TEXAS, *et al.*, §<br>   *Defendants*. § | NO. 1:16-CV-845 |

**UT DEFENDANTS' REPLY IN SUPPORT
OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

On September 12, 2016, the UT Defendants[1] moved to dismiss Plaintiffs' First Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Clerk's Doc. No. 48) ( "UT MTD"). Plaintiffs filed their response on October 6, 2016 (Clerk's Doc. No. 70) ( "P's Rsp."). The UT Defendants now reply to the points raised in that response.

**I.  Plaintiffs' reliance upon Government Code §§411.203 and 411.173(b) is misplaced.**

Plaintiffs argue that, under Texas Government Code §411.203, President Fenves has the power "to prohibit handgun licensees from carrying their guns in UT-Austin buildings or parts of buildings." P's Rsp. at 2. As Plaintiffs acknowledge, §411.203 specifies that:

> This subchapter does not prevent or otherwise limit the right of a public or private employer to prohibit persons who are licensed under this subchapter from carrying a handgun on the premises of the business. In this section, "premises" has the meaning assigned by Section 46.035(f)(3), Penal Code.

---

[1] The "UT Defendants" are Gregory L. Fenves, President of The University of Texas at Austin ("UT Austin"), and the Board of Regents for The University of Texas System, in their official capacities, including Paul L. Foster, R. Steven Hicks, Jeffery D. Hildebrand, Ernest Aliseda, David J. Beck, Alex M. Cranberg, Wallace L. Hall, Jr., Brenda Pejovich, and Sara Martinez Tucker. Plaintiffs also sued student regent Varun P. Joseph, but have voluntarily dismissed him. Clerk's Doc. No. 55.

On the other hand, Texas Government Code §411.2031(d-1) *specifically* provides that, in establishing gun exclusion zones, a University "president…may not establish provisions that generally prohibit or have the effect of generally prohibiting license holders from carrying concealed handguns on the campus of the institution." Thus, §411.2013(d-1) is a specific statute, because it applies only to university presidents (or other university officials) charged with implementing that provision. By contrast, §411.203 is a general statute, applicable to all "employers," and all "premises."

Contrary to Plaintiffs' assertions, §411.203's permissive grant of authority to "employers" does not render President Fenves's specific mandate under §411.2013(d-1) inoperative. This is so even assuming, for argument's sake, that President Fenves is properly regarded as an "employer" within the meaning of §411.203. Indeed, it is a settled principle of statutory construction that specific provisions override any general provisions which might be read as conflicting therewith. *See, e.g., Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228 (1957) (citations omitted). Thus, even if the President's specific mandate under §411.2031(d-1) could be read as being inconsistent with §411.203, the former governs. President Fenves was not free to disregard the legislature's specific mandate in favor of §411.203's general grant of authority (whose application to President Fenves is uncertain).

The fact that §411.2031(d-1) was enacted in 2015,[2] while §411.203 was enacted in 1997,[3] is further evidence of this. *See, e.g., United States v. Estate of Romani,* 523 U.S. 517, 532 (1998) (later, more specific statute governs). As a result, Plaintiffs are incorrect in their assertion that the President had "the choice," under §411.203 to "ban[] guns in classrooms."

Plaintiffs also invoke Texas Government Code §411.173(b), which provides that "[a] license holder may carry a concealed handgun on or about the license holder's person while the license holder is on the campus of an institution of higher education or private or independent institution of higher

---

[2] Tex. Acts 2015, 84th Leg., ch. 438 (S.B. 11) §1, eff. Aug. 1, 2016.
[3] Tex. Acts 1997, 75th Leg., ch. 165, §10.01(a), eff. Sept. 1, 1997.

2

education in this state." *See* P's Rsp. at 4. Plaintiffs argue that, under this provision, individuals licensed to carry handguns in other states may also do so on campus at UT Austin. Be this as it may, Plaintiffs fail to explain how this is relevant to either the Court's jurisdiction, or whether they have stated a claim upon which relief can be granted—the issues before the Court at this stage. As a result, the Plaintiffs' discussion on this point is of no consequence in deciding the UT Defendants' motion to dismiss.

## II.     The Response does not cure Plaintiffs' failure to state a First Amendment claim.

### a.  Plaintiffs lack standing to bring this pre-enforcement challenge.

Plaintiffs acknowledge that, in order to bring a pre-enforcement challenge under the First Amendment, the applicable "standing test [is] designed to determine whether plaintiffs asserting a 'chill' face sufficient injury based on a reasonable fear that they will be punished by officials if they engage in the speech they claim is protected but threatened." P's Rsp. at 6 n.7 (citing *Meese v. Keene*, 481 U.S. 465, 472 (1987)). The UT Defendants have explained why Plaintiffs fail several of these elements. First, no activity which the First Amendment protects would subject the plaintiffs to punishment by the UT Defendants.[4] UT MTD at 19-21. Second, Plaintiffs' generalized fear of chilled speech does not meet the test of objective reasonableness, and thus, does not confer standing. UT MTD at 15-17. *See also, e.g., Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1001 (9th Cir. 2010) ("self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear.") (citations and quotation marks omitted).

Nothing in Plaintiffs' response remedies these jurisdictional failures. Yet, Plaintiffs assert that, if it requires them to establish standing, the Court would "turn upside down both First Amendment standing law and rules governing construction of pleadings that require courts to construe them favorably to the plaintiffs." P's Rsp. at 7. They do not cite any "standing law" or "rules governing

---

[4] The UT Defendants repeat that professors do not have a First Amendment right to violate university policy or state law, even if they would do so via expressive conduct. UT MTD at 19-21.

3

construction of pleadings" that the Court would violate by requiring them to establish standing. Rather, Plaintiffs acknowledge that, in order to have standing to bring a pre-enforcement First Amendment challenge, they must establish that any alleged future self-censorship is "well-founded." P's Rsp. at 7 n. 6. They do not meet that standard here. Thus, for the reasons in the Motion to Dismiss, and those here, Plaintiffs' First Amendment claim should be dismissed under Rule 12(b)(1).

### b. Plaintiffs present no legal basis to sustain a claim under the First Amendment.

Even if Plaintiffs' allegations of future self-censorship were objectively reasonable, their First Amendment claim still would lack any legal basis, and should therefore be dismissed under Rule 12(b)(6). Despite invoking a litany of cases,[5] Plaintiffs offer no support for a First Amendment academic freedom claim based upon university policy that is neither a direct nor content-based restriction on speech. *Univ. of Pennsylvania v. EEOC*, 493 U.S. 182, 197 (1990); UT MTD at 18-19.

Plaintiffs concede that no content-based policy is at issue here, but insist that the First Amendment "reach[es] actions and rules that, while not direct, have the effect of intimidating and discouraging exercise of protected First Amendment rights." P's Rsp. at 10. They call this an "indirect intimidation principle." *Id.* In support, they cite the civil rights era case of *NAACP v. Alabama, ex. rel. Patterson*, which addressed the First Amendment freedom of association. 357 U.S. 449, 460 (1958).

---

[5] These are *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967); *Sweezy v. New Hampshire*, 354 U.S. 234 (1957); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978); *Omosegbon v. Wells*, 335 F.3d 668 (7th Cir. 2003); *Vega v. Miller*, 273 F.3d 460 (2d Cir. 2001); *Kingsville ISD v. Cooper*, 611 F.2d 1109 (5th Cir. 1980); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Garcetti v. Ceballos*, 547 U.S. 410 (2006); and *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014). To the extent these cases bind the Court, the UT Defendants have already explained why they do not support Plaintiffs' First Amendment claim. *See, e.g.,* UT MTD at 18 (distinguishing *Sweezy v. New Hampshire*); 19 (distinguishing *Keyishian v. Bd. of Regents*); 20 (distinguishing *Garcetti v. Ceballos*); UT Rsp. to MPI at 9 (distinguishing *Grutter v. Bollinger*); 11 (distinguishing *Demers v. Austin*); 12 (distinguishing *Omosegbon v. Wells*). The others are similarly inapposite. *See Regents of the Univ. of Cal. v. Bakke*, 438 U.S. at 312 (contemplating a *university's* institutional academic freedom in setting admissions policies); *Vega v. Miller*, 273 F.3d at 468 (finding defendants had qualified immunity and declining to decide whether any academic freedom right had been violated); *Kingsville ISD v. Cooper*, 611 F.2d at 1113 (contemplating classroom discussion *protected* by the First Amendment).

There, the Supreme Court held that the Alabama Attorney General could not, consistent with the First Amendment's protection of free association, compel the NAACP to disclose its membership list. The Court recognized that NAACP members had a First Amendment right "to pursue their lawful private interests privately and to associate freely with others in doing so." 357 U.S. at 466.[6] The Court took particular note of the NAACP's "uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* at 462.[7]

The Court held that the fact that Alabama had "taken no direct action to restrict the right of petitioner's members to associate freely, does not end [the First Amendment] inquiry." *Id.* at 461 (citations omitted). Rather, it considered that, "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as the forms of governmental action in the cases above were thought likely to produce upon the particular constitutional rights there involved." *Id.* at 462. Thus, the Court concluded that "compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *Id.* at 462-63. Plaintiffs characterize this as the "indirect intimidation principle." P's Rsp. at 10.

---

[6] *See also NAACP*, 357 U.S. at 462 (noting that "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association," and recognizing a "vital relationship between freedom to associate and privacy in one's associations.").

[7] *See also* 357 U.S. at 460 ("[e]ffective advocacy of both public and private points of view, *particularly controversial ones*, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly.") (citations omitted) (emphasis supplied).

*NAACP v. Alabama* does not save Plaintiffs' case, not least because it is sharply distinct on the facts. First, the Plaintiffs here are public employees wishing to violate State law and UT Austin policy, not individuals seeking "to pursue their lawful private interests privately," like the members of the NAACP in 1950's Alabama were. 357 U.S. at 466.[8] Second, unlike the Alabama Attorney General's demand for the NAACP's membership list, the UT Defendants' Campus Carry Policy does not "adversely [affect] the ability of petitioner and its members to pursue [an] effort to foster beliefs which they admittedly have the right to advocate." *Id.* at 462. Rather, it leaves space for them to hold (and espouse) whatever views they wish. Thus, to the extent that the "indirect intimidation principle"[9] that Plaintiffs advance finds support in First Amendment jurisprudence,[10] it is not implicated here. In fact, there is no basis to conclude that any act of the UT Defendants "is likely to affect adversely" the Plaintiffs' ability to engage in any activity the First Amendment protects.

In a final effort to state a First Amendment claim, Plaintiffs insist that *University of Pennsylvania v. EEOC* did not foreclose their right to recover under the reading of the First Amendment right to academic freedom that they advance. P's Rsp. at 14-15. But Plaintiffs do not develop this argument, and instead simply insist that their speculative allegations regarding chilled speech are "neither too attenuated nor too speculative," and that they are entitled to "an opportunity to prove their allegations." P's Rsp. at 15. Rule 12(b)(6), however, requires that a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations

---

[8] The UT Defendants also note that the rights of speech and association—thought both protected by the First Amendment—are distinct. They do not, however, contest that cases arising in the associational context might, in some instances, inform a court's disposition of a case about speech.

[9] Plaintiffs' citation to *Virginia v. Black* is also misplaced. P's Rsp. at 14 n.15 (quoting 538 U.S. 343, 360 (2003)). To repeat the quoted passage is to demonstrate its inapplicability here: "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id.* Plaintiffs have not accused the UT Defendants of such conduct, nor could they seriously do so.

[10] The UT Defendants note that this is not asserted as a basis for recovery in the Amended Complaint.

in the complaint are true (even if doubtful in fact)." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And irrespective of the facts alleged, Plaintiffs do not offer any legal support for the sort of First Amendment right they assert. This is sufficient to support dismissal under rule 12(b)(6). *Id.*[11]

### III.   The Response does not cure Plaintiffs' failure to state a Second Amendment claim.

To hear them tell it, Plaintiffs' "Second Amendment claim is admittedly a fresh take on Second Amendment jurisprudence." P's Rsp. at 22. Tellingly, they attempt to support a right to recovery under the Second Amendment by offering an incomplete citation to *District of Columbia v. Heller,* 554 U.S. 570 (2008). In *Heller,* the Court rejected the District of Columbia's attempt to use the "well-regulated" clause to defend a ban on useable handguns in the home, stating that "the adjective 'well-regulated' implies nothing more than the imposition of proper discipline and training." *Heller*, 554 U.S. at 597 (citations to historical sources omitted). *Accord* P's Rsp. at 20 ("*Heller* even gave more specific meaning to 'well-regulated.' It explained that the phrase means 'imposition of proper discipline and training.'") (quoting *Heller*, 554 U.S. at 597.) And, in any event, Plaintiffs cite no case where any Court has recognized an individual's Second Amendment right to challenge such "discipline and training" requirements—whether in their own state, or in another—as insufficiently restrictive.

Plaintiffs also read *McDonald v. City of Chicago* in an unprecedented way. P's Rsp. at 21 (citing 561 U.S. 742 (2010)). Plaintiffs assert that "*McDonald*'s plurality opinion explained that *Heller*'s basic holding was that self-defense is the Second Amendment's central component." P's Rsp. at 21 (citation omitted). They then assert that "[s]elf-defense has never been held to be confined to the use of deadly weaponry. Self-defense certainly extends to reach the concept of stepping away from or otherwise consciously avoiding danger that could result in bodily harm." *Id.* But they cite no authority for the

---

[11] The UT Defendants submit that resolution of this case does not require a determination as to the scope of any First Amendment academic freedom right individual professors might enjoy, because no such right would extend to a policy unrelated to teaching, which is neither direct nor content-based.

proposition that the Second Amendment confers rights in all contexts which might implicate some amorphous notion of "self-defense." Of course, there can be little dispute that, generally speaking, individuals can and should, if they choose, "step[] away from or otherwise consciously avoid[] danger that could result in bodily harm." P's Rsp. at 21. But Plaintiffs assert this principle as an affirmative "right" under the Second Amendment. No court has ever read the Second Amendment this way.

Of course, as Plaintiffs point out, "'gun use and gun control have been inextricably intertwined,' and…consequently, 'an expectation of sensible gun safety regulation was woven into the tapestry of the [Second Amendment] guarantee.'" P's Rsp. at 21 (quoting *Nat'l Rifle Ass'n v. ATF*, 700 F.3d 185, 200 (5th Cir. 2012), *cert. denied*, 134 S.Ct. 1364 (2014)). But Plaintiffs offer no legal support for their instant effort to override the legislature's determination about the proper relationship between these two ends. The Second Amendment secures the right of the people to keep and bear arms, with the caveat that the practice may be regulated by the government, as it sees fit. It is for this reason that Plaintiffs fail to identify even a single case where a Plaintiff has successfully challenged a state or federal gun law as insufficiently "well-regulated" under the Second Amendment.

Finally, Plaintiffs seek to avoid dismissal by stating that "Defendants have cited no case which rejects Plaintiffs' Second Amendment claim." P's Rsp. at 22. Defendants do not need to do this in order to show that Plaintiffs fail to state a claim under Rule 12(b)(6). More importantly, Plaintiffs have cited no case which supports their novel Second Amendment theory, asserting instead that "[t[he development of facts to establish their claim will further highlight how valid it is." P's Rsp. at 22. But this is baked into the Rule 12(b)(6) standard of accepting all well-pleaded facts as true. And without any *legal* support for their Second Amendment claim, the facts are irrelevant. Consequently, Plaintiffs' Second Amendment claim should be dismissed under Rule 12(b)(6).

**IV.     Plaintiffs' Equal Protection arguments cannot survive this dismissal motion.**

Plaintiffs acknowledge that "the government does not have an obligation to produce evidence to sustain its challenged rules or policies under the rationality standard" applicable here. P's Rsp. at 23 (citing *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993)). Still, the UT Defendants have presented ample evidence, factual support, and explanation for the Campus Carry Policy. *See, e.g.,* UT MTD at 4-10 and authorities cited therein. Contrary to Plaintiffs' assertions, the UT Defendants do not ask the Court to "stop at the proffered explanations" for the Campus Carry Policy. P's Rsp. at 23. Rather, they submit that upon reviewing the studied explanations for each element of the Campus Carry Policy, there can be no dispute that a rational basis supports all elements thereof, and Plaintiffs have failed to state an Equal Protection claim upon which relief can be granted.

Yet Plaintiffs seek to continue this case, arguing that under *St. Joseph Abbey v. Castille*, Equal Protection plaintiffs "ha[ve] to be given the opportunity to 'negate a seemingly plausible basis for the law by adducing evidence of irrationality.'" P's Rsp. at 24 (quoting 712 F.3d 215, 223 (5th Cir. 2013). This is a partial, misleading quotation of the Fifth Circuit's opinion, which actually stated that "although rational basis review places no affirmative evidentiary burden on the government, plaintiffs *may* nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." 712 F.3d at 223 (citing *FCC v. Beach Comms., Inc.,* 508 U.S. 307 (1993)) (emphasis supplied). As the UT Defendants have noted, *FCC v. Beach Communications* made clear that "a legislative choice is *not* subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." 508 U.S. at 315 (citations omitted); UT MTD at 23-25. *See also, e.g., Hines v. Alldredge*, 783 F.3d 197, 203 (5th Cir. 2015) (affirming district court's grant of Texas State Board of Veterinary Medical Examiners' motion to dismiss Equal Protection challenge to "the requirement that veterinary care be provided only after the veterinarian has seen the animal," because this requirement "is, at a minimum, rational: it is reasonable to conclude that the quality of care will be higher, and the risk of

9

misdiagnosis and improper treatment lower, if the veterinarian physically examines the animal in question before treating it.") (cert. denied, 136 S. Ct. 534). Thus, an Equal Protection plaintiff is not entitled to "fact-finding" unless he has pled a credible basis to support his allegations of irrationality.

Here, Plaintiffs have made no such attempt. The documents the parties have, by agreement, put in the record, carefully set out the legitimate state interests that drove the policy determinations. Plaintiffs attempt to confuse the issue by stating that "[t]he basis for permitting concealed handguns in classrooms (or not allowing professors to ban them) is that persons who obtain the license are well-trained in the legal and safe use of guns." P's Rsp. at 24. They then argue, "were that true, there would be no need to ban [handguns] from any location, especially locations where outside factors such as alcohol are absent." *Id.* But Plaintiffs confuse their failed Second Amendment claim with the UT Defendants' rational basis—nowhere do the UT Defendants rely upon the legislature's imposition of training and licensing requirements in setting gun exclusion zones. Rather, as the Campus Carry Working Group's Final Report exhaustively details, each gun exclusion zone is justified by its particular legal, safety, or other relevant considerations. *See, e.g.,* UT MTD at 4-10. Without attempting to show this is irrational, judicial fact finding is inappropriate under the Equal Protection Clause.

### V.     Plaintiffs have no basis to compel license holders to self-identify.

Tellingly, Plaintiffs' Response offers no legal support for their asserted right to compel license holders to disclose their status as license holders, or their decision to carry a legal concealed handgun. Thus, for the reasons set forth in the UT Defendants' Motion to Dismiss, the Court should reject the argument that Plaintiffs are entitled to compel such disclosure. *See also NAACP v. Alabama*, 357 U.S. at 462-63 ("[C]ompelled disclosure of" an individual's decision to exercise constitutional rights "which they admittedly have" is constitutionally problematic where "it may induce" individuals to refrain from exercising those rights, given "the consequences of this exposure.").

**Conclusion & Prayer**

For the reasons set forth in the UT Defendants' Motion to Dismiss, and those here, this case should be dismissed.

**Dated this 20th day of October, 2016.**

    Respectfully submitted,

    JEFFREY C. MATEER
    First Assistant Attorney General

    BRANTLEY STARR
    Deputy First Assistant Attorney General

    JAMES E. DAVIS
    Deputy Attorney General for Civil Litigation

    ANGELA V. COLMENERO
    Chief, General Litigation Division

    /s/Anne Marie Mackin
    AMANDA J. COCHRAN-MCCALL
    Deputy Chief, General Litigation Division
    Texas Bar No. 24069526
    amanda.cochran-mccall@oag.texas.gov
    ANNE MARIE MACKIN
    Assistant Attorney General
    Texas Bar No. 24078898
    OFFICE OF THE ATTORNEY GENERAL
    General Litigation Division
    P.O. Box 12548, Capitol Station
    Austin, TX 78711-2548
    (512) 463-2120
    (512) 320-0667 *Facsimile*
    anna.mackin@oag.texas.gov

    **ATTORNEYS FOR UT DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 20th day of October, 2016, a true and correct copy of the foregoing was filed electronically with the Court and delivered via the CM/ECF system to:

James George, Jr.
GEORGE, BROTHERS, KINCAID & HORTON LLP
114 W 7th Street, Ste. 1100
Austin, Texas 78701
512-495-1400
512-499-0094 Fax
State Bar No. 07810000
rjgeorge@gbkh.com

Malcolm Greenstein
GREENSTEIN & KOLKER
1006 E. Cesar Chavez Street
Austin, Texas 78702
512-472-6270
512-472-8263 Fax
State Bar No. 08403300
malcolm@greensteinandkolker.com

Renea Hicks
LAW OFFICE OF MAX RENEA HICKS
101 West 6th Street, # 504
Austin, Texas 78701
512-480-8231
512-480-9105
State Bar No. 09580400
rhicks@renea-hicks.com

**ATTORNEYS FOR PLAINTIFFS**

Prerak Shah
Senior Counsel to the Attorney General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
Texas Bar No. 24075053
prerak.shah@oag.texas.gov

**ATTORNEY FOR DEFENDANT PAXTON**

/s/Anne Marie Mackin
**ATTORNEY FOR UT DEFENDANTS**